UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
Alexis Allen, Latricia Hickenbottom &
Wyatt Logan,

       Plaintiffs,

       v.

Krucial Staffing, LLC & Brian Michael Cleary V,

       Defendants.
------------------------------------------------------------ X

                    COMPLAINT

                    20-cv-2859

            **JURY TRIAL DEMANDED**

## SUMMARY

1.    Most who respond to the COVID-19 crisis do so in good faith, but not everyone. This is the story of three nurses from Alabama who wanted to assist in the New York hotspot, but only in a manner consistent with protecting the lives of others and themselves, as well as their field of competence. It is also the story of a corporation, Krucial Staffing, profiteering from the crisis, putting nurses' lives at risk, and making promises that its CEO knew he couldn't keep.

2.    Plaintiff Wyatt Logan[1] is a nurse admitted to practice in Alabama, South Carolina, California, and Washington. Logan has two nursing degrees, and is studying for a Nursing Ph.D. Nursing jobs are well payed and Wyatt quit a job paying $2,000 a week at an Alabama hospital because, though he liked the job, he wanted to be closer to the front lines of the COVID crisis.

---

[1] Wyatt proceeds with a fictitious name, if the Court permits. He has no fear of not getting another job at a traditional hospital. But he has a well-founded fear of retaliation for bringing this lawsuit by travel. But he sees himself primarily as a "Travel Nurse" and he supports his family (including his extended family) on the high-paying deployments for which he signs up. There are only a handful of medical staffing agencies, and he fears being blacklisted. If that were to happen, it would not only decrease his income and deprive him of experience, but remove a highly competent nurse from the subgroup known as "Travel Nurses." He brings this lawsuit not only for compensation, but to raise consciousness. The other plaintiffs are not travel nurses, are identified by their true names, but support Wyatt.

3.      He was miffed when his Governor, Kay Ivey, insisted that, "Y'all, Alabama is not New York," when she refused to direct a stay-in-place order for her state. (She later woke up and smelled the corona).

4.      Wyatt is 27, and has terrific knowledge about medical practice. Nursing is his life, and he has responded to several short-term crises in remote locations. But, as explained below – just as a divorce lawyer is almost certainly not competent to file a patent application – not all nurses do the same things throughout medicine.

5.      Wyatt Logan was willing to travel to New York to help – even at the cost of losing his job in Alabama – but not his health, nor to work outside of his scope of competence. Krucial Staffing – a temporary worker's agency specializing in nursing staff – paid well: $10,000 weekly in his case (and $13,000 weekly for Alexis Allen, Latricia Hickenbottom and others who are nurse practitioners). The pay was attractive, but he was also motivated by doing the right thing.

6.      But after arriving in New York, he refused to risk his own life (or his family's). Additionally, when he pointed out the obvious flaws in Krucial's deployment of nurses (not as represented by Krucial or in accordance with accepted standards), the safety they were guaranteed, he was excoriated, fired and then held up as an example to other workers as to the fate they would suffer if they didn't engage in practices contraindicated to the practice of nursing or safety.

7.      Plaintiff Alexis Allen is the mother of two and has a BS in nursing, as well as an MS in Nursing where she obtained her Family Nurse Practitioner's certificate (which means she can prescribe medications and supervise other nurses). She is also studying for her doctorate and has completed all of this training at the relatively young age of 31. She is admitted to practice in Alabama.

8.      When called, she was enrolled in a Ph.D. course that cost $4,000. She decided to withdraw and retake the class in the summer. She wanted to help.

9.      Plaintiff Latricia Hickenlooper has a BS in nursing and took an MS to become a nursing practitioner. She is 32 and has two children of under ten years of age, whom she left with her husband when she went north. She quit her job as a Home Health Hospice Work Practitioner to help with the crisis – and not only for the not only for the short-term big money.

10.     Krucial lured all three plaintiffs to New York via mass-texts. Each received them second-hand, forwarded by friends. But Krucial is profiteering on the COVID pandemic in the most sanctimonious way. It hires medical staff from other states, mostly nurses – and primarily African American nurses (for reasons we can't ascertain.)[2] It hired Nurse Practitioners for unclear reasons as Latricia and Alexis would find out.

11.     After plaintiffs arrived in New York, they learned in a matter of days that Krucial subjects unsuspecting nurses to physical harm by requiring work without proper protective gear ("Personal Protective Equipment" or PPE).

12.     Just as significantly, it required them to work outside of their fields of competence – not just specialty, but *competence.* They all wanted to get closer to the crisis, but not inordinately to risk their or health or their families' health. They realized there was some risk, but were promised proper protection.

13.     They also wanted to keep their licenses, and they had no expectation that the Alabama Nursing Board of Overseers would allow them to work out of their field of competence.

14.     A nurse is not a fungible entity; different nurses have different competencies. For example, a nurse in a primary care doctor's office is known as a Clinical Nurse. They are not qualified to

---

[2] Krucial acted as agent of the New York City Health and Hospitals Corporation (HHC).

work the emergency room. No plaintiff is a clinical nurse. Each have been trained differently, but none of them were competent to work – in unsafe conditions no less – in the ICU, the ER or in critical care settings.

15.     When Krucial said they'd take almost anyone, and asked their specialty, each rightly presumed they would work in their field or at least in a manner that was consistent with competent care.

16.     When each plaintiff arrived to New York, they soon realized that Krucial's operation was a classic bait and switch: There was no appropriate PPE, and the mobile drive-through swabbing that Krucial was promised was almost non-existent. Ms. Hickenbottom knew of one white woman who was allowed to perform this function after an assignment to something which she felt was unsafe. Any plaintiff could have done swabbing, but Krucial added swabbing to the mass text knowing that New York had only two swabbing sites, just to lure as many applicants as possible.

17.     Krucial has profited on this crisis – like any temporary agency, it rakes in close to double what it pays its workers. It should suffer maximum monetary penalties for disrupting the lives of these fine and honorable nurses.

THE PARTIES, JURISDICTION & VENUE

18.     This is a diversity action. Plaintiffs are residents of the State of Alabama. Krucial Staffing is incorporated in Kansas, and Cleary, the CEO of Krucial, is a resident of Overland Park, Kansas. The amount in controversy exceeds $75,000.

19.     Venue is proper in that all of the acts and omissions occurred in this judicial district.

FACTS

20.     Plaintiffs are all experienced nurses. Starting with Wyatt Logan, he is trained in Rehabilitation Nursing, which means assisting people in nursing homes – from Alzheimer's

4

patients, amputees and people in a critical state who cannot care for themselves, short term or permanently. Though he is very knowledgeable, he has never worked with patients in a Medical-Surgical Unit (known as "Med-Surg") or on an ICU. At age 27, however, he has a Nursing degree and is studying for his Nursing Ph.D. He quit a $100,000 job to take this assignment. He adores being a travel nurse, has done it many times, and planned that he could take the gig, and return to Alabama when the COVID crisis makes its way through that state, as it has almost everywhere.

21.     Alexis Allen is a "Family Care" specialist. A nursing "specialty" is a term of art within nursing: "Specialty" and competence are distinct, though one is necessarily competent in her specialty, or perhaps others. But that doesn't mean she is competent to do any nursing assignment.

22.     Indeed, during her debacle, a YouTube video made its circulation among nurses who had not worked in hospital care warning them that to work out of one's area of competence could be grounds for nursing discipline. The video, titled "Be sure your credentials match the components of your practice," is presented by a former nurse practitioner, now a lawyer representing nurses. The video, last visited on April 6, 2020 is available at https://www.youtube.com/watch?v=xItMHni3QfY&feature=youtu.be.

23.     Allen is 31, a single mother with two young kids. She did not quit her job, but she lost the expected income from Krucial, which would have amounted to some six figures in income.

24.     Latricia Hickenbottom is an Adult Gerontology Primary Care Nurse Practitioner. She has worked in that role for nearly two years, and was previously a nurse. She has a BS and a Nursing MA. She is 32, has two young children, and has experience in long term care as an outpatient clinician, as well as in home health care.

25.     A Krucial recruiter told her over the phone that nurses or NP's would be placed based on their specialty or in an area they are comfortable with or knowledgeable in.

26.     Hickenbottom, like Wyatt, also quit her job, which paid approximately $100,000 annually to come and help in the crisis, relying on the representations of Krucial Staffing.

27.     On or about March 18, 2020, a friend forwarded Logan a mass-text sent to nurses asking that they deploy to New York to assist in the COVID crisis. The text, written in all-caps, was from CEO Cleary himself. Hickenbottom and Allen received the same text on or about the same day.

28.     The text stated: (1) all nurses (or NP's) would be provided appropriate Personal Protective Equipment (PPE); (2) nurses would be paid approximately $10,000 a week or $13,000 for Nurse Practitioners; and (3) a stipend of $76 daily for meals; plus (4) housing at the New Yorker Hotel.

29.     However, when recruiting staff, Krucial, did not mention that nurses would have to come with their own cash to front the meal allowance, then be reimbursed by paycheck. This was contrary to at least two of the plaintiffs' experiences in other per diem travel deployments. They brought some cash, but not as much as they would need before the paycheck. Wyatt had to lend money to some nurses who didn't have any cash to eat.

30.     The invitational text also states that nurses would be deployed at (a) a traditional hospital; (b) field hospitals (like the Javits Center); or (c) a mobile-testing site (where people are swabbed while driving through a tent). Logan wanted mobile testing, but as he would find out, there were negligible assignments available, and most of them were taken by permanent HHC workers. Krucial knew this in advance, but hung it out there to attract more workers.

31.     Logan would have accepted working at a field or traditional hospital if deployed within his area of competence (and given proper PPE). Indeed, Krucial asked him his specialty, so he expected to be deployed within his specialty.

32.     The contract was likely to be extended (and was) for another 60 days. Since the crisis in this epicenter will not abate soon, it might be stretched for longer, but time will tell.

33.     Plaintiff Wyatt, who was working in an Alabama Hospital for over $100,000 annually – a number that goes far in Alabama – was eager to respond to the crisis. He didn't mind the increase in pay and he doesn't deny that was a consideration in choosing to take this gig.

34.     The experience and excitement of travel nursing were his main interests. He has been deployed for these temporary assignments many times. He is only 27 and loves being a travelling nurse. He was thrilled to be getting experience in COVID.

35.     But no plaintiffs would have done it for any money had they known they were putting their lives at risk, as well as, potentially, their families. They also wouldn't have come had they known they would have to violated normative standards of nursing care.

36.     Logan asked for a leave of absence from his hospital in Alabama, but it refused this request. Plaintiff knew, however, that his skills were keen. Eventually, Alabama would need him again – whether at the hospital he worked at, or another. At the time he deployed to New York, however, Alabama was in denial. (After he was fired, he tried to get his old job back, but was told, "No thanks.") He hopes to be re-employed when Alabama becomes the new New York. Still, he's now unemployed.

37.     When he responded to Krucial's offer, Logan was asked his specialty as well as the others. Three hours later, he got a return call that he qualified. Krucial asked him which airport he would like to leave from, and if he could leave the next day, Thursday. He could not, so Krucial booked a flight for on or about Friday March 20.

38.     Allen answered, "Family Care" as her specialty – a nursing term of art. "Specialty" and competence are distinct, however. A nursing worker is necessarily competent in her specialty (and perhaps others) but that doesn't mean she is competent to do any nursing or nursing practice assignment.

39.     Hickenbottom told a Krucial Recruiter her specialty, mentioned above, and was told that Krucial would find something within it or something similar that she could handle given her training.

40.     All plaintiffs arrived on the date they agreed to, and checked into "The Ballroom" at the New Yorker Hotel where the operation was set up.

41.     The next day all returned to the Ballroom to fill out paperwork.

42.     On Sunday and Monday there were still no deployments, though plaintiffs were at least getting paid.

43.     On Tuesday, Logan returned to the Ballroom and was informed the "swab testing" assignment had "fallen through." In fact, the possibility that any Krucial staff would do swab testing was close to fiction, although Hickenbottom knew of one white woman who was allowed it.

44.     Logan was not assigned to be deployed anywhere. He consulted a woman who asked him his specialty. He responded, "Rehab." The woman replied, then you're going to Coler, which has a nursing home on site.

45.     He took the bus to Coler, a nursing home and partially shuttered hospital now being retrofitted for the crisis. But the hospital was not a rehab facility; it was a makeshift medical-surgical unit without rehab patients, as he would soon learn.

46.     Logan logically assumed – since he was asked his specialty – that he would work with rehab patients. Not so, as he learned the next day. An HHC nurse named Rosalie, informed him that he would not be working rehab, but in Med-Surg, which is not Logan's specialty, nor within his competence.

47.     At Coler, the entire group of thirty or so nurses expressed immediate surprise. Rosalie then lied – or repeated misinformation – saying, "Your patients will not have COVID; they will be overflow patients from a hospital – people who were being discharged with no place to go. They would be Med-Surg. patients with low acuity." (Low acuity patients are those being discharged from the hospital.)

48.     Rosalie said plaintiff would work with homeless people or people qualified for a skilled nursing facility who couldn't afford it and would be housed at Coler. Plaintiff was ready to accept such a limited assignment. But he sensed something was seriously amiss.

49.     After more orientation and another night at the hotel, then another orientation at Coler – all on basic things like washing hands – plaintiff returned for the third time to Coler. Rosalie and another man said each nurse would get 5-7 patients, who would be Rehab but not COVID patients. Logan was fine with that given the limitation Rosalie had described.

50.     Minute by minute, he learned (a) Rosalie's representations were incorrect; (2) he would have to work without proper PPE; and (c) Krucial had hired too many staff out of their level of competence. The COVID patients who needed skilled, critical care if in hospital.

51.     The nurses then met with someone who said he was a Chief Medical Officer. Although plaintiff thought he would be working in rehab, the CMO said he and the others should start assisting on the floor to get ready for the incoming COVID patients.

52.     Someone at Krucial (at which point and whom plaintiff does not recall) lied to the group, telling the nurses, "You know that new hospital Donald Trump is building – that's where you are going." There is no such facility. The lie, even if mild one, betrays Krucial's institutional thinking: purple fibs, appeasements and outright misrepresentations.

53.     He remembered this lie when he arrived at the makeshift unit.

54.    Despite the promise for proper PPE, this was the first time that Wyatt learned he would not be issued standard-of-care N-95 masks – the heavy white ones, not the thin surgical variety. The CMO modified his statement, noting that N-95's would be issued for those "doing aerosolized procedures such as endotracheal suctioning" or something similar. It is still not within the standard of care to limit PPE to such procedures. Logan was not competent to do that.

55.    When working with a COVID patient, the standard of care to protect against infection is (1) the N-95; (2) a plastic gown; (3) shoe covers; (4) a face shield or goggles; and (5) a head cover. The N-95's are particularly important because they prevent droplets or particulates from entering nasal and oral passages in a way that the surgical masks (or lesser cloth protections) do not.

56.    The shortage of these masks is not Krucial's fault. But Wyatt was promised standard-of-care PPE. When he sent out the blast emails, Cleary knew of the shortage of the 95's. Wyatt, while still in Alabama, knew nothing of any shortage of masks in New York or anywhere. He merely relied on Krucial's misrepresentation. Though he could have dispensed with some of the PPE –the booties or hair bonnet, for example – he expected reasonable PPE, as promised, and that included, at a minimum, the N-95, and perhaps more depending on the assignment.

57.    The CMO, after informing the nurses of the limitations in dispersing N-95 masks said, "If anyone is uncomfortable without the N-95, you are free to leave." This was cold comfort for nurses who traveled from all over the United States on the representation that they would be given proper PPE.

58.    Wyatt discovered that a strict standard of care would undoubtedly be required at Coler. His preference had been to swab noses, but he was willing to work with COVID Rehab patients. Now he had been asked to work in a Med Surg capacity, and not in the limited manner that Rosalie had explained.

59.    Plaintiff was stunned. Krucial provided him malpractice insurance, and informed the nurses that traditional norms of malpractice liability are suspended in times of emergency. But this was a misrepresentation. Although Governor Cuomo recently issued an Executive Order suspending some of the New York Education Law (which includes the rules for medical professionals), it merely says that medical professionals

> shall be immune from civil liability for any injury or death alleged to have been sustained directly as a result of an act or omission by such medical professional in the course of providing medical services in support of the State's response to the COVID-19 outbreak, **unless it is established that such injury or death was caused by the gross negligence of such medical professional**.

Executive Order 202.10 (emphasis added).

60.    But this is only a qualified immunity. "Gross negligence" is a conscious, voluntary disregard of the need to use reasonable care, which is likely to cause foreseeable grave injury or harm to persons, property, or both.

61.    It is plainly gross negligence to perform services one is unqualified to perform. Primary care is very different from acute care or intensive care. They are two separate educational tracks and separate knowledge bases and skills. A reasonable professional would foresee harm.

62.    Cuomo did not issue that order so that floods of unqualified people would come to New York, thus the Executive Order would not absolve plaintiffs of liability, if they had gone ahead with the assignments.

63.    This order also did not protect the nursing workers from being subject to suit – which anyone can file – which would require discovery, repeat appearances in New York with no compensation, and possibly trial. These are all agonizing things for laypersons, even she wins in the end.

64.     Further, Wyatt saw not only that the lack of PPE would expose him to the virus, but that he was not competent to do what Krucial expected. Krucial certainly knew this. The City and Krucial just lured bodies, many with minimal qualifications, to work in a disaster zone.

65.     Indeed, according to the Krucial Staffing Terms and Conditions of Employment, Krucial requires employees to follow

> **OSHA and their client facility's policies and procedures when using any equipment. This includes, but is not limited to, lifts, pumps, gowns, gloves, shoe covers, masks, respirators, and safety glasses. With respirators, familiarize yourself with the make and model of respirator that is used at the client facility and assure you have undergone proper fit testing procedures and education.**

(Bold in original.)

59.     The OSHA regulations, in turn, speak precisely of the basics that plaintiff alleges were required. The regulations, available at https://www.osha.gov/SLTC/covid-19/standards.html indicate:

> There is no specific OSHA standard covering COVID-19. However, some OSHA requirements may apply to preventing occupational exposure to COVID-19. Among the most relevant are:
>
> > OSHA's Personal Protective Equipment (PPE) standards (in general industry, 29 CFR 1910 Subpart I), which require using gloves, eye and face protection, and respiratory protection. . . . [and] The General Duty Clause, Section 5(a)(1) of the Occupational Safety and Health (OSH) Act of 1970, 29 USC 654(a)(1), which requires employers to furnish to each worker "employment and a place of employment, which are free from recognized hazards that are causing or are likely to cause death or serious physical harm."

60.     In addition, as a nurse admitted to practice in Alabama (and other states), plaintiffs could be subject to discipline by a state board for working in a capacity for which they were not trained. Logan, admitted in several states, was wary of having to rely on the assumption that a foreign state board would overlook nursing misconduct, even in a New York emergency. They certainly would not be required to.

61.    A Coler staff person then asked that Wyatt and the other nurses go to the empty floors to convert them for the incoming COVID patients; rooms were then being constructed.

62.    The floors reminded Wyatt of an abandoned army barracks in a post-apocalyptic horror movie.

63.    He learned that any nurse who chose to work at Coler (at any salary) would have vastly increased chances of contracting COVID, and not only because of the inadequate PPE.

64.    As the rooms were constructed and filled, each were fitted with four beds. On his last day, Coler was putting confirmed COVID patients in rooms with patients that (a) had symptoms but were not confirmed; (b) needed hospitalization for other reasons and had no other place to go.

65.    Plaintiff saw no ventilators, but given the airborne nature of the disease, those with COVID will infect their roommates, as well as many staff without proper PPE.

66.    In Wyatt's informed opinion, he could not understand why this was happening to him, and he considered it an invitation to death. Again, Wyatt was willing to do this work, but not at the cost of his life, or the potentiality that he would infect his elderly grandparents.

67.    Also essential to Wyatt is that there would different safety protocols, depending on the whether the patient had COVID. By mixing the COVID-infected with the untested or uninfected, it required protections of proper PPE at all times.

68.    Krucial reneged on its promise to provide proper PPE, as stated not only in the first text blast, but on Krucial's Instagram site, where a short video insists that nursing professionals would have proper PPE.

69.    Sadly, three nurses from Alabama had to upend their lives to travel north to expose this.

70.    As Ed Yong, a resolvase (DNA) expert trained at the University of Cambridge (who is a staff writer for The Atlantic) wrote on or about April 3:

[T]he word airborne has a technical meaning that's not just "carried through the air." When people are infected with respiratory viruses, they emit viral particles whenever they talk, breathe, cough, or sneeze. These particles are encased in globs of mucus, saliva, and water. Bigger globs fall faster than they evaporate, so they splash down nearby—these are traditionally called "droplets." Smaller globs evaporate faster than they fall, leaving dried-out viruses that linger in the air and drift farther afield—these are called "aerosols." When researchers say a virus is "airborne," like measles or chickenpox, they mean that it moves as aerosols. When the World Health Organization asserts that the new coronavirus is "NOT airborne," it's claiming that the virus instead spreads primarily through the close-splashing droplets, which either land directly on people's faces or are carried to their faces by unwashed, contaminated hands.

Such messaging is "really irresponsible," argues Don Milton, an expert in aerosol transmission at the University of Maryland. The scientific community doesn't even agree about whether aerosol transmission matters for the flu, so "to say that after three months we know for sure that this [new] virus is not airborne is … expletive deleted," he says. Milton and other experts who study how viruses move through the air say that the traditional distinction between big, short-range droplets and small, long-range aerosols is based on outdated science. Lydia Bourouiba of MIT, for instance, has shown that exhalations, sneezes, and coughs unleash swirling, fast-moving clouds of both droplets and aerosols, which travel many meters farther than older studies predicted. Both kinds of glob also matter over shorter distances: Someone standing next to a person with COVID-19 is more likely to be splashed by droplets and to inhale aerosols. [Item: WHO has updated this message, and Krucial did not rely on it anyway because it is still acting in an irresponsible manner.]

The question, then, isn't whether the coronavirus is "airborne" in the tediously academic way the word has been defined. As the journalist Roxanne Khamsi puts it, the virus is "definitely borne by air." The better questions are: How far does the virus move? And is it stable and concentrated enough at the end of its journey to harm someone's health?

71.   Plaintiff did not think whether Krucial was following WHO guidance, but he knew at a minimum that he was not provided essential PPE to protect him from patients, whose viral infections hang in the air and might be picked up by anyone entering the room.

72.   Only the N-95 – the white masks of heavy paper – prevent viruses from seeping into one's respiratory system. The N-95 is proper PPE to work in these rooms, along gloves and PPE of, arguably, lesser importance depending on the circumstance.

73.     One cannot sympathize with Krucial that manufacturers were behind in producing these masks quickly. That is not the fault of an unsuspecting, well-educated nurse from Alabama. He was told differently, and relied on Krucial's lies to bring him to New York.

74.     By deploying Plaintiff and other nurses into New York City, Krucial was putting them I harm's way. So too the patients, though, if not all, many of the Coler patients will die, and many nurses, given lack of proper PPE, will contract the virus. Some of those nurses will die.

75.     Plaintiff complained to Olivia from Krucial about these detrimental conditions, and all nurses had already been given an invitation to the door by the CMO. Olivia said, "We're just asking you to be flexible."

76.     Plaintiff responded, "My coming here from Alabama to work on the front lines is my being flexible."

77.     Plaintiff then asked to go up the chain of command to a person named Alex. He made the same complaint to Alex, who repeated the line about "flexibility."

78.     Wyatt went up the chain again and called CEO Cleary. He explained he had gone up the chain of command, and said he believed there was an emergency and he didn't feel comfortable working out of his field of competence. He asked if there were any rehab positions available, or something else he was qualified for.

79.     Brian Cleary shouted over the phone and said, "You mean to tell me you're a freaking rehab nurse and you are not going to work with med surg! That is ridiculous! I have clinical nurses who have never set foot in a hospital and now they are working in ICU!"

80.     The latter clause of Cleary's statement was a damning admission and evidence of gross negligence: ICU patients are the most critical of all. ICU nurses can only learn protocols on the job, with supervision, whereas clinical nurses work in doctors' offices and take temperatures, and

give shots. A clinical nurse would not, for example, know how to treat a gunshot wound. A clinical nurse will not know how to operate a ventilator for an advanced COVID patient. It takes about eight months to learn how to work in ICU.

81.     Plaintiff decided that the non-ventilated were more prone to expose the virus to others. The N-95 masks were required in all rooms. This is not to mention other essential PPE to protect nurses from globules of sputum or dry, airborne virus particles – would be coughed from the lungs of the non-ventilated patients. Of course this would depend on the situation, but Wyatt was only following guidelines – some of which came directly from Krucial's handbook.

82.     After Wyatt complained to Brian Cleary, he was immediately retaliated against and terminated. He had to suffer the indignity of paying for his own flight to get back to Alabama: the neglect of a small part of the deal, but evidence of retaliation.

83.     When he arrived home, he found the email about him, threatening other Krucial employees to "be flexible" or be fired. Yes, Plaintiff had agreed to be "flexible," but not at the cost of his life or his family's.

84.     <u>Alexis Allen</u> relied on her parents to take care of her kids when she travelled north, though, during the day they needed daycare which cost her approximately $1,000.

85.     Fortunately, because Alexis works remotely and usually at home, she did not have to quit her job as the others.

86.     She, too, was asked for her specialty.

87.     After arriving, she did paperwork for several days then on the 25th was deployed to Bellevue Hospital with other nurse practitioners and physicians' assistants.

88.     They all met with a Bellevue employee, a nursing administrator of Caucasian descent, who greeted everyone and invited the personnel to take a seat; there were approximately 25 in her

cohort. They waited at least four hours; during this time, the medical workers did nothing of substance, except to fill out a form regarding their specialties.

89.     Alexis had the distinct feeling that Bellevue did not expect a deployment of any nurse practitioners, and did not know what to do with any of the workers.

90.     Finally at about 1 PM, the same administrator returned and asked each employee to follow Bellevue's process for identification cards. Then, after two hours, they took lunch, then went upstairs to a room with a large table such one would see in a board room. They watched a half-hour video about the computer chart system.

91.     After another two hours, certain Bellevue personnel were in and out of the Board Room and it seemed as if they (the Bellevue people) were trying to ascertain who would be deployed to what assignment.

92.     The Bellevue personnel ultimately said that the only need that they had was for nurses and if anyone was not prepared to work as a nurse, they were not needed. Few agreed to this unexpected direction. Indeed, the PA's legally could not work as nurses. (They were eventually assigned to the Emergency Room.)

93.     Alexis, and most of the Nurse Practitioners would not agree to work out of title because they were repeatedly told not to do so by Krucial. And, indeed, it seemed odd that Nurse Practitioners were needed at all – paid at a higher salary – when there were hundreds of nurses arriving.

94.     Apparently, Krucial had purposely over hired. Alexis saw many people just waiting around the New Yorker Hotel every day. They signed in and went back to their rooms; some never saw the inside of a hospital or other medical facility by the time she left.

95.     Alexis called Donnie, her supervisor from Krucial, about the deployment of NP's as RN's, which was contrary to Krucial rules and directions. Donnie said that the issue would be discussed when everyone returned to the hotel. But by then there had been no change in the requirement not to work out of title.

96.     When Alexis said she would not be a nurse, Bellevue was still trying to determine what the NP's would do. As it happened, Alexis was willing to work as an RN at the guaranteed rate of pay *if she were competent to perform the job,* and could work safely with proper PPE. She could have done without the head covering, the paper booties, but depending on the assignment, she could not say with certainty what else she would have needed or not. Fortunately, she brought her own N-95 because, though Bellevue did have them, she was given one without a proper "Fit Test," insofar as everyone's face is different.

97.     After the failure of the "Fit Test," she and the others returned to the hotel.

98.     The next day, her group of personnel was brought to the Bellevue. Upon arrival, the PA's and NP's were separated. The NP's were then greeted by about three nurses who said they would be training.

99.     Alexis asked, "Are we being trained as NP's or as nurses?" No one from Krucial had yet given her permission to deploy as a nurse.

100.    Meanwhile, one of the trainers said, "We don't employ Nurse Practitioners at Bellevue," leaving Allen in a state of liminality and gross confusion.

101.    The team lead from Krucial and the trainers were in and out of the room and finally the Krucial team leader allowed this option: To work as a med surg nurse or in the ICU as an NP. If you work in the ICU, it was said, all one would have to do is write lab orders and help turn the patients bodies as required.

102.    Although Allen could have turned patient bodies, she noted "I don't think Family NP's can write orders because it is beyond our scope of practice." She mentioned that she didn't want to violate any rules of the Alabama Nursing Board. Writing orders is like prescribing drugs. One has to have the competency to interpret lab results to know what drugs to prescribe, or what further testing might be needed, if there is a procedure that is needed. Alexis could not do this with competence.

103.    Instead of further speaking out loud among the group, she texted the team leader, Aimee – a Krucial employee. After some back and forth they both agreed that the situation was a disaster.

104.    Allen got on well with Aimee, but there no resolution that day. Nurses in med surg floors were assigned over 10 patients. Alexis was simply not going to accept an assignment that she couldn't do.

105.    Aimee later said that Krucial had determined that her only options were med surg or ICU. Alexis was willing and could have done so many things, including work at the Javits Center, which had both swabbing and outpatient care. It was as if she had signed up for a course in Calculus, but placed instead in advanced Russian.

106.    She returned to the hotel and was told to go to her room and someone from Krucial would be in touch. She would have to book her own flight, though she was reimbursed.

107.    Several people at hotel who were NP's never received an assignment. They didn't need NP's, but they were still recruiting them as of at least March 31, as Allen saw from the Krucial Facebook page.

108.    Later, Allen heard from Aimee, who told her that she had resigned too; she agreed Krucial was pressuring NP's to work outside of their scope of practice.

109.   <u>Latricia Hickenbottom</u> also deployed to New York as a nurse practitioner. Before arriving north, there were no specifications as to what type of degree or specialty Krucial wanted. She saw the company was accepting everyone, including newly graduated nurse practitioners.

110.   However, also, as she arrived, if not before, she filled out job paperwork and answered a questionnaire about her experiences and specialties.

111.   She was assigned to Harlem Hospital. The workers there took her group of NP's on a tour, and afterwards doled out assignments.

112.   There was no orientation. Latricia shadowed a physician for about three hours. He mostly sat at a desk during this time, making notes. She also followed him into the ICU and ER.

113.   After that, she was told to perform as a hospitalist – which, traditionally, means a doctor who works in a hospital. A Nurse Practitioner can perform the role of hospitalist to some extent, but not if it is out of her scope of practice.

114.   She had explained to Krucial, specifically Donnie and her Team Leader Calada, that she was not a hospitalist; she had no experience in acute care. Her degree was in primary care and to work in an acute-care setting, whether it be a hospital or an urgent care facility is contrary to the ethics of her profession. Again, she would have been practicing outside the scope of her competence.

115.   The team leaders offered that she work as an RN, or staff nurse. But she saw that many such nurses without critical care training were working with maybe ten patients at a time, all on ventilators.

116.   Latricia is not critical-care trained, let alone trained to work with 10 patients. True, this was an emergency, but she was not competent to do what Krucial insisted and could have risked her license or committed gross negligence.

117.     When she returned to the hotel, she went to the Ballroom where the Krucial staff convened, and she alerted them of the situation.  Staff said they would discuss the situation further.

118.     The same night, a Hospital Chief Resident sent out assignments via text. Latricia was to work the next day in a COVID overflow intensive care unit.

119.     The text included language that employees could not question assignments and must be flexible.

120.     Staff finally told her there were only hospital assignments, and she would have to take one or demobilize.

121.     Latricia chose to return home because Bellevue was clearly unsafe for patients and there was the potential of having a mark on her license (or reputation) for working outside the scope of her practice.

122.     Krucial didn't even try to find her something where she could work with competence, although one Caucasian woman secured a plum assignment at a swabbing site.

123.     But just like Logan and Alexis, Latricia would done anything that was legal, that she was competent to do. There had to be something she could have done. But she was not willing to anything that was illegal, contrary to the standard of care, that could be deemed gross negligence, or that was forbidden by her state Nursing Board.

124.     It wasn't much to ask.

FIRST CAUSE OF ACTION
BREACH OF CONTRACT

125.     Plaintiffs repeats and realleges all previous paragraphs.

126.     Plaintiffs entered into an employment contract which was expected to last for less than one year.

127.     Plaintiffs followed the terms of that contract.

128.    Defendants breached that contract.

129.    As a result of the foregoing, two plaintiffs left jobs paying in the range of $100,000 a year in parts (a) to make much more money than they were; (b) help with the COVID crisis; and (c) enhance their experience.

130.    As a result of the foregoing, plaintiffs have each been damaged individually in amounts in excess of $75,000 and to be determined with more specificity at trial.

SECOND CAUSE OF ACTION<br>QUASI CONTRACT – RELIANCE ON A PROMISE

131.    Plaintiffs repeat and reallege all previous paragraphs.

132.    In the contingency that a classic breach-of-contract claim is insufficient to cover their damages, and is otherwise not duplicative with this claim, plaintiffs relied on the promises offered by Krucial.

133.    Krucial did not live up to its promises, which were the proximate cause of their accepting the assignments and their need to demobilize, in some cases, after having quit their jobs in Alabama.

134.    As a result of the foregoing, plaintiffs have been damaged.

THIRD CAUSE OF ACTION<br>NEW YORK LABOR LAW § 741

135.    Plaintiffs repeat and reallege all previous paragraphs.

136.    Krucial took retaliatory action against one, two or all plaintiffs because they (a) disclosed to a supervisor a policy or practice of the employer that the plaintiff(s), in good faith, believed the assignments constituted improper quality of patient care; or (b) objected or refused to participate in such activity.

137.    Each plaintiff brought the improper quality of patient care to the attention of a supervisor and afforded the employer a reasonable opportunity to correct such activity, policy or practice.

138.    As a result of the foregoing, plaintiff has been damaged, and are entitled to reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION
## BREACH OF CONTRACT IMPLIED-IN-LAW

139.    Plaintiffs repeat and reallege all previous paragraphs.

140.    Plaintiffs were fired – or forced to resign – based on a contract implied in law under the doctrine established in *Wieder v. Skala,* 80 N.Y.2d 628 (1992).

141.    Each plaintiff is required, as a condition of his or her licensure, to follow certain rules and specifications of the state in which they are licensed as nurses or nurse practitioners.

142.    Each plaintiff is subject to discipline if he or she violates any code – at a minimum – of the code of conduct of the State of Alabama.

143.    The Alabama Board of Nursing Administrative Code, Chapter 610-X-8 (Disciplinary Action) states that failure to exercise the applicable standard of care is grounds for discipline, at maximum loss of licensure.

144.    The Codes of all states also impose reciprocal discipline for those who violate similar provisions in other states. Wyatt, with the most certifications, could have been disciplined by approximately four state Nursing Boards had he taken these assignments.

145.    At least one plaintiff mentioned the disciplinary code to officials at Krucial, and the other two pointed out that they were being asked to violate the standard of care.

146.    Although traditional malpractice-liability rules might be relaxed during an emergency, in addition to the chance they could commit gross negligence, Krucial had no authority to allow its recruits to violate their state's licensing board's standards of care.

147.    Plaintiffs were unwilling to violate these standards of care.

148.    Plaintiffs were terminated or required to resign because they refused to violate the standards of care of their home state.

149.    As a result of the foregoing, plaintiffs have been damaged.

FIFTH CAUSE OF ACTION
FRAUD

150.    Plaintiffs repeats and realleges all previous paragraphs.

151.    Defendants made representations as to material facts, including that (a) plaintiffs would work in their field of expertise; (b) that plaintiffs would get proper PPE; (c) that there were jobs available that they could perform even if not precisely within their field of expertise;

152.    Such representations were false.

153.    Defendants intended to deceive plaintiffs. In sending out the mass text, they intended solely to bring in as many bodies as they could, without regard to these workers' area of competence

154.    Plaintiffs believed and justifiably relied upon the statements

155.    They were induced by it to engage in coming to New York for high pay for at least several weeks and – in two cases – leaving their jobs.

156.    As a result of such reliance, plaintiffs sustained pecuniary loss as estimated herein.

157.    There are additional damages beyond which may be compensated by the breach of contract causes of action, including but not limited to (a) the emotional toll the debacle took on each plaintiff, to varying degrees; (b) the loss that they could help in a competent manner; (c) the scurrilous defamation invited upon Wyatt in a mass email to scare other employees.

158.    Additionally, insofar as defendants' actions are in violation of public policy, punitive damages should be assessed.

WHEREFORE, Plaintiffs demands the following relief:

1.         Compensatory Damages in the amount of no less than $500,000;

2.         Punitive Damages;

3.         Attorneys' fees and costs under New York Labor Law § 741;

4.         An injunction preventing Krucial from placing staff showing symptoms of

COVID on airplanes without quarantine or testing;

5.         Such other relief as the Court may deem appropriate.

Dated:     New York, New York
           April 6, 2020


_Greg S. Antollino_
_____
Gregory Antollino, Esq.
275 Seventh Avenue, Seventh Floor
New York, New York 10001
(212) 334-7397
gantollino@gmail.com