UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
Alexis Allen, Latricia Hickenbottom &
Wyatt Logan, Nancy Torres, Jose Pinlac &
Aimee Branch,

      Plaintiffs,

      v.

Krucial Staffing, LLC & Brian Michael Cleary V,

      Defendants.
------------------------------------------------------------ X

          AMENDED COMPLAINT

          20-cv-2859 (JGK)

          **JURY TRIAL DEMANDED**

"Nurses are not just doers. Our work is supported by evidence and guided by theory. We integrate evidence and theory with our knowledge of patients and make important decisions with and for patients and families at the point of care."

Antonia Villarruel, Ph.D., RN, professor, and Margaret Bond Simon Dean of Nursing at the University of Pennsylvania.

SUMMARY

1.    Most who respond to the COVID-19 crisis do so in good faith, but not all. This complaint tells the story of several nurses from Alabama, Illinois and other states who wanted to assist in the New York hotspot – but only in a manner consistent with protecting the lives of others and themselves, and to do so within their field of competence. It is also the story of a corporation, Krucial Staffing, profiteering from the crisis, putting nurses' lives at risk, and making promises that its CEO knew he couldn't keep.

2.    Plaintiff Wyatt Logan[1] is a nurse admitted to practice in Alabama, South Carolina, California, and Washington. Logan has two nursing degrees and is studying for a Nursing Ph.D.

---

[1] Wyatt proceeds with a fictitious name, if the Court permits. He has no fear of not getting another job at a traditional hospital. But he has a well-founded fear of retaliation for bringing this lawsuit by travel. But he sees himself primarily as a "Travel Nurse" and he supports his family (including his extended family) on the high-paying deployments for which he signs up. There are only a handful of medical staffing agencies, and he fears being blacklisted. If that were to happen, it would not only decrease his income and deprive him of experience, but remove a highly competent nurse from the subgroup known as "Travel Nurses." He brings this lawsuit not only for compensation, but to raise consciousness. The other plaintiffs are not travel nurses, are identified by their true names, but support Wyatt.

Nursing jobs are well paid, and Wyatt quit a job paying $2,000 a week at an Alabama hospital because, though he liked his post, he wanted to be closer to the front lines of the COVID crisis.

3.     He was miffed when his Governor, Kay Ivey, who initially insisted that because "Alabama is not New York," there was no reason for her to direct a stay-in-place order. (She later woke up and smelled the corona.)

4.     Wyatt is 27 and has a terrific knowledge of medical practice. Nursing is his life, and he has responded to several short-term crises in remote locations. But, as explained below – just as a divorce lawyer is (almost) undoubtedly not competent to file a patent application – not all nurses do the same things throughout medicine.

5.     Wyatt Logan was willing to travel to New York to help – even at the cost of losing his job in Alabama. But he was unwilling to sacrifice his health, nor work outside of his scope of competence. Krucial Staffing – a temporary worker's agency specializing in nursing staff – paid well: $10,000 weekly in his case (and $13,000 weekly for Alexis Allen, Latricia Hickenbottom, and others who are nurse practitioners). The pay was attractive, but he was also motivated by doing the right thing.

6.     But after arriving in New York, he refused to risk his own life (or his family's). Additionally, when he pointed out the obvious flaws in Krucial's deployment of nurses, he was excoriated, fired, and then held up as an example to other workers as to the fate they would suffer if they didn't engage in contraindicated practices.

7.     Plaintiff Alexis Allen is the mother of two and has a BS in nursing, as well as an MS in Nursing, where she obtained her Family Nurse Practitioner's certificate (which means she can prescribe medications and supervise other nurses). She, too, studies for her doctorate; she has completed all of this training at the age of 31. She is admitted to practice in Alabama.

8.      When she Krucial called her, she had already enrolled in a Ph.D. course that cost $4,000. She decided to withdraw and retake the class in the summer. She wanted to help.

9.      Plaintiff Nancy Torres is an experienced nurse who has worked in several capacities in travel nursing assignments for her income. She resides in Illinois.

10.     Plaintiff Latricia Hickenlooper has a BS in nursing and took an MS to become a nursing practitioner. She is 32 and has two children under ten years of age, whom she left with her husband when she went north. She quit her job as a Home Health Hospice Work Practitioner to help with the crisis – and not only for the big short-term money.

11.     Plaintiff Jose Pinlac is a resident of the state of Florida. He is retired, 69 years of age, and has a family. He is an RN and previously served in the EBOLA and SARS crises. What he saw in those assignments was nothing like he saw in New York. Krucial fired in a day for demanding proper PPE.

12.     Plaintiff Aimee (pronounced *AH-mee*) Branch is a resident of the state of Tennessee. She is a nurse with young children.

13.     Krucial lured four plaintiffs to New York via mass-texts. Each received them second-hand, forwarded by friends. (Pinlac heard from a friend and drove to New York; Torres applied online.) But Krucial is profiteering on the COVID pandemic in a most sanctimonious way. It hires medical staff from other states, mostly nurses. It hired Nurse Practitioners for reasons unclear, as Latricia and Alexis would find out.

14.     After plaintiffs arrived in New York, they learned in a matter of days that Krucial subjects unsuspecting nurses to physical harm by requiring work without proper protective gear ("Personal Protective Equipment" or PPE).

15.     Just as significantly, it required them to work outside of their fields of competence – not only specialty but *expertise*. They all wanted to get closer to the crisis, but not inordinately to risk their or health or their families' health. They realized there was some risk, but Krucial promised proper protection. (It later changed its rules, but only after this lawsuit was filed.)

16.     They also wanted to keep their licenses, and most did not expect that their home states Nursing Boards of Overseers would allow them to work out of their field of competence.

17.     A nurse is not a fungible entity; different nurses have different competencies. For example, a nurse in a primary care doctor's office is known as a Clinical Nurse and is not qualified to work in the emergency room. No plaintiff is a clinical nurse, but each has different training. Only Pinlac was competent to work – if the conditions were sale– in the ICU or the ER.

18.     Krucial took almost anyone, and when prospective employees called, Krucial staffers asked their specialty. Each rightly presumed they would work in their field or at least in a manner that was consistent with competent care.

19.     When Plaintiffs arrived in New York, each realized that Krucial's operation was a classic bait and switch: There was no appropriate PPE, and the mobile drive-through swabbing that Krucial had promised (in the text) was almost non-existent. Ms. Hickenbottom knew of one woman who was allowed to perform this function after an assignment to something which she felt was unsafe. Any plaintiff could have done swabbing, but Krucial lured them with swabbing, knowing that New York had only two swabbing sites.

20.     Plaintiffs were willing to do other jobs within their areas of competence. By forcing them to do otherwise, Krucial has profited from this crisis. Like any temporary agency, it rakes in close to double what it pays its workers, and now that so many people have been laid off, it is bringing

in nurses by the thousands – to New York and, now, Louisiana. It should suffer maximum monetary penalties for disrupting the lives of these excellent and honorable nurses.

THE PARTIES, JURISDICTION & VENUE

21.     This is a diversity action. Plaintiffs are residents of the States of Alabama. Tennessee, Illinois, and Florida. Krucial Staffing is incorporated in Kansas, and Cleary, the CEO of Krucial, is a resident of Overland Park, Kansas. The amount in controversy exceeds $75,000.

22.     Venue is proper in that all of the acts and omissions occurred in this judicial district.

FACTS

23.     Plaintiffs are all experienced nurses. Starting with Wyatt Logan, he trained in Rehabilitation Nursing, which means assisting people in nursing homes – from Alzheimer's patients, amputees, and people in a critical state who cannot care for themselves, short term or permanently. Though he is very knowledgeable, he has never worked with patients in a Medical-Surgical Unit (known as "Med-Surg") or in an ICU. At age 27, however, he has a Nursing degree and is studying for his Nursing Ph.D. He quit a $100,000 job to take this assignment. He adores being a travel nurse, has done it many times, and planned that he could take the gig and return to Alabama when the COVID crisis makes its way through that State, as it has almost everywhere.

24.     Alexis Allen is a "Family Care" specialist. A nursing "specialty" is a term of art within nursing: "Specialty" and competence are distinct, though one is necessarily competent in her specialty or perhaps others. But that doesn't mean she is qualified to do any nursing assignment.

25.     Indeed, during her debacle, a YouTube video made its circulation among nurses who had not worked in hospital care warning them that to work out of one's area of competence could be grounds for nursing discipline. The video, titled "Be sure your credentials match the components of your practice," is presented by a former nurse practitioner, now a lawyer representing nurses.

The   video   last   visited   on   April   7,   2020,   is   available   at https://www.youtube.com/watch?v=xItMHni3QfY&feature=youtu.be.

26.     Allen is 31, a single mother with two young kids. She did not quit her job, but she lost the expected income from Krucial, which would have amounted to some six figures in revenue.

27.     Aimee Branch is also a Family Care Specialist and a Nurse Practitioner. She also has young children and is a font of knowledge about the operations – or lack thereof – at Krucial.

28.     Latricia Hickenbottom is an Adult-Gerontology Primary Care Nurse Practitioner. She has worked in that role for nearly two years and was previously a nurse. Latricia has a BS and a Nursing MA. She is 32, has two young children, and has experience in long term care as an outpatient clinician, as well as in-home health care.

29.     A Krucial recruiter told her over the phone that nurses or NP's would be placed based on their specialty or in areas in which they are comfortable or knowledgeable.

30.     Hickenbottom, like Wyatt, also quit her job, which paid approximately $100,000 annually to come and help in the crisis, relying on the representations of Krucial Staffing.

31.     Nancy Torres is an RN, who was sent home from the deployment in New York because she insisted on working within her field of practice with PPE. She was strongly encouraged to leave because she would not engage in life-threatening procedures. She has experience in psychiatric nursing and correctional settings.

32.     On or about March 18, 2020, a friend forwarded Logan a mass-text sent to nurses asking that they deploy to New York to assist in the COVID crisis. The text, written in all-caps, was from CEO Cleary himself. Hickenbottom and Allen received the same SMS on or about the same day.

33.     The text stated: (1) all nurses (or NP's) would be provided appropriate Personal Protective Equipment (PPE); (2) nurses would earn approximately $10,000 a week or $13,000 for Nurse

Practitioners; and (3) a stipend of $76 daily for meals; plus (4) housing at the New Yorker Hotel. Krucial also promised them to test when they demobilized, as well as quarantine if necessary, but the two for whom this was necessary did not get this pay.

34.     The invitational text also states that nurses would deploy at (a) a traditional hospital, (b) field hospitals (like the Javits Center), or (c) a mobile-testing site (where people drive through a tent are swabbed through their noses). Logan wanted mobile testing, but as he would find out, there were negligible assignments available in that area; most were taken by permanent HHC workers. Krucial knew this in advance but hung it out there to attract more workers.

35.     Logan would have accepted working at a field or traditional hospital if deployed within his area of competence (and given proper PPE). Indeed, Krucial asked him his specialty, so he expected a position within his specialty.

36.     The contract was likely to be extended (and was) for another 60 days. Since the crisis in this epicenter will not abate soon, the City lengthened for another three weeks, but time will tell if this lengthening will happen again. There is also now talk of a $5,000 bonus for any working eight consecutive weeks.

37.     Plaintiff Wyatt, who was working in an Alabama Hospital for over $100,000 annually – a number that goes far in Alabama – was eager to respond to the crisis. He didn't mind the increase in pay, and he doesn't deny that was a consideration in choosing to take this gig.

38.     The experience and excitement of travel nursing were his main interests. He has been deployed for these temporary assignments many times. He is young and loves being a traveling nurse. He was thrilled to be getting experience in COVID.

39.     But no plaintiffs would have done it for any money had they known they were putting their lives at risk, as well as, potentially, their families. They also wouldn't have come had they known they would have to violate normative standards of nursing care.

40.     Logan asked for a leave of absence from his hospital in Alabama, but it refused this request. Plaintiff knew, however, that his skills were keen. Eventually, Alabama would need him again – whether at the hospital he worked at, or another. At the time he left for New York, however, Alabama was in denial. (After he Krucial fired him, he tried to get his old job back, but the hospital told him no.) He hopes to be re-employed when Alabama becomes the new New York. Still, he's now unemployed.

41.     When he responded to Krucial's offer, Krucial asked Logan his specialty as well (and the other plaintiffs were as well). Three hours later, he got a return call that he qualified. Krucial asked him which airport he would like to leave from, and if he could leave the next day, Thursday. He could not, so Krucial booked a flight for on or about Friday, March 20.

42.     Ms. Allen answered, "Family Care," as her specialty – a nursing term of art. "Specialty" and competence are distinct, however. A nursing worker is necessarily competent in her specialty (and perhaps others), but that doesn't mean she is competent to do any nursing or nursing practice assignment.

43.     Hickenbottom told a Krucial Recruiter her specialty, mentioned above, and Krucial told her it would find something within it or something similar that she could handle given her training.

44.     All plaintiffs arrived on the date they agreed to and checked into "The Ballroom" at the New Yorker Hotel where the Krucial operation set up.

45.     The next day all returned to the Ballroom to fill out paperwork.

46.     On Sunday and Monday, there were still no deployments, though plaintiffs were at least getting paid.

47.     On Tuesday, Logan returned to the Ballroom, and someone from Krucial informed him the "swab testing" assignment had "fallen through." The possibility that any Krucial staff would do swab testing was close to fiction, although Hickenbottom knew of one woman who was allowed it.

48.     Krucial initially did not assign Logan to any hospital. He consulted a woman who asked him his specialty. He responded, "Rehab" (nursing lingo). The woman replied, then you're going to Coler, which has a separate nursing home on site.

49.     He took the bus to Coler, which contains a partially shuttered hospital; the City has retrofitted a couple of floors for the crisis. But the hospital was not a rehabilitation facility; it was a makeshift medical-surgical (Med-Surg) unit without rehab patients, as he would soon learn.

50.     Logan logically assumed – since Krucial asked him his specialty – that he would work with rehab patients. Not so, as he learned the next day. An HHC nurse (Rosalie Boumantay) informed him that he would not be working Rehab, but in Med-Surg, which is not Logan's specialty, nor within his competence.

51.     At Coler, the entire group of thirty-some nurses expressed surprise. Rosalie then lied – or repeated misinformation – saying, "Your patients will not have COVID; they will be overflow patients from a hospital – people who discharged with no place to go. They would be Med-Surg. patients with low acuity." (Low acuity patients are those discharged from the hospital on their way home.) But this was either misinformation or Rosalie's style in getting staff to return the next day.

52.     Rosalie said Plaintiff would work with homeless people or people qualified for a skilled nursing facility who couldn't afford the fees so that Coler would house them. Plaintiff was ready to accept such an assignment. But he sensed something was seriously amiss.

53.     After more orientation and another night at the hotel, then another orientation at Coler – all on basic things like washing hands – plaintiff returned for the third time to Coler. Rosalie and another man said each nurse would get 5-7 patients, who would be rehab but not COVID patients. Logan was okay with that given the limitation Rosalie had described.

54.     Minute by minute, he learned (a) Rosalie's representations were incorrect; (2) he would have to work without proper PPE; and (c) Krucial had hired too many staff out of their level of competence. The COVID patients who needed skilled, critical care if in hospital.

55.     The nurses then met with someone who said he was a Chief Medical Officer. Although Plaintiff thought he would be working in rehab, the CMO said he and the others should start assisting on the floor to get ready for the incoming COVID patients.

56.     Someone at Krucial (at which point and whom Plaintiff does not recall) lied to the group, telling the nurses, "You know the new hospital Donald Trump is building? That's where you are going." There is no such facility. The lie, even if mild one, betrays Krucial's institutional thinking: purple fibs, appeasements, and outright misrepresentations.

57.     He remembered this lie when he arrived at the makeshift unit.

58.     Despite the promise for proper PPE, this was the first time that Wyatt learned he would not be issued standard-of-care N95 masks – the heavy white ones, not the thin surgical variety.

59.     The difference between surgical masks and the N95 variety is extreme. The paper one measures in microns – one could easily analogize the surgical mask to as potato bag and the N95 to 1000-thread Egyptian Cotton. While many nurses volunteer to put themselves in harms' way –

only the N95 with a proper fit will keep out bacteria –Krucial promised these volunteers something different.

60.     The CMO modified his statement – too late for those deployed – noting that would issue N95's only for those "doing aerosolized procedures such as endotracheal suctioning." It is still not within the usual standard of care to limit PPE to such procedures. Logan was not competent to do suctioning, and, indeed, one could also say the standard of care is to perform such systems in a negative-pressure room to avoid flying bacterial microbes.

61.     While the City HHC and the CDC have issued modified standards – which will kill nurses – when working with a COVID patient, the standard of care to protect against infection is (1) the N95; (2) a plastic gown; (3) shoe covers; (4) a face shield or goggles; and (5) a headcover. The N95's are particularly important because they prevent droplets or particulates from entering nasal and oral passages in a way that the surgical masks (or lesser cloth protections) do not.

62.     The shortage of these masks is not Krucial's fault. But Wyatt was promised standard-of-care PPE. When he sent out the blast emails, Cleary knew of the scarcity of the 95's. Wyatt, while still in Alabama, knew nothing of the shortage of masks in New York or anywhere. He merely relied on Krucial's misrepresentation. Though he could have dispensed with some of the PPE – the booties or hair bonnet, for example – he expected some. It was promised, especially the N95 or more, depending on the assignment.

63.     The CMO, after he informed the nurses of new limits in dispersing N95 masks, said, "If anyone is uncomfortable without the N95, you are free to leave." This statement was cold comfort for nurses who traveled from all over the United States on the representation that they Krucial would provide proper PPE.

64.     Wyatt discovered that the new patients at Coler would require the traditional minimum standards of care to protect him. His preference had been to swab noses, but he was willing to work with COVID Rehab patients. Now he had been asked to work in a Med Surg capacity and not in the limited manner that Rosalie had explained.

65.     Plaintiff was stunned. Krucial provided him malpractice insurance and informed the nurses that traditional norms of malpractice liability are suspended in times of emergency. But this was a misrepresentation. Although Governor Cuomo has issued an Executive Order suspending *some* rules for medical professionals, the order says just that medical professionals:

> shall be immune from civil liability for any injury or death alleged to have been sustained directly as a result of an act or omission by such medical professional in the course of providing medical services in support of the State's response to the COVID-19 outbreak, **unless it is established that such injury or death was caused by the gross negligence of such medical professional**.

Executive Order 202.10 (emphasis added).

66.     But this is only qualified immunity. "Gross negligence" is a conscious, voluntary disregard of the need to use reasonable care, which is likely to cause foreseeable grave injury or harm to persons, property, or both.

67.     It is gross negligence to perform services one is unqualified to perform. Primary care is different from acute or intensive care. Each requires a different educational track, and each is distinct with varying bases of knowledge and skills. A reasonable professional would foresee harm.

68.     Cuomo did not issue that order so that floods of unqualified people would come to New York. Thus the Executive Order would not absolve plaintiffs of liability if they had gone ahead with the assignments as they would be committing gross negligence.

69.     Krucial also sent a blast email citing the "Model State Emergency Health Powers Act," and the "Uniform Emergency Volunteer Health Practitioners Act" would protect the workers from

liability. The problem is that the MSEHPA is only a draft of model legislation. The Centers for Disease Control wants states to pass this law, but not all have; neither Alabama or Illinois have passed such legislation, and New York has only adopted privacy portions of the Act.

70.    The "Uniform Emergency Volunteer Health Practitioners Act" has not been adopted in Alabama. It has in Illinois but does not protect against gross negligence or recklessness.

71.    Krucial, in this blast, had the nerve to construe these Acts to suggest that a nurse would be reckless *not* to act as a Good Samaritan and at the risk of his life. He, not so craftily, defined "recklessness" as standing by and not engaging in gross negligence, and risking one's life, in a way contraindicated to their health and safety and the standard of care – another intimidation tactic, and there were so very many.

72.    Also, none of this legislation protected workers from being subject to suit – which any patient or decedent may file – which might require discovery, repeat appearances in New York with no compensation, and possibly trial. These are distressing things for laypersons – even she wins in the end.

73.    Further, Wyatt saw not only that the lack of PPE would expose him to the virus, but that he was not competent to do what Krucial expected. Krucial certainly knew this. The City, through Krucial, just lured bodies, many with minimal qualifications, to work in a disaster zone. It is unclear whose fault lies in City's failures to coordinate with Krucial, but for now, plaintiffs assume, under traditional rules of agency, that Krucial is responsible.

74.    Indeed, according to the Krucial Staffing Terms and Conditions of Employment, Krucial requires employees to follow

> **OSHA and their client facility's policies and procedures when using any equipment. This includes, but is not limited to, lifts, pumps, gowns, gloves, shoe covers, masks, respirators, and safety glasses. With respirators, familiarize yourself with the make**

**and model of respirator that is used at the client facility and assure you have undergone proper fit testing procedures and education.**

(Bold in original.)

65.     The OSHA regulations, in turn, speak precisely of the basics that Plaintiff alleges were

required. The rules, available at https://www.osha.gov/SLTC/covid-19/standards.html indicate:

> There is no specific OSHA standard covering COVID-19. However, some OSHA requirements may apply to preventing occupational exposure to COVID-19. Among the most relevant are:
>
>> OSHA's Personal Protective Equipment (PPE) standards (in general industry, 29 CFR 1910 Subpart I), which require using gloves, eye and face protection, and respiratory protection. . . . [and] The General Duty Clause, Section 5(a)(1) of the Occupational Safety and Health (OSH) Act of 1970, 29 USC 654(a)(1), which requires employers to furnish to each worker "employment and a place of employment, which are free from recognized hazards that are causing or are likely to cause death or serious physical harm."

60.     These OSHA protocols, especially the 1970 Act, in turn, require a panoply of PPE for

conditions such as these. Under § 1910.134, "Respiratory Protection," employers must include a

proper "FIT test" – which OSHA characterizes as "mandatory" – to be sure the mask seals the face

so that nothing escapes into a gap between the mask and the face. There is also "mandatory"

checking of a decent seal; and, most importantly – as it might have applied to these unsuspecting

nurses – 'mandatory" information for "Employees Using Respirators When not Required Under

Standard." It reads:

> Respirators are an effective method of protection against designated hazards when properly selected and worn. Respirator use is encouraged, *even when exposures are below the exposure limit.* If . . . you provide your own respirator, you need to take certain precautions to be sure that the respirator itself does not present a hazard.
> You should do the following:
>
>> 1. Read and heed all instructions provided by the manufacturer on use, maintenance, cleaning and care, and warnings regarding the respirators limitations.
>>
>> 2. Choose respirators certified for use to protect against the contaminant of concern. NIOSH, the National Institute for Occupational Safety and Health of the U.S.

Department of Health and Human Services, certifies respirators. A label or statement of certification should appear on the respirator or respirator packaging. It will tell you what the respirator is designed for and how much it will protect you.

3. Do not wear your respirator into atmospheres containing contaminants for which your respirator is not designed to protect against. For example, a respirator designed to filter dust particles will not protect you against gases, vapors, or very small solid particles of fumes or smoke.

4. Keep track of your respirator so that you do not mistakenly use someone else's respirator.

61.     No plaintiff was given this specific information, which is a matter of informed consent. However, the HHC guidelines – before HHC amended them days ago – say much the same thing.

62.     The OSHA regulations also include head, foot, and hand protection, all or most of which were not followed in any setting.

63.     As a nurse admitted to practice in Alabama (and other states), plaintiffs could be subject to discipline by a state board for working in a capacity for which they were untrained. Logan, admitted in several states, was wary of having to rely on the assumption that a foreign state board would overlook nursing misconduct, even in a New York emergency. They certainly would not be required to suspend disciplinary rules.

64.     A Coler staff person then asked that Wyatt and the other nurses go to the empty floors to convert them for the incoming COVID patients; the HHC was constructing new rooms.

65.     The floors reminded Wyatt of an abandoned army barracks in a post-apocalyptic horror movie.

66.     He learned that any nurse who chose to work at Coler (at any salary) would have vastly increased chances of contracting COVID, and not only because of the inadequate PPE.

15

67.    As the rooms were constructed and filled, each contained four beds. On Wyatt's last day, Coler was putting confirmed COVID patients in rooms with patients that (a) had symptoms but were not verified; (b) needed hospitalization for other reasons and had no other place to go.

68.    The Nursing Home, meanwhile, is crying out for help, as it has no PPE and has suffered a breakout of COVID and death.

69.    Plaintiff saw no ventilators, but given the airborne nature of the disease, those with COVID will infect their roommates, as well as many staff without proper PPE.

70.    In Wyatt's informed opinion, he could not understand why this was happening, and he considered it an invitation to death. Again, Wyatt was willing to work to assist in the crisis. But as promised: not at the cost of his life or the potentiality that he would infect his elderly grandparents.

71.    He also wanted to keep his licenses.

72.    Essential to Wyatt is that there would different safety protocols, depending on whether the patient had COVID. By mixing the COVID-infected with the untested or uninfected, it required protections of proper PPE at all times, in every room.

73.    Krucial reneged on its promise to provide proper PPE, as stated not only in the first text blast but on Krucial's Instagram site, where a short video insists that nursing professionals would have appropriate PPE.

74.    Sadly, three nurses from Alabama had to upend their lives to travel north to expose this, (though some journalists had been following the matter).

75.    As Ed Yong, a resolvase (DNA recombination) expert trained at Cambridge, who is a staff writer for The Atlantic, wrote on or about April 3:

> [T]he word airborne has a technical meaning that's not just "carried through the air." When people are infected with respiratory viruses, they emit viral particles whenever they talk, breathe, cough, or sneeze. These particles are encased in globs of mucus, saliva, and water. Bigger globs fall faster than they evaporate, so they splash down nearby—these are

traditionally called "droplets." Smaller globs evaporate faster than they fall, leaving dried-out viruses that linger in the air and drift farther afield—these are called "aerosols." When researchers say a virus is "airborne," like measles or chickenpox, they mean that it moves as aerosols. When the World Health Organization asserts that the new coronavirus is "NOT airborne," it's claiming that the virus instead spreads primarily through the close-splashing droplets, which either land directly on people's faces or are carried to their faces by unwashed, contaminated hands.

Such messaging is "really irresponsible," argues Don Milton, an expert in aerosol transmission at the University of Maryland. The scientific community doesn't even agree about whether aerosol transmission matters for the flu, so "to say that after three months we know for sure that this [new] virus is not airborne is … expletive deleted," he says. Milton and other experts who study how viruses move through the air say that the traditional distinction between big, short-range droplets and small, long-range aerosols is based on outdated science. Lydia Bourouiba of MIT, for instance, has shown that exhalations, sneezes, and coughs unleash swirling, fast-moving clouds of both droplets and aerosols, which travel many meters farther than older studies predicted. Both kinds of glob also matter over shorter distances: Someone standing next to a person with COVID-19 is more likely to be splashed by droplets and to inhale aerosols. [Item: WHO has updated this message, and Krucial did not rely on it anyway because it is still acting irresponsibly.]

The question, then, isn't whether the coronavirus is "airborne" in the tediously academic way the word has been defined. As the journalist Roxanne Khamsi puts it, the virus is "definitely borne by air." The better questions are: How far does the virus move? And is it stable and concentrated enough at the end of its journey to harm someone's health?

76.     Plaintiffs did not consider whether Krucial was following WHO guidance or not; indeed, the medical community has universally criticized WHO guidance on COVID. Still, all knew at a minimum that they needed essential PPE to protect him from patients whose viral infections hang in the air and might be picked up by anyone entering the room.

77.     Only the N95 – the white masks of heavy paper – prevent viruses from seeping into one's respiratory system. The N95 is proper PPE to work in these rooms, along with gloves and PPE of, arguably, lesser importance depending on the situation.

78.     One cannot sympathize with Krucial that manufacturers were behind in producing these masks quickly. That is not the fault of unsuspecting, well-educated nurses from Alabama and the other states. Wyatt was told differently and relied on Krucial's lies to bring him to New York.

79.     By deploying Plaintiff and other nurses into New York City, Krucial was putting them in harm's way. The same is true of the patients, though, if not all, many of the Coler patients will die, and many nurses, given lack of proper PPE, will contract the virus. Some of those nurses will die.

80.     Plaintiff complained to Olivia (from Krucial) about these detrimental conditions. All nurses had already been given an invitation to the door by the CMO. Olivia explained, "We're just asking you to be flexible."

81.     Plaintiff responded, "My coming here from Alabama to work on the front lines is my being flexible."

82.     Plaintiff then asked to go up the chain of command to a person named Alex(andra) Lender. He made the same complaint to Alex, who repeated the line about "flexibility."

83.     Wyatt went up the chain again and called CEO Cleary. Wyatt explained he had gone up the chain of command and said he didn't feel comfortable working out of his field of competence. He asked if there were any rehab positions available, or something else for which he was qualified.

84.     Brian Cleary shouted over the phone and responded, "You mean to tell me you're a freaking rehab nurse, and you are not going to work with med surg! That is ridiculous! I have clinical nurses who have never set foot in a hospital, and now they are working in ICU!"

85.     The latter sentence of the above-stated statement was a damning admission and evidence of gross negligence: ICU patients are the most critical of all. ICU nurses can only learn protocols on the job, with supervision, whereas clinical nurses work in doctors' offices and take temperatures, and give shots. A clinical nurse would not, for example, know how to treat a gunshot wound. A clinical nurse will not know how to operate a ventilator for an advanced COVID patient. It takes about eight months to learn how to work in ICU.

86.     Plaintiff decided that the non-ventilated were more prone to expose the virus to others. All of these rooms required the N95 masks. This need does not mention other traditional PPE to protect nurses from globules of sputum or dry, airborne virus particles – which come from the sputum laden coughs of the non-ventilated patients. Of course, this would depend on the situation, but Wyatt was only following guidelines – some of which came directly from Krucial's handbook and HHC's training.

87.     After Wyatt complained to Brian Cleary, he was immediately retaliated against and terminated. He had to pay for his flight to Alabama. The neglect of a small part of the deal was also evidence of retaliation.

88.     When he arrived home, he found a mass-text about him, threatening other Krucial employees to "be flexible" or be fired. Yes, Plaintiff had agreed to be "flexible," but not at the cost of his life, his family's, or any license.

89.     Alexis Allen relied on her parents to take care of her kids as she traveled north; during the day, they needed daycare, which cost her approximately $1,000.

90.     Fortunately, because Alexis works remotely and usually at home, she did not have to quit her job as the others.

91.     She, too, was asked for her specialty.

92.     After arriving, she completed the paperwork for several days. On the 25th, Krucial sent her to Bellevue Hospital with other nurse practitioners and physicians' assistants.

93.     They all met with a Bellevue employee, a nursing administrator of Caucasian descent, who greeted everyone and invited the personnel to sit. There were approximately 25 in her cohort, and they did as instructed, but waited at least four hours. During this time, these supposed "Krucial" medical workers did nothing of substance, except to fill out a form regarding their specialties.

94.     Alexis had the distinct feeling that Bellevue did not expect deployment of any nurse practitioners, and the hospital administration did not know what to do with any of them, even if they were needed elsewhere in HHC.

95.     Finally, at about 1 PM, the same administrator returned and asked each employee to follow Bellevue's process for identification cards.

96.     Then, after two hours, all took lunch, then went upstairs to a Board Room with a long table. They watched a half-hour video about the computer chart system.

97.     After another two hours, certain Bellevue personnel were in and out of the Board Room, and it seemed as if they (the Bellevue personnel) were trying to ascertain whom they would send the Krucial employees to what assignment.

98.     The Bellevue personnel ultimately said that the only need that they had was for nurses; if anyone would not work as a nurse, they were unneeded. Few agreed to this unexpected direction. Indeed, the PA's legally could not work as nurses. (Bellevue eventually assigned the PA's to the Emergency Room.)

99.     Alexis and most of the Nurse Practitioners would not agree to work out of title <u>because they were repeatedly told not to do so by Krucial</u>. And, indeed, it seemed odd that Nurse Practitioners were needed at all – paid at a higher salary – when there were hundreds of nurses arriving.

100.     Krucial had purposely over-hired; it hires still. Alexis saw people daily just waiting around the New Yorker Hotel. They signed in and went back to their rooms; some never saw the inside of a hospital or other medical facility by the time she left.

101.     Alexis called Donnie, her supervisor from Krucial, about the deployment of NPs as RN's, which was contrary to Krucial rules and directions. Donnie said that he would discuss the issue

when everyone returned to the hotel. But as she was at Bellevue, there was no change in the requirement not to work out of title.

102.   When Alexis said she would not be a nurse, Bellevue still tried to ascertain what the NP's could do. As it happened, Alexis was willing to work as an RN at the guaranteed rate of pay *if she were competent to perform the job* and could function safely with proper PPE. Alexis could have done without the head covering, the paper booties, but depending on the assignment, Alexis could not say with certainty what else she would have needed or not. Fortunately, she brought her N95 because, though Bellevue did have them. A worker simply gave her one on an estimate and without a proper "Fit Test" – a crucial part of being safe from infection, as everyone's face is different.

103.   After the failure of the "Fit Test" – the person operating the machine did not know how to work it and was just handing out "guestimates" based on face size – she and the others returned to the hotel.[2]

104.   The next day, her group of personnel arrived at Bellevue. The PA's and NP's separated into different groups. Three nurses greeted the NPs with whom they would train.

105.   Alexis asked, "Are we being trained as NP's or as nurses?" No one from Krucial had yet given her permission to deploy as a nurse.

106.   Meanwhile, one of the trainers said, "We don't employ Nurse Practitioners at Bellevue." This statement left Allen in a state of liminality and confusion.

107.   The Krucial team leader and the Bellevue trainers were in and out of the room. Finally, the Krucial person allowed this option: To work as a med-surg nurse or in the ICU as an NP. If you

---

[2] The fit test also requires a smell test to determine whether particles can enter the seal. Whether one vaguely fits in a mask means nothing if airborne particles can seep in

work in the ICU, Allen learned, all one would have to do is write lab orders and help turn the patients' bodies as required.

108.     Although Allen could have turned patient bodies, she noted: "I don't think Family NP's can write orders because it is beyond our scope of practice." She mentioned that she didn't want to violate any rules of the Alabama Nursing Board.

109.     Writing lab orders is like prescribing drugs. One has to have the competence to interpret lab results to know what medications to prescribe, or what further testing might be needed, or if there is a procedure that is required. Alexis could not do this with competence.

110.     Instead of further speaking among the group, she texted the team leader, Aimee Branch, also a plaintiff herein. After some back and forth, they both agreed that the situation was a disaster.

111.     Allen got on well with Aimee, but there no resolution that day. Nurses in Med Surg floors were assigned over ten patients. Alexis was not going to accept an assignment that she couldn't perform with competence.

112.     Aimee later said that Krucial had determined that her only options were Med Surg or ICU. Alexis was willing and could have done so many things, including work at the Javits Center, which had both swabbing and outpatient care. But Krucial refused: it was as if she had signed up for a course in Calculus, but placed instead in advanced Russian.

113.     She returned to the hotel. Someone in the Ballroom told to go to her room, and someone from Krucial would be in touch. She would have to book her flight (she, unlike others, was reimbursed).

114.     Several people at the hotel who were NP's never received an assignment. They didn't need NP's, but they were still recruiting them as of at least March 31, as Allen saw from the Krucial Facebook page.

115.    Later, Allen heard from Aimee that she had been fired, as explained below. She agreed Krucial was pressuring NPs to work outside of their scope of practice.

116.    Aimee Branch's situation was much like Alexis's, and it won't be repeated here. However, things in her case are of particular note.

117.    First, in addition to complaining about the lack of proper patient care (and care for the nurses), she verified with her Tennessee Board of Nursing that working outside of her scope of practice would be considered gross negligence.

118.    This report contradicted Krucial's suggestions to the contrary. Aimee was labeled a troublemaker for contradiction Krucial's false representations.

119.    The next day, at Bellevue, a nurse made a call to someone at HHC (or perhaps Krucial). The conversation was within earshot of all. The Bellevue nurse said, "What are we supposed to do with all of these fucking Nurse Practitioners?"

120.    Someone whom Aimee knew as a CMO told the nurse to apologize.

121.    The nurse did apologize, but then immediately called operations at Krucial, and complained about Aimee

122.    When Aimee returned to the Ballroom, she was summarily fired on the pretext of whatever the nurse from Bellevue had said. Krucial did not even ask Aimee for her side of the story. Indeed, Krucial had already labeled her a troublemaker for demanding a proper deployment.

123.    After the lawsuit, Alex Tender called Aimee, but Aimee did not answer.

124.    Nancy Torres is an RN, whose recent experience has been in psychiatric nursing, and a corrections environment. She has worked in Med-Surg, Intermediate Monitored Care, and Rehab, though not recently. She told Krucial about her psychiatric and corrections experience.

125.    She applied for the deployment, and Krucial accepted her at the nurse's rate. Like the others, she was promised PPE in the email confirming her hiring, which indicated, in part, that "any staff that are [sic] directly working with the general public in close proximity will be provided PPE." PPE was not defined, and there was no indication that the minimum standard of care had been reduced, or that nurses should not expect the N95.

126.    Again, the Krucial handbook incorporates OSHA regulations, which require the PPE. Upon information and belief, Krucial sent her this handbook.

127.    Nancy arrived on March 22. On the first day, filled in paperwork, but did not work the next day as Krucial told her she had not been assigned to a hospital. Though ready at 5 AM, her name was not on a list. She went to her room after a staffer named Michael told her: "Go to your room!"

128.    Krucial employee Alex Tender said, "Since you refused to go to work, we're not going to pay you." As it happens, Krucial did pay her, and Nancy did not refuse to work, but Alex's comments suggested to Nancy that something was amiss. She was correct.

129.    On March 24, Krucial bussed her and others to Coler. She had missed the orientation from the previous day, so she was given a crash course for ten minutes on how to suction a patient needing tracheostomy care. Nancy had done that procedure a few times, though not in a while. The patient has an opening in her neck; a tube inserted into the throat sucks mucous out of the lungs. It requires the room to be very clean. The nurse needs proper protection. Otherwise, a nurse could introduce bacteria into the patient, and vice versa.

130.    The standard of care is to do endotracheal suctioning in a "negative pressure room" where bacteria do not travel, as the room environment prevents it.

131.    Although Nancy brought her N95 mask, she could not do this procedure and protect herself performing intubations. She had had only five-minutes of training for something she hadn't done in years. There was limited PPE.

132.    She, with others, did some "Epic Training" on charting, with the examples on a screen far and blurry as they sat in the classroom. One would have to have hands-on experience to do this charting; Coler provided none.

133.    The staff at Coler chose her as part of a group of nurses to set up a new hospital with supply carts, supplies, computers, linens, and stock – whatever needed. The nurses also put linens on the new beds in the new rooms. Nancy did this without complaint.

134.    On or about the same day, there were modules of computer training on the standard of care and isolation precautions. Nancy took several screenshots indicating the N95 was the standard of care at Coler; HHC guidelines stated explicitly that "use [of the] N95 respirator mask if there is possible exposure to aerosol-generating procedures [to] ensure meticulous environmental disinfection."

135.    But the staff at Coler said no one would be getting an N95, except for those who did intubations. The HHC's own rules required the N95 if there is "possible exposure," not just those doing intubations. The screenshot showed the proper standard of care.

136.    After she finished such training (such as there was), there was talk of the next day. Rosalie, as she had told Wyatt, said there would be no COVID patients arriving then, only those in post-ambulatory status. Rosalie told Nancy and the others that these were patients who were ready for discharge but had nowhere to go. She referred to them as "walkie talkie" patients.

137.    Rosalie promised to look into getting N95's for everyone, but, bless her heart, this was a fib to get the nurses to return. No one would get the N95's and those who brought their own would have to reuse them – which OSHA and HHC guidelines say is a contraindicated practice.[3]

138.    All Krucial temp. nurses raised concerns about incoming patients not having been tested for COVID could be infected, causing everyone worries without the PPE.  Rosalie stated she would have an answer by morning.

139.    The next day Nancy and the Coler cohort met the same CMO as had Wyatt. (Upon information and belief, but both of them were in the same room at the same time.)

140.    The CMO said the CDC is recommending surgical masks, not the N95. This CDC modification might have been correct at the time; the CDC is a federal agency with less independence than OSHA, whose regulations differ, as do Krucial Staffing Guidelines (which incorporate OSHA guidelines). So do HHC guidelines, indicating that a medical worker should

> **NOT** reuse an N95 respirator during or after aerosol-generating procedures such as bronchoscopy, intubation, or open endotracheal suctioning UNLESS a surgical mask was on top of the N95 to protect from aerosolized particles. [The HHC guidelines] indicate that **N95 Respirators ARE needed:** when caring for a patient on Airborne Precautions or Airborne + Contact + Eye Protection Precautions

137.    After meeting with the CMO, some Krucial Nurse Practitioners walked throughout the facility with N95's before the patient arrivals. Nancy asked Alex, an HHC employee, "If N95's are not necessary, why" is there a disparity in the use of between nurses and nurse practitioners?

138.    Alex said, laughingly, "Because they are going to be assessing patients." This response was non-sensical, as nurses would assess patients too, and a lie. Alex knew it.

---

[3] Upon information and belief, HHC lowered its standard of care shortly after Nancy trained for it.

139.    The nurses assessed patients as well, just at lesser pay. Why should they get lesser PPE? Someone decided that more secondary training resulted in more significant health risks, perhaps death

140.    Nancy returned that evening to the ballroom with three other employees and all voiced concerns.

141.    The Ballroom staff reiterated that the CMO said they would be doing intubations, but not getting N95's, just surgical masks.

142.    The nurses collectively expressed that they came to New York to do a job, and Krucial promised proper PPE, not just surgical masks.

143.    At first, the Krucial Staff agreed.

144.    A female Krucial staff member (unknown name) said that Brian – a Krucial supervisor – had said: "do not take patients without proper PPE."

145.    She then said the nurses were covered by insurance without proper PPE. This statement she attributed to Krucial staff member Brian, whom Rosalie spoke to telephonically earlier in the day. Brian tried to help nurses working out of expertise, but he was soon shut down by his higher-ups, among them Jennifer Pino and most certainly Brian Cleary.

146.    Nancy pulled a Krucial supervisor to the side and said, "I have concerns because I am a psych nurse." There were others as well. Krucial promised to position her at a psychiatric facility, or in a psychiatric capacity. She said she did "not feel comfortable suctioning when these patients are high acuity, bed-bound, and not in negative pressure rooms."

147.    Paul said, "I get it. Send me an email, and I'll talk to the facility that you should work on another assignment." He added, "I will try to get you reassigned, but, at this time, there is nowhere

for you to go.  . . . Let Rosalie know that you are willing to work in another assignment where you can help out. I'll try to find something else for you."

148.    The next day, Nancy and others returned to Coler to take temperatures as directed by Rosalie.

149.    Nancy asked again for orientation, and Rosalie said she would provide it the next day.

150.    Twenty-four hours later, Nancy waited in a large, open area for orientation when Rosalie came in and asked, "What are you doing?  Get in there and take care of those patients."

151.    Nancy explained what the two had discussed the day before. She reminded Rosalie that Paul was working on a new assignment for her.

152.    Rosalie showed frustrated and stated she would have to talk to Krucial about the psych nurses that she didn't need, that were not appropriate for Coler, and should be assigned elsewhere. She stated, "In the meantime, go downstairs again and take temperatures."

153.    Nancy responded, "What about orientation?"

154.    Rosalie replied, "I don't need psych nurses." Her voice reflected frustration, and she added, "I can't understand why they are sending psych nurses." But, indeed, this made sense – why orient nurses to a facility where they could not work.

155.    Nancy and others continued to take temperatures.

156.    Then came Stephanie: a loud, aggressive woman working for Krucial. She said, "I'm the lead!" She stormed off, saying, "You two are going home. I called for transportation to the hotel."

157.    When the car arrived, Stephanie barked at them and demanded they all get on the phone with one Jennifer Pino – a chief enforcement officer of sorts who works for Krucial, though Nancy didn't know her at the time.

158.    Nancy declined to speak and asked Stephanie to "Speak to Rosalie." Rosalie was willing and shooed Stephanie upstairs.

159.    Throughout the day, Nancy saw many patients transferred from area hospitals, all of whom were of high acuity.  She also observed some to have tracheotomies, life-vests.[4] There was talk of one patient having a feeding (or "PEG") tube. Patients were moaning and crying out while on the stretchers.

160.    Meanwhile, in addition to Nancy's employable skills, she noted that there "were people dying every day that there was no more room to store bodies from Elmhurst. Is there no psychiatric need in these circumstances?"

161.    Stephanie then came downstairs to demand names. She said, "I'm going to file a complaint with Krucial because you and another a nurse are refusing assignments."  Nancy told Stephanie not to worry: that was between the facility and the nurses or the nurses and Krucial. Stephanie continued to show aggression in front of police officers, EMT's, staff, and patients. She then stormed off.

162.    Rosalie again asked Jennifer to listen to Nancy's side of the story before they sent her home. Jennifer refused. Rosalie was overwhelmed by the untrained nurses – for this facility – and wanted to find them something they could do. Jennifer refused to talk to her.

163.    Nancy and other nurses got back to the hotel and wanted to speak to Paul. Jennifer Pino (whom Nancy had not yet met) was in the Ballroom. She wanted to discuss what happened at Coler and mentioned that Paul had promised her a psych assignment (or something she was competent to do.)

---

[4] A Life Vest is a personal defibrillator worn by patients at risk for sudden cardiac arrest. It monitors the patient's heart; if the patient goes into a life-threatening arrhythmia, it delivers a shock treatment to restore the patient's heart to normal rhythm.

164.    "Paul does not handle that," Stephanie said. "We need people who are willing to get in there!" Jennifer said that because she refused to perform patient care, she should, therefore, "demobilize" and go home.  That's what we need right now.  I highly encourage you to go home."

165.    Nancy said, "I am trying to protect my license."

166.    Pino responded you need "to get in there and do what was required! Your license is protected by a waiver." [That was a pure lie.] "If you are assigned a ventilated patient, get in there and do what you need to do. This is a pandemic, and we're in disaster mode. Even if you've never had a ventilated patient, you need to be willing to get in there and get hands-on! They're probably going to die anyway!"

167.    Jennifer added, "Your license is protected, and if you're not willing to work with the patients at Coler that you should leave."

168.    Nancy asked, "Are you telling me to go or recommending it?"

169.    Jennifer didn't want Nancy around but was too afraid to fire her. She said, "I highly recommend you leave."

170.    Nancy stated, "I will leave if you want, but you should realize that I came here to work and wanted the same opportunity as promised," within her specialty and with PPE. She added, "I have to find somewhere to go because my mom is quarantined in my home after completing chemotherapy." She walked out of the Ballroom, and Jennifer yelled out for her to sign the demobilization papers. Nancy walked away.

171.    Nancy tried to resolve the problem through Krucial Human Resources the next morning. One woman named Taylor said, "Don't go yet! Don't leave yet!"

172.    That evening one Anne Nichole from HR called and reiterated that they wanted people to be comfortable, and absolutely, they could find a place for Nancy.

173.     Nichole advised Nancy to speak to someone in The Ballroom.  Nancy went down (again) with a friend, but everyone was busy, and no one acknowledged her, so she left.

174.     She went to her room to call Nicole again. Her demeanor had suddenly changed. She stated that Nancy never told her that Rosalie wanted people to provide patient care and or that psych nurses were not needed.

175.     The statement was objectively true, but a non sequitur; Nancy had explained to Rosalie that she awaited a different assignment for which she was qualified.

176.     Then Nicole added that she should be ready to jump in and do anything asked of her, including suctioning under unsafe conditions. Meanwhile, Rosalie did not need her.

177.     Nicole stated that Jennifer had told her she (Nancy) swore three times during a conversation when she complained about Stephanie's behavior at work.

178.     Nancy questioned why Jennifer would say that. Jennifer had not been at Coler, and it never happened.

179.     Three times? It seemed an over-plotted lie. Nancy said that as a mother of several kids, that was not within her repertoire of behaviors. "I'm not a child, and I wasn't there to argue with her.

180.     She added she was expressing concerns about safety "because this is what's going on at the facility. People come here to risk their lives; they come here to do a job because nursing is a calling. I thought I could help in some capacity, even if I am a psych nurse. People are dying alone."

181.     Nicole continued the line that Nancy should be willing to *any* work required as of her – a safe or not – or she should consider going home. Nancy responded, "At this point, I'm not going to argue anymore. I don't want to work for a company that won't provide basic safety equipment."

182.    She added that there were places that Krucial (or HHC) where her skills could be of use. She noted, "there is a nurse at Jacobi Hospital, in addition to Paul, trying to pull me to another facility." Nichole did not want to hear it.

183.    She added, "There were also labor and delivery nurses I could have worked with." Nancy was also willing to work at the Javits Center.

184.    Ultimately, Ann Nichole said she didn't want to find a place where Nancy was comfortable, nor help in any capacity. Nancy then stopped making points and said, "I'll be I'll be gone tomorrow."

185.    The next day, her friend from Jacobi texted her and reported that a nursing supervisor by the name of Shameka still wanted her services.

186.    Nancy said she'd wait a bit, but she had rented a car to drive home. She would not get on an airplane because she had a scratchy throat and presumed she might have COVID.

187.    After thirty minutes, no one called. Nancy packed her car, letting her friend at Jacobi know that she had to leave.

188.    She drove back to Illinois, which took 13 hours at a constant rate.

189.    Nancy thought her scratchy throat was just from the mask because she wasn't drinking water, and did not want to remove it from her face.

190.    But then she started feeling respiratory constriction. Nancy felt as if she was able to take a deep breath, and she got sicker, so she went to a local ER on her doctor's orders.

191.    The PA at the ER advised that she probably had COVID, but could not test her, even if she paid out of pocket. Since tests were scarce, that would be her employer's responsibility. The PA gave her a note indicating she probably had COVID, though she did not get a test.

192.    She called Krucial, which refused to find a place for her to have a test. Its refusal was no surprise because this is how Krucial works. It was likely retaliation after Nancy concluded was constructively discharged for complaining about patient safety. She left rather than risk her life. Hopefully, she will recover.

193.    Adding insult to injury, on April 9 – apropos of nothing pertinent at the time – Nancy received a text from Krucial, stating:

> Finally, as I have said before, many times. [sic] If you can't protect yourself with PPE, you need to speak to a clinical lead at the hotel or speak to a hospital administrator before proceeding if there are concerns with PPE.

194.    This was another lie from Brian, and an invitation to termination if anyone complained. In later emails –stupidly, Krucial never eliminated any plaintiff from its email list – this would change as HHC changed its rules to allow for the surgical mask to replace the N95 as the standard of care.

195.    Jose Pinlac is an ER nurse – an RN with 35 years' experience, including, as indicated, during the EBOLA and SARS crises. He is licensed in Florida and California and has inactive licenses in other states. He is 69 years of age and has a family.

196.    A friend informed him of the openings in New York. The friend needed a companion on the trip, and he agreed to go. Both applied and were accepted.

197.    Like the others, they were promised PPE, without any mention that the PPE would be different than in any other situation. Jose knows PPE, and would never have come had he known it would have been so woefully limited.

198.    Krucial asked him his specialty, which was in the emergency room. Unlike others who deployed to settings for which they were not qualified, Jose's case involved the grossly inadequate PPE – not as promised.

199.    He and his then drove north, arrived in New York on March 31, 2020.

200.    Upon arrival, the two did fit testing. According to OSHA, "fit testing" analyses "the seal between the respirator's facepiece and the nurse's face. It takes about fifteen to twenty minutes to complete and one tests annually. After passing a fit test with a respirator, you must use the same make, model, style, and size respirator on the job." *See* https://www.osha.gov/video/respiratory_protection/fittesting_transcript.html. (Last visited on 4/10/20.)

201.    They reported to New Yorker Ballroom. Because Jose had had a fit test within a year, he had a document certifying his size.

202.    Jose learned he would work on a night shift at a hospital.

203.    He went to sleep, but the next morning in the Ballroom, he asked for his N95. He asked, "Jen," Jennifer, and Brian, all Krucial workers, none of whom would answer him directly. He began to think something was amiss. Why do a fit test if there is no N95 to provide?

204.    Krucial staff told him he would get the mask at the facility. This was a lie.

205.    Warily, he got on a bus to Woodhull Hospital in Brooklyn.

206.    After arriving at Woodhull, there was an orientation, plus computer training on COVID and charting. The COVID training specified that the nurses would need the full armor of PPE, including the N95.

207.    People at Woodhull asked him to start working, but he inquired, again and again, about his mask. Some nurses had them, some not.

208.    One of the Woodhull nurses was anxious for him to start.

209.    Jose said, "I need a proper mask." She ignored him. He repeated: "No, no, no, we need masks."

210.     Wanting some protection, he asked for a surgical mask, at least. He saw some on a desk of a nursing supervisor. She grabbed them out of his reach and said he would get his later.

211.     He would not go to the ER. The staff was getting upset with him.

212.     A man took his temperature; neither had a mask. He waited with no cover, near a pile of dirty, soiled linens.

213.     He then to the hospital lobby to get a surgical mask, then a staff room. There he received a face shield. But a shield is not an N95; it is just to protect the worker from fluids. A mask protects the lungs from bacteria.

214.     Someone gave him ordinary medical gloves – not rubber – but thin paper – ordinary for single use of modest danger, and a plastic apron. When he trained for EBOLA and SARS, there was more extensive protection. Finally, after begging, he got a paper surgical mask.

215.     In the ER, there were people immobile, likely to die, moaning, and groaning.

216.     He intubated one patient, then others. He used the same paper gloves that he used on other patients – a sure case of transferring bacteria and gross negligence.

217.     A doctor selected patients who would get ventilators and who needed intubation.

218.     Patients were urinating and defecating on the floor. Monitors were beeping, beeping: evidence of crisis or death.

219.     All Jose could do was administer palliative care drips of morphine or intubate.

220.     He finished his shift, but he had used the same PPE for four hours. He washed his hands; he had no shoe covers and his shoes were undoubtedly covered in deadly viruses and bacteria.

221.     The day shift arrived as he embarked on the bus, leaving for the hotel. Jose knew that people going to Woodhull would infect the bus when they returned, and transmit the virus to other temporary workers when they changed places.

222. Indeed, one nurse tested positive. It was then that Krucial then stopped the promised testing.

223. When he returned to The New Yorker, he put his clothes into the basement laundry.

224. He had brought Lysol from Florida and disinfected his room. His friend came, and he told her, "Please be careful, nurses are coming in and out of these hospitals and will be infecting everyone."

225. She rapped on the door. Jose knew he had been heavily infected and told her, "Don't come into my room!"

226. Then a Krucial staffer came in, and Jose told him he refused to work without PPE. His friend went downstairs, returned, and informed him Krucial was going to fly him out and do testing. Alex Render, one of the recruiters, promised that everyone would receive a COVID test when they left. Not so.

227. He called his family, complained about the lack of PPE, and made this complaint to Krucial Staff, several times. He even called the corporate office.

228. Someone accused him of having brain damage, called Krucial HR, and told them he was "unfit."

229. Krucial provided an Uber to the airport. Jose had no symptoms, but he was exposed.

230. He did not want to infect his family and went to a hotel to quarantine. Krucial was supposed to get him tested before sending him home, but they did this to no one, or very few.

231. He called and asked again that Krucial pay for his quarantine and testing. Krucial refused this reasonable request, about $2,000.

232. Now in a hotel in Boca Raton, he was tested, waited three days, then learned the result was inconclusive. He has to wait another week to be retested and remain in quarantine on his dime.

233.   <u>Brian Burr</u> received a text message from Krucial on March 25, 2020, inquiring if he would be a medical provider for the NYC COVID-19 frontline. Brian has military experience, is a Board-certified Psychiatric Mental Health Nurse Practitioner and Family Nurse Practitioner.

234.   He has a medical family practice graduate degree from Old Dominion University, and he is a doctoral candidate in Behavioral Therapy. Brian has worked as a nurse for four years and has a practice specializing in children's needs. He left this practice for this time, wanting to help on the front line. He also has extensive experience procuring medical supplies.

235.   He drove his car from Virginia to New York City the next day, paying for his gas and parking across the street from the New Yorker hotel.

236.   He learned the basics on the 27th, and Krucial staff told the newly arrived that it would assign them to different locations. His assignment was Elmhurst Hospital as the emergency room team lead, as many nurses had quit or walked out the night before because of the lack of PPE, as well as the condescending attitude that Elmhurst Hospital had towards the Krucial staff. Initially, he helped source IV bags, food & drinks for patients. On Saturday or Sunday of that week, a reporter contacted him about the situation at Elmhurst. Brian did a video interview with WABC News. As a result of that interview, the hospital staff at Elmhurst told him he was not welcome there anymore.

237.   Burr returned to the hotel and told the story. CEO Cleary (at that time) knew he could use Burr and asked him to join the administrative team in sourcing PPE, as there was none available for staff. He spent the next five to ten days, every day, on the phone with different vendors and with family and friends connecting with people that could send PPE, food, uniforms, shoes, and foot scanners to the hotel.

238.    So the staff would have clean clothes. Burr organized the laundry service to come to pick up dirty clothes. Burr prearranged for a delivery service to send food. Several administrators on-site asked if Burr would use his car to grocery shop at Costco to pick up vitamins for the Krucial staff. He did that and submitted receipts, but Krucial only reimbursed him for the amount of the vitamins, not the food he delivered. Someone then asked if he would drive nurses to other locations in hospitals that had slept in or missed their busses. Brian complied without complaint. He continued to find sources for necessary things such as algorithms for ventilators, appropriate ways for staff members to have forms available so that they could treat patients and have the protective equipment that he supplied.

239.    Brian Cleary said he was a vital part of the team. Cleary even sent him a bonus of $1,500 for his ingenuity. He was able to get pathogen foot scanners, PPE, uniforms, scrubs, meals, eye protection offer staff that Burr would give out.

240.    Brian's friend, Rebecca, offered to send 65 N95 masks. Brian refused to allow him to donate these masks to Elmhurst Hospital; he emailed the VP for the HHC and offered to put him in touch with Johnson & Johnson for the PPE, but the VP had no time for safety.

241.    Because the mail would come in through the mailroom at the New Yorker, some PPE went missing. Cleary then told him that he would book him a room in the hotel that Burr could "lock supplies," as he put it, and so they didn't go missing. That is where Burr stashed most of the donations – uniforms for those who lost their luggage, coolers (there were no refrigerators in the rooms), even coffee machines, microwaves so that staff could eat between shifts. He was working 20 hours a day.

242.    Burr was asked by another member on April 1 if he would go to Costco then deliver pizzas to the staff at Coler because they were not able to eat – there are few places to eat on that quiet

island. He did that and even bought the pizzas on his credit card and drove them in his car to Coler. Rebecca Love, a person Burr knew who procured medical supplies, called and said she had an additional 1,500 N95 masks that she would like to send to him from Johnson & Johnson. But she needed an answer by 4 PM as the plane was leaving and he needed to know where they were going. She had them rerouted from Sloan-Kettering to Krucial because of Krucial's needs.

243.    Cleary didn't like this. He called Burr on his cell phone at approximately 4 PM that day.

244.    <u>Brian Burr</u> was able to procure N95's when Brian Cleary could not. Burr was drawing too much attention to the effort. Cleary said that it was making him look bad, and he was fired. Burr apologized for making him look bad – even though Cleary makes Cleary look bad – but that he sought out for the safety of the staff, which he thought paramount, *and which he was hired as an admin. to do*. But to Cleary, it was all about Cleary.

245.    Brian asked Emmanuel Badillo at the hotel to help him collect four foot scanners – something Burr had procured through donations. These scanners cost $10,000 apiece and eliminate the bacteria and viruses the workers would have on their shoes. Each scanner had a place the donors wanted them to go if not Krucial. Brian was afraid that Krucial would resell them to a different location. These were in his charge; he was responsible for taking them and maintaining them with proper bulbs – Krucial wouldn't know how to do that.

246.    The scanners were lost, likely stolen.  Burr called the NYPD, which arrived on the scene. The officers and the manager checked the security cameras, and they found the footage of Krucial staff members pushing the equipment into an unused banquet kitchen. They all went to that kitchen and retrieved the scanners.

247.    Brian from Krucial instructed the New Yorker to terminate his room, and Barry told him that if Burr didn't leave the hotel by 5, he would be charged for the night and have to pay out-of-

pocket with the credit card on file. Burr did not want to pay for the higher priced room, so he packed his belongings. When he returned, the police were gone, and what happened to the scanners Brian has yet to find out. Likely, Cleary talked the cops out of Burr's complaint, and the NYPD just accepted Cleary's word for it. But that was pure theft.

248.    Burr spoke to all the donors to let them know that he would soon be working at another site and not send more equipment to Krucial, like the PPE (i.e., the masks).

249.    If Burr were embarrassing Brian Cleary with his extensive efforts, he would transfer them to his new deployment. He left the information with Barry, the hotel manager. Burr had also ordered 300 pairs of donated crocs that had arrived on April 3, though Burr instructed Manny to distribute them to staff. Manny asked him to have a letter signed by Brian, allowing him to have these donated to the team.

250.    Brian refused to tender that letter. When the masks arrived, there were only two boxes instead of three that were to be shipped. Burr had the two distributed between the Javits Center and Elmhurst and Woodhull Hospitals.

251.    When Cleary learned that Burr had foiled him again – he decided to blast an email to Krucial staffers to everyone on several outlets that Brian Burr was a "scammer" and to report to him if seen on site.

252.    Latricia Hickenbottom also deployed to New York as a nurse practitioner. Before arriving north, there were no specifications as to what type of degree or specialty Krucial wanted. She saw the company was accepting everyone, including newly graduated nurse practitioners.

253.    However, also, as she arrived, if not before, she filled out job paperwork and answered a questionnaire about her experiences and specialties.

254.    She went, as requested, to Harlem Hospital. The workers there took her group of NP's on a tour, and afterward doled out assignments.

255.    There was no orientation. Latricia shadowed a physician for about three hours. He mostly sat at a desk during this time, making notes. She also followed him into the ICU and ER.

256.    After that, someone at Bellevue told her to perform as a hospitalist; a "hospitalist" is simply a hospital doctor. A Nurse Practitioner can perform the role of a hospitalist to some extent, but not if it is out of her scope of practice.

257.    She had explained to Krucial, specifically Donnie and her Team Leader Calada, that she was not a hospitalist; she had no experience in acute care. Her degree was in primary care, and to work in an acute-care setting, whether it be a hospital or an urgent care facility is contrary to the ethics of her profession. Again, she would have been practicing outside the scope of her competence.

258.    The team leaders offered that she works as an RN or staff nurse. But she saw that many such nurses without critical care training were working with maybe ten patients at a time, all on ventilators.

259.    Latricia is not critical-care trained, let alone trained to work with ten patients. True, this was an emergency, but she was not competent to do what Krucial insisted and could have risked her license or committed gross negligence.

260.    When she returned to the hotel, she went to the Ballroom where the Krucial staff convened, and she alerted them of the situation.  Staff said they would discuss the situation further.

261.    The same night, a Hospital Chief Resident sent out assignments via text. Latricia was to work the next day in a COVID overflow intensive care unit.

262.    The text included language that employees could not question assignments and must be flexible.

263.    Staff finally told her there were only hospital assignments, and she would have to take one or demobilize.

264.    Latricia chose to return home because Bellevue was unsafe for patients, and there was the potential of having a mark on her license (or reputation) for working outside the scope of her practice.

265.    Krucial didn't even try to find her something where she could work with competence, although one Caucasian woman secured a plum assignment at a swabbing site.

266.    But just like Logan and Alexis, Latricia would have done anything legal that she was competent to do. There had to be something she could have done. But she was not willing to anything illegal, contrary to the standard of care that a jury her Nursing Board would consider gross negligence.

267.    It wasn't much to ask.

FIRST CAUSE OF ACTION
BREACH OF CONTRACT

268.    Plaintiffs repeat and reallege all previous paragraphs.

269.    Plaintiffs entered into an employment contract, which was expected to last for less than one year.

270.    Plaintiffs followed the terms of that contract.

271.    Defendants breached that contract.

272.    As a result of the previous, two plaintiffs left jobs paying in the range of $100,000 a year in parts (a) to make much more money than they were; (b) help with the COVID crisis, and (c) enhance their experience.

273.    As a result, plaintiffs have each been damaged, individually, in amounts over $75,000.

SECOND CAUSE OF ACTION
QUASI CONTRACT – RELIANCE ON A PROMISE

274.    Plaintiffs repeat and reallege all previous paragraphs.

275.    In the contingency that a classic breach-of-contract claim is insufficient to cover their damages, and is otherwise not duplicative with this claim, plaintiffs relied on the promises offered by Krucial.

276.    Krucial did not live up to its promises, the proximate cause of plaintiffs accepting the assignments or, in some cases, having quit their jobs in Alabama.

277.    As a result of the preceding, plaintiffs have been damaged.

THIRD CAUSE OF ACTION
NEW YORK LABOR LAW § 741

278.    Plaintiffs repeat and reallege all previous paragraphs.

279.    Krucial took retaliatory action against plaintiffs because they (a) disclosed to a supervisor a policy or practice of the employer that the Plaintiff(s), in good faith, believed the assignments constituted improper quality of patient care; or (b) objected or refused to participate in such activity.

280.    Each Plaintiff brought the improper quality of patient care to the attention of a supervisor and afforded the employer a reasonable opportunity to correct such activity, policy, or practice.

281.    As a result of the preceding, Plaintiffs have been damaged and are entitled to reasonable attorneys' fees.

FOURTH CAUSE OF ACTION
BREACH OF CONTRACT IMPLIED-IN-LAW

282.    Plaintiffs repeat and reallege all previous paragraphs.

283.    Plaintiffs were fired – or forced to resign – based on a contract implied in law under the doctrine established in *Wieder v. Skala,* 80 N.Y.2d 628 (1992).

284.    Each Plaintiff is required, as a condition of nursing licensure, must follow the rules of the State in which they work.

285.    Each Plaintiff is subject to discipline if he or she violates any code – at a minimum – of the code of conduct of the State of Alabama (and other states).

286.    For example, the Alabama Board of Nursing Administrative Code, Chapter 610-X-8 (Disciplinary Action) states that failure to exercise the applicable standard of care is grounds for discipline, at a maximum loss of licensure. All states' nursing codes – including Tennessee's, as Aimee would learn, have similar provisions.

287.    The Codes of all states also impose reciprocal discipline for those who violate similar provisions in other states. Wyatt, with the most certifications, could have been disciplined by approximately four state Nursing Boards had he taken these assignments.

288.    At least one plaintiff mentioned the disciplinary code to officials at Krucial, and the other two pointed out that Krucial asked them to violate the standard of care.

289.    Although traditional malpractice-liability rules relax during an emergency, in addition to the chance they could commit gross negligence, Krucial had no authority to allow its recruits to violate their State's licensing board's standards of care.

290.    Plaintiffs were unwilling to violate these standards of care.

291.    Plaintiffs were terminated or required to resign because they refused to violate the standards of care of their home state.

292.    As a result of the preceding, plaintiffs have been damaged.

FIFTH CAUSE OF ACTION
FRAUD

293.    Plaintiffs repeat and reallege all previous paragraphs.

294.    Defendants made representations as to material facts, including that (a) plaintiffs would work in their field of expertise; (b) that plaintiffs would get proper PPE; (c) that there were jobs available that they could perform even if not precisely within their field of expertise.

295.    Krucial misrepresented that PPE would be in short supply.

296.    It misrepresented that the PPE rules would change, and misrepresented the scope of individual Model Acts (and possibly Governor Cuomo's Executive Order).

297.    Such representations were false.

298.    Defendants intended to deceive plaintiffs. In sending out the mass text, they intended solely to bring in as many bodies as they could, without regard to these workers' area of competence, or their lives.

299.    Plaintiffs believed and justifiably relied upon the statements

300.    They were induced by it to engage in coming to New York for high pay for at least several weeks and – in two cases – leaving their jobs.

301.    As a result of such reliance, plaintiffs sustained financial loss.

302.    There are additional damages beyond which may be compensated by the breach of contract causes of action, including but not limited to:

    (a) the emotional toll the debacle took on each Plaintiff, to varying degrees;

    (b) the loss that they could have the experience of helping in the prime U.S. COVID hotspot competently;

    (c) the scurrilous defamation invited upon Wyatt in a mass email to scare other employees;

    (d) the exposure to COVID without proper PPE;

(e) the failure to test the nurses as they left the assignment;

(f) the failure of Krucial to follow its own worker's compensation guidelines, which provided for testing, but was refused by two plaintiffs;

303.    Additionally, insofar as defendants' actions violate public policy, punitive damages should be assessed, which are not available under traditional contract law.

SIXTH CAUSE OF ACTION
CONVERSION
(as to Brian Burr)

304.    Plaintiffs repeat and reallege all previous paragraphs.

305.    Brian Burr was deprived of four scanners, which were in his control, each costing $10,000.

306.    Krucial and or Brian Cleary stole those scanners.

307.    The defendants refuse to tender back the scanners to Burr, and they are likely now damaged.

308.    As a result of the preceding, Brian Burr has been damaged.

SEVENTH CAUSE OF ACTION
DEFAMATION
(as to Brian Burr)

309.    Plaintiffs repeat and reallege all previous paragraphs.

310.    Brian Burr was fired from the job because he was doing things for the staffers that Cleary could not do for Krucial Staffers.

311.    Brian Cleary then sent out a blast email referring to Brian as a "scammer."

312.    This was defamation per se.

313.    The word scammer is incapable of anything other than defamatory meaning.

314.    The word and its context harmed Burr as a result.

315.    As a result of the preceding, Brian Burr has been damaged.

WHEREFORE, Plaintiffs demands the following relief:

1.        Compensatory Damages for no less than $1,000,000;

2.        Punitive Damages for such causes of action that allow it;

3.        Attorneys' fees and costs under New York Labor Law § 741;

4.        Such other relief as the Court may deem appropriate.

Dated:      New York, New York
            April 13, 2020


*Greg S. Antollino*
_____

Gregory Antollino, Esq.
275 Seventh Avenue, Seventh Floor
New York, New York 10001
(212) 334-7397
gantollino@gmail.com

47