UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
Alexis Allen, Latricia Hickenbottom &
Jalen Eaton, Nancy Torres, Jose Pinlac,
Aimée Branch, Brandon Burr,

       Plaintiffs,

       v.

Krucial Staffing, LLC & Brian Michael Cleary V,

       Defendants.

------------------------------------------------------------ X

SECOND
AMENDED COMPLAINT

20-cv-2859 (JGK) (OTW)

**JURY TRIAL DEMANDED**

> Clinical competency has been a challenging issue in nursing[.] The feeling of low competency  . . . influences the quality of care. Nursing care in surgical departments [requires] considerable clinical competencies. Surgery is a traumatic procedure, and patients need special care. Many patients confront complex situations, and nurses should be competent in making urgent and correct clinical decisions in surgical wards. Besides, infection is an important issue in surgical departments and surgical nurses must be competent in implementing infection control strategies.

"A Study on Improving Nursing Clinical Competencies in a Surgical Department," <u>NursingOpen</u>, July 2020, pp. 1052–1059.[1]

> The Grey nurse entered a rose garden
>    Where roses' shadows dappled her.
> Her apron was brown with blood. She prayed,
>    And roses wondered at her prayer.

D.H. Lawrence, "The Grey Nurse," <u>Poetry: A Magazine of Verse</u>, 1919.

1.     Almost any nurse who responds to a COVID-19 crisis does so in good faith, plus the high

pay – $10-13,000 a week. Notwithstanding the salary, they have a right to good faith and fair

dealing, respect, and that their employer keeps its promises. Unfortunately for these plaintiffs,

---

[1] Mohammad Afshar, Hamidreza Sadeghi-Gandomani, and Negin Masoudi Alavi, Faculty of Nursing and Trauma Nursing Research Center, Kashan University of Medical Sciences, Kashan, Iran, available at <u>https://tinyurl.com/y4jyxnk5</u>.

Krucial Staffing, a disaster-response, temporary-personnel agency corral nurses in a fraudulent manner, promising so much, delivered so little – even withholding the last promised paycheck.

2.     This diversity action recounts the story of seven nurses from states other than New York who wanted to assist in the New York hotspot – but only in a manner consistent with protecting the lives of others and themselves, and within their field of competence. It is also the story of an LLC, Krucial Staffing, profiteering from the crisis, putting nurses' lives at risk, and making promises that its CEO (and other of its principals) knew they wouldn't keep. The DocuSign contracts were blunderbuss – not highly favorable to the employer, as most are. Krucial could get away with these only because it knew it wasn't going to abide by them and require the nurses to sue to have promises kept.

3.     Krucial, from Lawrence, Kansas, is backed by a wealthy hedge fund on-site. They run a cruel operation: Nurses are lured into COVID hotspots and pushed as if they were *any* warm body with a nursing degree into circumstances they were incapable and untrained to perform. Workers were given lip service "not to do anything for which they are uncomfortable." But the slightest objection by any nurse about lack of Personal Protective Equipment (PPE) or their subjugation to coercion to perform procedures for which they lacked minimum qualifications in termination – a word hidden by the quasi-military, Orwellian "demobilization."

4.     Loyal aides-de-camp – hench workers enforced the Krucial strategy with resolve. Health risks were built into the process, to be sure, but a nurse's failure to obey an order that risked a patient's life or that of the nurse himself resulted in the form of banishment with strong notes of contempt. These nurses who only wanted to do good were whisked away on a bus crowded like a rabbit warren, and if they had to wait for a plane, confined to a cramped, second-rate hotel room.

5.      Krucial neither encouraged nor enforced physical distancing at the New Yorker Hotel, where everyone stayed, nor to and from the hospitals was not implemented in the least. For example, is not proof, but look:



6.      There was not even a "mini contact-tracing program" within the operation. Some nurses contracted the virus and exposed others, but the "others" were not told of the possible infection nor even tested. These others – and plaintiff Aimée Branch was an "other" – left New York as asymptomatic carriers, infecting people in buses, airports, cramped airplanes, and then their families. It should be no surprise that as New York recovers, the parts of the Midwest and South from where Krucial recruited the nurses are now in a state of decimation.

7.      Plaintiff Jalen Eaton is a nurse admitted to practice in Alabama, South Carolina, California, and Washington. Mr. Eaton has two nursing degrees; he studies for a Ph.D. when he can.

8.      Nursing jobs *can* be well paid, but not in all parts of the country. Southern and midwestern nurses make $40,000-60,000 annually, and the salaries in Northeast and West dwarf such salaries. That is why Jalen is a travel nurse. When he (and so many others) got a mass text from Brian Cleary in March 2020, he quit a job paying $2,000 a week. He lives the life of a flaneur, and travel nursing is his life. He liked his post, but he wanted to be closer to the front lines of the COVID crisis; at the time, that was New York. Five figures a week was indeed an incentive.

9.      The City of New York (perhaps with help from FEMA) paid Krucial over fifteen million dollars as an *initial* payment f to bring in the nurses from lesser-paid areas of the nation. Krucial knew of these salary disparities and recruited from precisely those areas where so much money would intimidate any employee from insisting on quality of care. That is how the "aides-de-camp" kept the travel nurses in line, threatening them with loss of such a well-paid job if they objected to Krucial's unethical, unsafe practices.

10.     Wyatt is in his late twenties and has an excellent knowledge of medical practice. Nursing is his life, and he has responded to several short-term crises in remote locations. But just as a divorce lawyer is (almost) undoubtedly not competent to file a patent application – not all nurses do similar things in nursing, which is a subset of the practice of medicine, which, if employed improperly, can kill.

11.     Eaton was willing to travel to New York to help – even at the cost of losing his job in Alabama. The pay was attractive, but he was also motivated by doing the right thing. But he was unwilling to sacrifice his health, nor work outside of his scope of competence.

12.     Krucial paid $10,000 weekly in his case. The salary was $13,000 for nurse practitioners – including plaintiffs Alexis Allen, Latricia Hickenbottom, and Aimée Branch. But HHC apparently did not need nurse practitioners. One can't explain this, as the City asked for NP's, but it fit with Krucial's ploy: bring in nurses with higher educational credentials and that covered for assigning them to dying patients whom they weren't qualified to attend.

13.     After arriving in New York, Jalen refused to risk his own life (or his family's). Additionally, when he pointed out the obvious flaws in Krucial's method, he was excoriated, fired, and then held up as an example to other workers as to the fate they would suffer if they didn't engage in contraindicated practices.

14.     Plaintiff Alexis Allen is the mother of two and has a BS and MS in Nursing, and she has a Family Nurse Practitioner's certificate (which means she can prescribe medications and supervise other nurses). She, too, studies for her doctorate; she has completed all of this training at the age of 31. She is admitted to practice in Alabama.

15.     When she Krucial called her, she had already enrolled in a Ph.D. course that cost her $4,000. She decided to withdraw and retake the class in the summer. She wanted to help.

16.     Plaintiff Nancy Torres is an experienced nurse who has worked in several capacities in travel nursing assignments for her income. She resides in Illinois.

17.     Plaintiff Latricia Hickenbottom has a BS in nursing and took an MS to become a nurse practitioner. She is 32 and has two children under ten, whom she left with her husband when she travelled north. She quit her job as a Home Health Hospice Work Practitioner to help with the crisis – and not only for the big short-term money. When she returned earlier than expected, she came clean and tried to get her job back unsuccessfully.

18.     That nurses in these regions would quit their jobs for such high pay underscores another social flaw in Krucial's model: It robs rural and less-than-wealthy exurbs of nurses that these areas need – just to allow Krucial to scam the nurses, provide care lacking in quality to the hotspots, and allow Krucial and its hedge fund to rake in hundreds of millions.

19.     Plaintiff Jose Pinlac is a resident of Florida. He is retired and lives with a family. He is an RN and previously served in the EBOLA and the first SARS crises. What he saw in those assignments was nothing like he saw in New York. Krucial fired him in a day for demanding proper PPE, even though PPE was guaranteed as part of the blunderbuss DocuSign contract. It didn't matter what contract Krucial tendered to nurses; tin would not have abided by any term it didn't like, forcing nurses like these plaintiffs to sue.

20.     Plaintiff Aimée (*Ah-MAY*) Branch is a citizen of Tennessee. She is a nurse with young children and a nurse practitioner. She caught COVID as a result of Krucial's lax standards and was out of work a month. While the DocuSign contract guaranteed quarantine pay, Krucial doled it out as it wished. Branch is still owed $10,000 in quarantine pay. Plaintiffs Torres and Pinlac got no quarantine pay.

21.     Brandon Burr is a nurse practitioner who runs a small practice in Virginia. He was fired by Cleary in a fit of rage that came with a defamatory mass email to all other nurses. Although he procured on his own substantial PPE and other things like discounts and lent it to Krucial, Cleary didn't like it that a mere nurse was doing a better job than Krucial in making the workplace safer. The PPE, some of which was high-tech, Krucial hid in the New Yorker Hotel and stole from him. To kick Mr. Burr while he was down, Krucial gave him less than half of the quarantine pay that he was entitled to.

22.     After the plaintiffs arrived in New York, they were in for an unpleasant surprise: Krucial subjects unsuspecting nurses to physical harm by requiring work without proper PPE.

23.     Just as significantly, it required them to work outside of their fields of competence – not only specialty but *expertise.* They all wanted to get closer to the crisis, but not inordinately risk their or health or their families' health. They realized there was some risk, but Krucial promised proper protection. (It later changed its rules, but only after this lawsuit was filed.)

24.     Each plaintiff also wanted to keep their licenses, and there are probably so few plaintiffs because only these believed that their home states' Nursing Boards of Overseers would allow them to work out of their field of competence. The rest just followed the hench persons' orders because it paid so well.

25.     A nurse is not a fungible entity; different nurses have different competencies. For example, a nurse in a primary care doctor's office is known as a Clinical Nurse; she is not qualified to work in the emergency room. No plaintiff is a clinical nurse, but each has different training. Only Pinlac was competent to work – if the conditions were safe– in the Intensive Care Unit or Emergency Room.

26.     Krucial took almost anyone with a nursing degree. True, when prospective employees called, Krucial staffers asked their specialty. Each therefore rightly presumed they would work in their field or at least in a manner that was consistent with *competent* care. But this was not the case.

27.     When Plaintiffs arrived in New York, each realized that Krucial's operation was a classic bait and switch: There was no appropriate PPE, and, for example, the mobile drive-through swabbing that Krucial promised (in the text) was almost non-existent. Any plaintiff – indeed any person with basic training – could have done swabbing. Krucial lured the nurses with non-existent swabbing jobs, but it was a lie. New York had only two swabbing sites at the time and they were fully staffed.

28.     Plaintiffs were willing to do other jobs within their areas of competence. By forcing them to do otherwise, Krucial profited from the crisis on an existential level. Like any temporary agency, it rakes in close to double what it pays its workers, and when so many people were furloughed, it was easy to bring in nurses by the thousands – to New York, Louisiana and now Texas. It should suffer maximum monetary penalties for disrupting the lives of these excellent and honorable nurses.

JURISDICTION & VENUE

29.     Plaintiffs are residents of the States of Alabama, Tennessee, Illinois, and Florida. Krucial Staffing is incorporated in Kansas, and Cleary, the CEO of Krucial, is a resident of Overland Park, Kansas. The amount in controversy exceeds $75,000, thus allowing diversity jurisdiction.

30.     Venue is proper in that all of the acts and omissions occurred in this judicial district.

DEATH TRIAGE AND ITS DISCONTENTS

31.     Jalen Eaton is trained in Rehabilitation Nursing, which means assisting people in nursing homes –Alzheimer's patients, amputees, and people in a critical state who cannot care for themselves. Though very knowledgeable, he has never worked with patients in a Medical Surgical Unit (known as "Med-Surg") or an ICU.

32.     Alexis Allen is a "Family Care" specialist. A nursing "specialty" is a term of art within nursing: "Specialty" and competence are distinct, though one is necessarily competent in her specialty or perhaps others, that doesn't mean she is qualified to do any nursing assignment.

33.     Indeed, during the Krucial debacle, a YouTube video made its circulation among nurses who had not worked in hospital care warning them that to work out of one's area of competence – it could be grounds for nursing discipline. The video, titled "Be sure your credentials match the components of your practice," is presented by a former nurse practitioner, now a lawyer representing nurses.

34.     The     video    last    visited on      April    7,    2020,    is      available     at https://www.youtube.com/watch?v=xItMHni3QfY&feature=youtu.be.

35.     Allen is 31, a single mother with two young kids. She did not quit her job, but she lost the expected income from Krucial, which would have amounted to some six figures in revenue.

36.     Aimée Branch is also a Family Care Specialist and a Nurse Practitioner. She also has young children and is a font of knowledge about the operations – or lack thereof – at Krucial.

37.    Latricia Hickenbottom is an Adult-Gerontology Primary Care Nurse Practitioner. She has worked in that role for nearly two years and was previously a nurse. Latricia has experience in long-term care as an outpatient clinician and in-home health care.

38.    A Krucial recruiter told Latricia over the phone that nurses (NP's) would be placed based on their specialty or in areas in which they are "comfortable" or knowledgeable. "Comfort," was a pejorative to Krucial and its enforcers or aides-de-camp. If one is not comfortable, one is demobilized.

39.    Hickenbottom, like Eaton, also quit her job, which paid approximately $100,000 annually to come and help in the crisis. She relied on Krucial's representations to her financial detriment, though she is now re-employed.

40.    Nancy Torres is an RN, who was demobilized because she insisted on working within her field of practice and with PPE – as promised. She was bullied by a henchman to leave because she would not engage in life-threatening procedures. She has experience in psychiatric nursing and correctional settings.

41.    On or about March 18, 2020, a friend forwarded Eaton a mass-text sent to nurses asking that they deploy to New York to assist in the COVID crisis. The text, written in all-caps, was from CEO Cleary himself. Hickenbottom and Allen received the same text on or about the same day.

42.    The text stated: (1) all nurses (or NP's) would be provided appropriate Personal Protective Equipment (PPE); (2) nurses would earn approximately $10,000 a week or $13,000 for Nurse Practitioners; and (3) a stipend of $76 daily for meals; plus (4) housing at the New Yorker Hotel. Krucial also promised them to test when they demobilized, as well as quarantine if necessary, but the two for whom this was necessary did not get this pay.

43.     The invitational text also stated that nurses would deploy at (a) a traditional hospital, (b) field hospitals (like the Javits Center), or (c) a mobile-testing site (where people drive through a tent are swabbed through their noses). Eaton wanted mobile testing, but as he would find out, there were no assignments in that area; most were taken by permanent New York City Health and Hospital Corporation workers. Krucial knew this in advance but hung it out there to attract more workers. Swabbing: You have to wear a hazmat suit, but the pay is so delicious you can forget about fashion.

44.     Eaton would have accepted working at a field or traditional hospital if deployed within his area of competence (and given proper PPE). Since Krucial asked him his specialty, he expected a position within his specialty. But this was the way Krucial operated: Why ask for one's specialty other than to reinforce the idea that one would work within his specialty.

45.     The contract was likely to be extended (and was) for another 60 days. There was talk of a $5,000 bonus for anyone working eight consecutive weeks, but it is unknown if that suggestion of a promise came to fruition.

46.     No plaintiffs would have joined this campaign, this maneuver for nurses and cash for any money had they known they were putting patient lives at risk, as well as their own and potentially their families.

47.     All plaintiffs arrived on the date they agreed to, and checked into "The Ballroom" at the New Yorker Hotel where the Krucial operations were set up.

48.     After paperwork and some waiting around, within a few days plaintiffs began to be deployed. Someone from Krucial informed everyone that the "swab testing" assignment had "fallen through." The possibility that any Krucial staff would do swab testing was close to fiction, however, although Hickenbottom knew of one woman who was allowed it.

49.     Krucial originally did not assign Logan to a hospital. He consulted a woman who, again, asked him his specialty and responded, "Rehab," which is nursing lingo. The woman replied, "Then you're going to Coler," which has a separate nursing home on site. Coler happened to have a rehabilitation center on the property, but no plaintiffs or staff nurses would work in Rehab. It was just a further appeasement.

50.     Coler, in fact, would eventually become a warehouse for the dead; cadavers became too numerous that the City had to put the dead in refrigerated trucks.

51.     Jalen took the bus to Coler, which was once a hospital. The Rehab center was on one floor and City retrofit a couple of floors for the crisis. But rehabilitation facility it was not – rather, it was a makeshift Med-Surg unit.

52.     Logan assumed – since Krucial asked him his specialty – that he would work with rehab patients. Not so, as he learned the next day. An HHC nurse (Rosalie Boumantay) informed him that he would not be working Rehab, but in Med-Surg, which is not Logan's specialty, nor within his competence.

53.     At Coler, the entire group of thirty-some nurses expressed surprise. (There is a video of this.) Rosalie then lied – or repeated misinformation – saying, "Your patients will not have COVID; they will be overflow patients from a hospital – people who discharged with no place to go. They would be Med-Surg. patients with low acuity." Low acuity patients are those discharged from the hospital on their way home. But this was either misinformation or Rosalie's style in getting staff to return the next day. Whichever, it was untrue.

54.     Rosalie said Plaintiff would work with homeless people those qualified for a skilled nursing facility who were on Medicaid. Plaintiff was ready to accept such an assignment. But he sensed something was seriously amiss.

55.     After more orientation and another night at the hotel, then another orientation at Coler – all on basic things like washing hands – plaintiff returned for the third time to Coler. Rosalie and another man said each nurse would get 5-7 patients, who would be rehab but not COVID patients. Logan was fine with that given the limitation Rosalie had described.

56.     Minute by minute, he learned (a) Rosalie's representations were incorrect; (2) he would have to work without proper PPE; and (c) Krucial had hired too many staff out of their level of competence. The COVID patients who needed skilled, critical care if in hospital would get the warm bodies, but nothing approaching competence. There was a rEaton so many died.

57.     The nurses – Jalen, other non-plaintiffs, and Nancy Torres who was also there – then met with someone who said he was Chief Medical Officer. Although Plaintiff thought he would be working in rehab, the CMO said he and the others should start assisting on the floor to get ready for the incoming COVID patients.

58.     Someone at Krucial (at which point and whom Plaintiff does not recall) had earlier lied to the group, telling the nurses, "You know the new hospital Donald Trump is building? That's where you are going." There is no such facility. The Trump Hospital lie, whether wicked or mild, betrays Krucial's institutional thinking: purple fibs, appeasements, and outright misrepresentations.

59.     Jalen remembered this lie when he arrived at the makeshift unit at Coler.

60.     Despite the promise for proper PPE, this was the first time that he learned he would not be issued standard-of-care N95 masks.

61.     The difference between surgical masks and the N95 variety is extreme. A surgical mask provides protection, but measures in microns – a surgical mask is better than a t-shirt, but the N95 requires a special test and it more akin to high thread Egyptian Cotton. While many nurses volunteer to put themselves in harms' way – only the N95 with a proper fit will keep out bacteria

– Krucial promised these volunteers exactly that but reneged on the promise. The one person with connections who could bring in the N95s – Brandon Burr – was fired because he made CEO Cleary look bad. Cleary didn't want to address the N95 shortage – he just wanted to send out the highly paid less-than-competent nurses in to dangerous rooms to perform what one might call death triage – masks be damned.

62.     The CMO at Coler modified his statement – too late for those deployed – noting that he would issue N95s only for those "doing aerosolized procedures such as endotracheal suctioning."

63.     It is still not within the usual standard of care to limit PPE to such procedures. Eaton was not competent to do suctioning, and, indeed, one could also say the standard of care is to perform such procedures in a negative-pressure room to avoid flying viral or bacterial microbes.

64.     While the City HHC and the CDC have issued modified standards – which has killed nurses – when working with a COVID patient, the standard of care to protect against infection is (1) the N95; (2) a plastic gown; (3) shoe covers; (4) a face shield or goggles; and (5) a headcover. The N95s are particularly important because they prevent droplets or particulates from entering nasal and oral passages in a way that the surgical masks (or lesser cloth protections) do not.

62.     The shortage of these masks was not entirely Krucial's fault – at least with the exception of firing Brandon in a fit of rage, and Brandon was able to bring at least *some* relief.

63.     Nevertheless, Eaton was promised standard-of-care PPE. When Cleary sent out the blast texts, Cleary knew of the scarcity of the 95's. Eaton, still in Alabama, knew nothing of the shortage in New York or anywhere. He merely relied on Krucial's wilful misrepresentation. Though he could have dispensed with some of the PPE – the booties or hair bonnet, for example – he expected the essential.

64.   The CMO, after he informed the nurses of new limits in dispersing N95 masks, said, "If anyone is uncomfortable without the N95, you are free to leave." This statement was cold comfort for nurses who traveled from all over the United States on the representation that Krucial would provide proper PPE.

65.   Jalen discovered that to treat new patients coming to Coler would require traditional minimum standards of care to protect him – and the patient, the vast majority of whom died. His preference had been to swab noses, but he was willing to work with COVID Rehab patients. Now he had been asked to work in a Med Surg capacity and not in the limited manner that Rosalie had explained.

66.   He was stunned. Krucial provided him malpractice insurance and informed the nurses that traditional norms of malpractice liability are suspended in times of emergency. But this was a misrepresentation. Although Governor Cuomo issued an Executive Order suspending *some* rules for medical professionals, the order says just that medical professionals are "immune from civil liability for any injury or death  . . . unless it is established that such injury or death was caused by the gross negligence of such medical professional." Executive Order 202.10.

67.   But this is only qualified immunity. "Gross negligence" is a conscious, voluntary disregard of the need to use rEatonable care, which is likely to cause foreseeable grave injury or harm to persons, property, or both.

68.   It is plainly gross negligence to perform services one is unqualified to perform. The Executive Order would not absolve plaintiffs of liability if they had gone ahead with the assignments  - they would have been committing gross negligence.

69.   Krucial also sent a blast email citing the "Model State Emergency Health Powers Act," and the "Uniform Emergency Volunteer Health Practitioners Act" that would protect the workers from

liability. The problem is that the MSEHPA is only draft, model legislation. The Centers for Disease Control wants states to pass this law, but not all have; neither Alabama nor Illinois have; New York has only adopted privacy portions of the Act.

70.    The "Uniform Emergency Volunteer Health Practitioners Act" has not been adopted in Alabama. It has in Illinois but does not protect against gross negligence or recklessness.

71.    Krucial, in this blast, had the nerve to construe these Acts to suggest that a nurse would be reckless *not* to act as a Good Samaritan and at the risk of his life. Cleary, who signed the email, craftily – if inartfully – defined "recklessness" as standing by and refusing to engage in gross negligence. This was just another of Krucial's intimidation tactics, and there were so many.

72.    Also, none of this legislation protected workers from being subject to suit – which any patient or decedent may file – which might require discovery, repeat appearances in New York with no compensation, and possibly trial. These are distressing things for laypersons – even she wins in the end.

73.    Krucial certainly knew these nurses were incompetent to tend to the dying in any way other than to babysit the patients as they died, at a great cost to the nurses' own lives. The City, through Krucial, wanted nursing bodies to work in a disaster zone. It looked better than nothing, but at what cost? It is unclear whose fault lies in City's failures to coordinate with Krucial, but for now, plaintiffs assume, under traditional rules of agency, that Krucial is responsible.

74.    Indeed, according to the Krucial Staffing Terms and Conditions of Employment, Krucial requires employees to follow "OSHA and their client facility's policies and procedures when using any equipment."

75.    OSHA still requires the strongest use of PPE. The City *did* until the day after the travel nurses were trained in HHC procedures.

76.     Additionally, OSHA protocols require that employers must include a proper "FIT test" – which OSHA characterizes as "mandatory" – to be sure the mask seals the face, and nothing escapes into any gap between the mask and the face.

77.     The OSHA regulations also include head, foot, and hand protection, all or most of which were not followed in any setting.

78.     As a nurse admitted to practice in various states, plaintiffs could be subject to discipline by a state board for working in a capacity for which they were untrained. Eaton, admitted in several states, was wary of having to rely on the assumption that a foreign state board would overlook nursing misconduct, even in a New York emergency. The sister state would not be required to suspend disciplinary rules.

79.     A Coler staff person asked Eaton and the other nurses go to the empty floors to convert them for the incoming COVID patients. The floors reminded Wyatt of an abandoned army barracks in a post-apocalyptic horror movie.

80.     Any nurse who chose to work at Coler (at any salary) would have vastly increased chances of contracting COVID, and not only because of the inadequate PPE.

81.     As the rooms were constructed and filled, each contained four beds. On Eaton's last day, Coler was putting confirmed COVID patients in rooms with patients that (a) had symptoms but were not verified as COVID positive; (b) needed hospitalization for other rEatons and had no other place to go. There would naturally, thus, be extreme cross contamination. This added to the dead bodies.

82.     Jalen could not understand why this was happening, and he considered it an invitation to death. Again, he was willing to work to assist in the crisis, but as promised: not at the cost of his life or the potentiality that he would infect his elderly grandparents.

83.     He also wanted to keep his licenses.

84.     Essential to Jalen was that there would different safety protocols, depending on whether the patient had COVID. By mixing the COVID-infected with the untested or uninfected, it required protections of proper PPE at all times, in every room.

85.     Krucial reneged on its promise to provide proper PPE, as stated not only in the first text blast but on Krucial's Instagram site, where a short video insists that nursing professionals would have appropriate PPE.  (It was taken down after this lawsuit was filed.)

86.     Sadly, three nurses from Alabama had to upend their lives to travel north to expose this horror, to great upheaval in their lives. Krucial, sanctimonious, punished nurses who spoke of the malpractice (as did other hospitals, including, shamefully, NYU).

87.     One cannot sympathize with Krucial that manufacturers were behind in producing these masks as quickly as they could. That is not the fault of unsuspecting, well-educated nurses from the South and Midwest.

88.     By deploying Plaintiff and other nurses into New York City, Krucial was putting them in harm's way. The same is true of the patients, though, if not all, many of the Coler patients will die, and many nurses, given lack of proper PPE, will contract the virus. Some of those nurses will die.

89.     Plaintiff complained to Olivia, a Krucial employee, about these detrimental conditions. All nurses had already been given an invitation to the door by the CMO. Olivia explained, "We're just asking you to be flexible."

81.     Plaintiff responded, "My coming here from Alabama to work on the front lines is my being flexible."

82.     Plaintiff then asked to go up the chain of command to a person named Alex Lender. He made the same complaint to Alex, who repeated the line about "flexibility." Indeed, flexibility with

their lives as they tended to the dying in abysmal conditions amounting not only to gross negligence but malpractice.

83.     Jalen went up the chain again and called CEO Cleary. Wyatt explained whom he had spoken to before and said he didn't feel comfortable working out of his field of competence.

He asked if there were any rehab positions available, or something else for which he was qualified.

84.     Brian Cleary shouted over the phone, responding: "You mean to tell me you're a freaking rehab nurse, and you are not going to work with med surg! That is ridiculous! I have clinical nurses who have never set foot in a hospital, and now they are working in ICU!"

85.     The last sentence of the above-quoted statement was a damning admission and evidence of gross negligence at a minimum: ICU patients are the most critical of all. ICU nurses can only learn protocols on the job, with supervision, whereas clinical nurses work in doctors' offices and take temperatures and give shots. A clinical nurse would not, for example, know how to treat a gunshot wound. A clinical nurse will not know how to operate a ventilator for an advanced COVID patient. It takes about eight months to learn how to work in ICU.

86.     Plaintiff decided that the non-ventilated were more prone to expose the virus to others. All of these rooms required the N95 masks. This need does not mention other traditional PPE to protect nurses from globules of sputum or dry, airborne virus particles – which come from the sputum laden coughs of the non-ventilated patients. Of course, this would depend on the situation, but Jalen was only following guidelines – some of which came directly from Krucial's handbook and HHC's training, both of which were following OSHA rules.

87.     After he complained to Cleary, he was immediately retaliated against and terminated. He had to pay for his flight to Alabama, despite the promise that he would be flown home. How dare

this uppity Black man speak to Cleary like this! The neglect of a small part of the deal was evidence of retaliation and just a kick in the pants as the henchmen sent Jalen out the door.

88.     When he arrived home, he found a mass-text about *him,* threatening other Krucial employees to "be flexible" or be fired. Yes, Plaintiff had agreed to be "flexible," but not at the cost of his life, his family's, or any license he possessed.

89.     Alexis Allen relied on her parents to take care of her kids as she traveled north; during the day they needed daycare, which cost her approximately $1000.

90.     Fortunately, because Alexis works remotely and usually at home, she did not have to quit her job as the others.

91.     She, too, was asked for her specialty – the continual gauzy misrepresentation.

92.     After arriving and completing paperwork, Krucial sent her to Bellevue Hospital with other nurse practitioners and physicians' assistants.

93.     They all met with a Bellevue a nursing administrator of Caucasian descent, who greeted everyone and invited them to sit. There were approximately 25 in her cohort, and they did as instructed even if to wait four hours as HHC and Krucial tried to coordinate the joint deployment.

94.     Alexis had the distinct feeling that Bellevue did not expect deployment of any nurse practitioners, and the hospital administration did not know what to do with any of them, even if they were needed elsewhere in HHC.

95.     Then they were trained on Bellevue process for identification cards. After two hours, all took lunch, then went to a Board Room with a long table. They watched a half-hour video about the computer chart system.

96.     After another two hours, certain Bellevue personnel were in and out of the Board Room, and it seemed as if they (the Bellevue personnel) were trying to figure out where they would send the Krucial employees.

97.     The Bellevue personnel ultimately said that the only need that they had was for nurses; if anyone would not work as a nurse, they were unneeded. Few agreed to this unexpected direction. Indeed, the Physician's Assistants legally could not work as nurses. (Bellevue eventually assigned the PA's to the Emergency Room.)

98.     Alexis and most of the Nurse Practitioners would not agree to work out of title <u>because they were repeatedly told not to do so by Krucial</u>. And, indeed, it seemed odd that Nurse Practitioners were needed at all – paid at a higher salary – when there were hundreds of nurses arriving and more on the way.

99.     Krucial had purposely over-hired and did the same thing in Louisiana and Texas. Alexis saw people daily waiting around the New Yorker Hotel. They signed in and went back to their rooms; some never saw the inside of a hospital or other medical facility by the time she left.

100.    Alexis called Donnie, her supervisor from Krucial, about the deployment of NPs as RN's, which was contrary to Krucial's rules and directions. Donnie said that he would discuss the issue when everyone returned to the hotel.

101.    When Alexis said she would not be a nurse, Bellevue tried again to ascertain what the NP's could do. As it happened, Alexis was willing to work as an RN at the guaranteed rate of pay *if she were competent to perform the job* and could function safely with proper PPE. Fortunately, she brought her own N95 because, though Bellevue did have them, a worker simply stuck one in her face – and without the smell test that ensures a proper seal. This is not a proper "Fit Test" – an essential part of being safe from infection, as everyone's face is different.

102.    After the failure of the "Fit Test" – the person operating the machine did not know how to work it and was just handing out "guestimates" based on face size – she and the others returned to the hotel.[2]

103.    The next day, her group of personnel arrived at Bellevue. The PA's and NP's separated into different groups. Three nurses greeted the NPs with whom they would train.

104.    Alexis asked, "Are we being trained as NP's or as nurses?" No one from Krucial had yet given her permission to deploy as a nurse.

105.    Meanwhile, one of the trainers said, "We don't employ Nurse Practitioners at Bellevue." This statement left Allen in a state of liminality and confusion.

106.    The Krucial team leader and the Bellevue trainers were in and out of the room in a flurry of confusion and whispers. Finally, the Krucial employee allowed this option: To work as a med-surg nurse or in the ICU. But if she were to work in the ICU, she would have to write lab orders and help turn the patients' bodies as required.

107.    Allen could have turned patient bodies – and anyone could – but she noted: "I don't think Family NP's can write orders because it is beyond our scope of practice." She mentioned that she didn't want to violate any rules of the Alabama Nursing Board.

108.    Writing lab orders is like prescribing drugs. One has to have the competence to interpret lab results to know what medications to prescribe, or what further testing might be needed, or if there is a procedure that is required. Alexis could not do this with competence.

109.    Instead of further speaking among the group, she texted the team leader, Aimée Branch, also a plaintiff herein. After some back and forth, they both agreed that the situation was a disaster.

---

110.    Allen got on well with Aimée, but there no resolution that day. Nurses in Med Surg floors were assigned over ten patients. Alexis was not going to accept an assignment that she couldn't perform with competence.

112.    Aimée later said that Krucial had determined that her only options were Med Surg or ICU. Alexis was willing and could have done so many things, including work at the Javits Center, which had both swabbing and outpatient care. But Krucial refused: it was as if she had signed up for a course in Calculus but placed instead in advanced Russian.

113.    She returned to the hotel. Someone in the Ballroom told to go to her room, and someone from Krucial would be in touch. She would have to book her flight (she, unlike others, was reimbursed).

114.    Several people at the hotel who were NP's never received an assignment. They didn't need NP's, but they were still recruiting them as of at least March 31, as Allen saw from the Krucial Facebook page.

115.    Later, Allen heard from Aimée that she had been fired, as explained below. She agreed Krucial was pressuring NPs to work outside of their scope of practice.

116.    Aimee's situation was much like that of Alexis; she, too, complained about quality of care and was fired.

117.    In addition, matters in her situation are of particular note. First, in addition to complaining about the lack of proper patient care (and care for the nurses), she verified with her Tennessee Board of Nursing that working outside of her scope of practice would be considered gross negligence.

118.   This report contradicted Krucial's suggestions to the contrary. Aimée was labeled a troublemaker for contradicting Krucial's false representations and insistence on working without competence.

119.   The next day, Aimée returned to Bellevue, and a nurse call to someone at HHC (or Krucial). The conversation was within earshot of all. The nurse said, "What are we supposed to do with all of these fucking Nurse Practitioners?" The anger arose from the complaint of patient safety and working within the role of incompetence that Krucial (and likely Bellevue) expected.

120.   Someone whom Aimée knew as a CMO heard this call and told the nurse to apologize. She did, but then immediately called operations at Krucial, and complained about Aimée. The call succeeded in getting Aimée fired for refusing to work outside of her realm of competence.

121.   When Aimée returned to the Ballroom, she was summarily fired on the pretext of whatever the nurse from Bellevue had said. Krucial did not even ask Aimée for her side of the story. Indeed, Krucial had already labeled her a troublemaker for demanding a proper deployment.

122.   Nancy Torres is an RN, whose recent experience is in psychiatric nursing, and corrections environments. She has worked in Med-Surg, Intermediate Monitored Care, and Rehab, though not recently. She told Krucial about her psychiatric and corrections experience.

123.   She applied for the deployment, and Krucial accepted her at the nurse's rate. Like the others, she was promised PPE in the email confirming her hiring, which indicated, in part, that "any staff that are directly working with the general public in close proximity will be provided PPE." PPE was not defined, and there was no indication that the minimum standard of care had been reduced, or that nurses should not expect the N95.

124.   Again, the Krucial handbook incorporates OSHA regulations, which require the PPE. Upon information and belief, Krucial sent her this handbook.

125.    Nancy arrived on March 22 and went through the paperwork routine. Even though she had

not been assigned to a hospital, she went to her room after a henchperson (Michael) told her: "Go

to your room!"

126.    Krucial employee Alex Tender said, "Since you refused to go to work, we're not going to

pay you." Insane! She wasn't asked to do anything. As it happens, Krucial paid her, but Nancy did

not refuse to work. Alex's comments suggested to Nancy that something was amiss, and she was

correct. Bully the nurses and publicly fire to intimidate everyone.

129.    On March 24, Krucial bussed her and others to Coler. She was given a crash course for ten

minutes on how to suction a patient needing tracheostomy care. Nancy had done that procedure a

few times, though not in a while. The procedure requires that the patient's throat is sliced open; a

tube inserted into the throat sucks mucous out of the lungs. It requires the room to be very clean.

The nurse needs proper protection. Otherwise, a nurse could introduce bacteria into the patient,

and vice versa.

130.    The standard of care is to do endotracheal suctioning in a "negative pressure room" where

airborne virus does not travel.

131.    Although Nancy brought her N95 mask, she could not perform intubations and protect

herself. She had had only five-minutes of training for a procedure she hadn't done in years.

132.    The staff at Coler chose her as part of a group of nurses to set up a new hospital with supply

carts, supplies, computers, linens, and stock – whatever needed. The nurses also put linens on the

new beds in the new rooms. Nancy did this without complaint.

133.    On or about the same day, there were modules of computer training on the standard of care

and isolation precautions. Nancy took several screenshots indicating the N95 was the standard of

care at Coler; HHC guidelines stated explicitly that "use [of the] N95 respirator mask if there is

possible exposure to aerosol-generating procedures [to] ensure meticulous environmental disinfection."

134.    But the staff at Coler said no one would be getting an N95, except for those who did intubations. This contradicted HHC's own rules requiring the N95 if there is "possible exposure," not just for those doing intubations. The screenshot showed the proper standard of care.

135.    After she finished such training (such as it was), there was talk of the next day. Rosalie, as she had told Jalen, said there would be no COVID patients arriving then, only those in post-ambulatory status. Rosalie told Nancy and the others that these were patients who were ready for discharge but had nowhere to go. She referred to them as "walkie talkie" patients.

136.    Rosalie promised to look into getting N95s for everyone, but, bless her heart, this was a fib to get the nurses to return. No one would get the N95s and those who brought their own would have to reuse them – which OSHA and HHC guidelines say is a contraindicated practice.[3]

137.    All Krucial temp. nurses raised concerns about incoming patients not having been tested for COVID could be infected, causing everyone worries without PPE.

138.    The next day Nancy and the Coler cohort met the same CMO just as Jalen.

139.    The CMO said the CDC is recommending surgical masks, not the N95. This was a misrepresentation. The CDC was not recommending surgical masks per se, but only because N95s were in shortage.

140.    After meeting with the CMO, some Krucial Nurse Practitioners walked throughout the facility with N95s before the patient arrivals. Nancy asked Alex, an HHC employee, "If N95s are not necessary, why" is there a disparity in the use of N95s between nurses and nurse practitioners?

---

[3] Upon information and belief, HHC lowered its standard of care shortly after Nancy trained for it.

141.   Alex said, laughingly, "Because they are going to be assessing patients." This response was non-sensical, as nurses would "assess" patients as well

142.   Nancy returned that evening to the ballroom with three other employees and all voiced concerns.

143.   The Ballroom staff modified what the CMO said – that they would be doing intubations, but not getting N95s, just surgical masks. This was an invitation to infection.

143.   The nurses collectively expressed that they came to New York to do a job, and Krucial promised proper PPE, not just surgical masks.

144.   A Krucial supervisor, Brian said: "Do not take patients without proper PPE."

145.   Another Krucial staffer then said the nurses were covered by insurance without proper PPE. What did this mean? That they had malpractice insurance? That they had worker's compensation insurance should they become infected?

146.   As it happened, Krucial has two Worker's Compensation policies, one of which only covers nurses in certain states – none of the plaintiffs live in these states – and another that covers "disease" but the disease must be contracted while on the job – something a worker's compensation carrier would fight to the death because discovery of infection doesn't always happen immediately.

147.   In addition, intentional acts such as these are not barred by Worker's Compensation in the State of New York.

148.   Nancy returned to Coler the next day and was told to take temperatures. It was known by now that she was "uncomfortable" working out of competence without PPE. She wasn't flexible. A henchwoman was on her way to send Nancy on her way.

149.   Nancy started the day taking temperatures.

150.    Rosalie was there and said to Nancy, "I don't need psych nurses." Her voice reflected frustration, and she added, "I can't understand why they are sending psych nurses."

151.    Then came Stephanie: a loud, aggressive woman working for Krucial – and aide-de-camp. She said, "I'm the lead!" She stormed off, saying, "You two are going home. I called for transportation to the hotel."

152.    When the car arrived, Stephanie barked at them and demanded they all get on the phone with one Jennifer Pino – a chief enforcement officer of sorts who works for Krucial, though Nancy didn't know her at the time.

153.    Throughout the day, Nancy saw many patients transferred from area hospitals, all of whom were of high acuity.  She also observed some to have tracheotomies, life-vests (personal defibrillators worn by patients at risk for sudden cardiac arrest). There was talk of one patient having a feeding (or "PEG") tube. Patients were moaning and crying out while on the stretchers.

154.    Meanwhile, in addition to Nancy's employable skills, she noted that there "were people dying every day that – as she heard on the news – there was no more room to store bodies from Elmhurst. Is there no psychiatric need in these circumstances?"

155.    Stephanie then came downstairs to demand names. She said, "I'm going to file a complaint with Krucial because you and another a nurse are refusing assignments." Stephanie continued to show aggression in front of police officers, EMT's, staff, and patients. She stormed off.

156.    After a while, Nancy and other nurses were returned to the hotel. Nancy was told to speak to someone named Paul for a proper assignment.

157.    "Paul does not handle that," Stephanie snarled. "We need people who are willing to get in there!" (She could have added, "And risk your lives without PPE outside of your scope of competence.)

158.    Nancy said, "I am trying to protect my license."

159.    Pino responded you need "to get in there and do what was required! Your license is protected by a waiver." That was a pure lie.

160.    Pino continued, "If you are assigned a ventilated patient, get in there and do what you need to do. This is a pandemic, and we're in disaster mode. Even if you've never had a ventilated patient, you need to be willing to get in there and get hands-on! They're probably going to die anyway!" The latter admission was surely true and exposes Krucial's pandemic profiteering.

161.    Jennifer added, "Your license is protected, and if you're not willing to work with the patients at Coler that you should leave."

162.    Nancy asked, "Are you telling me to go or recommending it?"

163.    Jennifer didn't want Nancy around but was too afraid to fire her. She said, "I highly recommend you leave."

164.    Nancy stated, "I will leave if you want, but you should realize that I came here to work and wanted the same opportunity as promised," within her specialty and with PPE. She added, "I have to find somewhere to go because my mom is quarantined in my home after completing chemotherapy."

165.    Nancy walked out of the Ballroom, and Jennifer yelled out for her to sign the demobilization papers. But Nancy did not such thing. She's a midwestern mom who expects that people will do what they promise and not harm others. This might be true most of the time, but not with Krucial, an organization governed by greed and lies.

166.    Nancy tried to resolve the problem through Krucial Human Resources the next morning. One woman named Taylor actually told her, "Don't go yet! Don't leave yet!" There was a promise to try to find a new assignment.

167.     Nancy went to the Ballroom and back to her room with no assignment. She returned then spoke to Taylor again, who had clearly been given orders. Her demeanor was vastly changed. She stated Nancy never told her (Taylor) that Rosalie wanted people to provide patient care or that psych nurses were not needed.

168.     What difference did that make? The statement was objectively true, but a non sequitur. It made no difference in the context of Nancy just wanting a job that she could perform without harming patients and protecting herself. Imagine – a job risking your life when – as Krucial admitted and as turned out to be true – almost all of the patients would die.

169.     Someone named Nicole added that she should be ready to jump in and do anything asked of her, including suctioning under unsafe conditions.

170.     Nicole then threw in something odd: that Nancy swore three times during a conversation when with henchperson Stephanie's the day before.

171.     Nancy denied this. And three times? It seemed an over-plotted lie. Nancy said that as a mother of several kids, that was not within her repertoire of behaviors. "I'm not a child, and I wasn't there to argue with her.

172.     She added she was expressing concerns about safety "because this is what's going on at the facility. People come here to risk their lives; they come here to do a job because nursing is a calling. I thought I could help in some capacity, even if I am a psych nurse. People are dying alone."

173.     Nicole would not let up even though Nancy added that there were places that Krucial (or HHC) could use her skills. She noted, "there is a nurse at Jacobi Hospital trying to pull me to another facility." Nichole did not want to hear it.

174.     Nancy added, "There are also labor and delivery nurses I could have worked with." Nancy was also willing to work at the Javits Center.

175.    Ultimately, Nichole said she "didn't want" to find a position where Nancy was comfortable, nor to help in any capacity. Nancy then stopped responding and gave in: "I'll be gone tomorrow."

176.    The next day, her friend from Jacobi texted her and reported that a nursing supervisor by the name of Shameka still wanted her services.

177.    *Feh.* Nancy waited a bit, but she had rented a car to drive home. She would not get on an airplane because she had a scratchy throat and presumed, she might have COVID. She drove back to Illinois, which took 13 hours at a constant rate.

178.    Nancy hoped her scratchy throat was just from the mask because she hadn't been drinking enough water, as she did not want to remove the mask from her face.

179.    But then she started feeling respiratory constriction. Nancy felt as if it were difficult to take a deep breath, and she got sicker. She went to a local ER on her doctor's orders.

180.    A PA at the ER advised that she probably had COVID, but could not test her for it, even if she paid out of pocket. Since tests were scarce, that would be her employer's responsibility, it was explained. The PA gave her a note indicating she probably had COVID, though he did not test her.

181.    She called Krucial, which *refused* to find a place for her to have a test. One might say, *Mon dieu!* But Krucial's refusal should be no surprise because <u>this is how Krucial works</u>. It might also have neem retaliation after Nancy concluded was constructively discharged for complaining about patient safety. She left rather than risk her life. She has recovered and is working again but wonders why she was put through this horror.

182.    Adding insult to injury, on April 9 – apropos of nothing pertinent at the time – Nancy received a text from Krucial, stating:

> Finally, as I have said before, many times. [sic] If you can't protect yourself with PPE, you
> need to speak to a clinical lead at the hotel or speak to a hospital administrator before
> proceeding if there are concerns with PPE.

183.   What? This was another of Brian Cleary's illogical lies, and an invitation to termination if anyone still employed by Krucial complained. In later emails –stupidly, Krucial never eliminated any plaintiff from its email list – this would change as HHC changed its rules to allow for the surgical mask to replace the N95 as the standard of care.

184.   Jose Pinlac is a retired ER nurse with 35 years' experience, including, as indicated, during the EBOLA and SARS crises. He is licensed in Florida and California and has inactive licenses elsewhere.

185.   A friend informed him of the openings in New York. The friend needed a companion on the trip north, and he agreed to go. Both applied and were accepted and travelled by car.

186.   Like the others, they were promised PPE, without any mention that the PPE would be different than in any other situation. Jose knows PPE and would never have come to New York had he known it would have been so woefully limited.

187.   Krucial asked him his specialty – an element of Krucial's fraud to suggest to a nurse that he would work within his specialty. As it happened, and unusually, Jose was the only plaintiff that got an assignment within his specialty in the emergency room at Elmhurst Hospital. But his assignment was disastrous. But again there was no PPE not as promised, not anywhere, none.

188.   He and his friend arrived in New York on March 31, 2020.

189.   Upon arrival, the two did fit testing. Jose learned he would work on the night shift at a hospital, which turned out to be the beleaguered Woodhull.

190.   He went to sleep, but the next morning in the Ballroom, he asked for his N95. He asked, "Jen," Jennifer, and Brian, all Krucial workers, none of whom would answer him. He began to think something was amiss. Why perform a fit test if there was no N95? It was all an ugly charade.

191.   Krucial staff told him he would get the mask at the facility. This was a lie.

192.    Warily, he got on a bus to Woodhull Hospital in Brooklyn.

193.    After arriving at Woodhull, there was computer training on COVID, which specified that the nurses would need the full armor of PPE, including the N95.

194.    People at Woodhull asked him to start working, but he inquired, again and again and again, about his mask. Some nurses had them, some not.

195.    One of the Woodhull nurses was anxious for him to start.

196.    Jose said, "I need a proper mask." She ignored him. He repeated: "No, no, no, we need masks."

197.    Wanting some protection, he asked for a surgical mask, at least. He saw some on a desk of a nursing supervisor. She snatched them out of his reach and said he would get his later. Another lie.

198.    He would not go to the ER and the staff was getting upset with him. But what did anyone expect? These nurses were promised PPE and knew nothing of a shortage. What universe were they living in?

199.    A man took his temperature; neither had a mask. He waited with no face cover, near a pile of soiled linens.

200.    He then to the hospital lobby to get a surgical mask, then to a staff room. There he received at least a face shield – not as protective as a surgical mask, let alone an N95; it only protects the worker from fluids – not airborne virus.

201.    Someone gave him ordinary medical gloves – not rubber, just thin paper ordinary for single use of modest danger; he also got a plastic apron. When he trained for EBOLA and SARS, there was more extensive protection. Finally, after begging, he got a paper surgical mask.

202.    In the ER, there were people immobile, dying, moaning, and groaning.

203.    Patients were urinating and defecating on the floor. Monitors were beeping, beeping: evidence of crisis or death.

204.    Jose intubated one patient, then a few others. He used the same paper gloves that he used on other patients – a sure case of transferring bacteria and probably gross negligence.

205.    A doctor on site selected patients who would get ventilators and who needed intubation. All Jose could do was administer palliative care drips of morphine or intubate.

206.    He finished his shift, but he had used the same PPE for four hours. He washed his hands; he had no shoe covers and his shoes were undoubtedly covered in deadly viruses and bacteria.

207.    The day shift arrived as he embarked on the bus, leaving for the hotel. Jose knew that people going to Woodhull would infect the bus when they returned and transmit the virus to other temporary workers when they switched.

208.    Indeed, one nurse tested positive.

209.    When he returned to The New Yorker, he put his clothes into the basement laundry.

210.    He had brought Lysol from Florida and disinfected his room. His friend came, and he told her, "Please be careful, nurses are coming in and out of these hospitals and will be infecting everyone."

211.    His friend rapped on the door. Jose knew he had been heavily infected and told her, "Don't come into my room!"

212.    Then a Krucial staffer came in, and Jose told him he refused to work without PPE. His friend went downstairs, returned, and informed him Krucial was going to fly him out and do testing. Alex Render, one of the recruiters, promised that everyone would receive a COVID test when they left. Didn't happen.

213.    He called his family, complained about the lack of PPE, and made this complaint to Krucial

Staff, several times. He even called the corporate office.

214.    Someone accused him of having brain damage, called Krucial HR to complain about him,

and told them he was "unfit." Unfit? Krucial is unfit. Jose only wanted proper PPE, as promised,

and knew nothing of any PPE shortage because Krucial Staffing lied to him.

215.    Krucial provided an Uber to the airport. Jose had no symptoms, but he was exposed. He

did not want to infect his family and went to a hotel to quarantine. Krucial was supposed to get

him tested before sending him home, but they did this to no one, or very few.

216.    He called and asked again that Krucial pay for his quarantine and testing. Krucial refused

this request.

217.    Now in a hotel in Boca Raton, he was tested, waited three days, then learned the result was

inconclusive. He had to wait another week to be retested and remain in quarantine on his dime.

Finally, he tested negative.

218.    Brian Burr received a text message from Krucial on March 25, 2020, inquiring if he would

be a medical provider for the NYC COVID-19 frontline. Brian has military experience, is a Board-

Certified Psychiatric Mental Health Nurse Practitioner and Family Nurse Practitioner.

219.    He has a medical family practice graduate degree from Old Dominion University, and he

is a doctoral candidate in Behavioral Therapy. Brian has worked as a nurse for four years and

specializes in children's needs. He left this practice for this time, wanting to help on the front line.

He also has extensive experience procuring medical supplies.

220.    He drove his car from Virginia to New York City the next day.

221.    He learned some basics on the March 27, and Krucial staff told the newly arrived that it

would assign them to different locations. His assignment was Elmhurst Hospital as the emergency

room team lead; by then many nurses had quit because of the lack of PPE or had been fired. There was a condescending attitude that Elmhurst Hospital had towards the Krucial staff. Initially, he helped source IV bags, food & drinks for patients. On Saturday or Sunday of that week, a reporter contacted him about the situation at Elmhurst. Brian did a video interview with WABC News. As a result of that interview, the hospital staff at Elmhurst told him he was not welcome.

222.    Burr returned to the hotel and told his story. CEO Cleary (at the time) liked Burr's military get-things-done demeanor. He knew he could use Burr and asked him to join the administrative team in sourcing PPE, as there was none available for staff.

223.    Burr spent the next five to ten days, every day, on the phone with different vendors and with family and friends connecting with people that could send PPE, food, uniforms, shoes, and foot scanners to the hotel.

224.    So the staff would have clean clothes, Burr organized the laundry service to come to pick up dirty clothes. Burr prearranged for a delivery service to send food.  Several administrators on-site asked if Burr would use his car to grocery shop at Costco to pick up vitamins for Krucial staff. He did that and submitted receipts, but Krucial only reimbursed him for a fraction of the amount he spent.

225.    Someone asked if he would drive nurses to other locations in hospitals that had slept in or missed their busses. Brian complied without complaint. He continued to find sources for necessary things such as algorithms for ventilators, appropriate ways for staff members to have forms available so that they could treat patients and have the protective equipment that he supplied.

226.    Brian Cleary said he was a vital part of the team. Cleary even sent him a bonus of $1,500 for his ingenuity. He was able to get pathogen foot scanners, PPE, uniforms, scrubs, meals, eye

protection for staff that Burr handed out. He had procured it and the donating vendors expected him to dole out the equipment as he deemed fit.

227.    Brian's friend, Rebecca, offered to send 65 N95 masks. Then Brian changed his attitude. He refused to allow him to donate these masks to Elmhurst Hospital.

228.    Because the mail would come in through the mailroom at the New Yorker, some PPE went missing. Cleary then told him that he would book him a room in the hotel that Burr could "lock supplies," as he put it, so they wouldn't go missing. That is where Burr stashed most of the donations –  uniforms for those who lost their luggage, coolers (there were no refrigerators in the rooms), even coffee machines, microwaves so that staff could eat between shifts. He was working 20 hours a day.

229.    Burr continued to do his part, including delivering pizzas to the staff at Coler as there are few places to eat on Roosevelt Island, where Coler is. He even bought the pizzas on his credit card and drove them in his car to Coler, without reimbursement. Rebecca Love, a person Burr knew who procured medical supplies, called and said she had an additional 1,500 N95 masks that she would like to send to him from Johnson & Johnson. But she needed an answer by 4 PM; the plane was leaving, and she needed to know where they were going.

230.    Rebecca had them rerouted from Sloan-Kettering to Krucial because of Krucial's needs.

231.    Cleary didn't like this. Burr was protecting Krucial staff, but this didn't look good. Krucial nurses had to work without PPE.

232.    Cleary called Burr on his cell phone at approximately 4 PM that day.

233.    Brian Burr was able to procure N95s when Brian Cleary could not. Burr was drawing too much attention to the effort of saving lives rather than death triage without protection. Cleary said that it was making him look bad, and he was fired. Burr apologized for making him look bad –

even though Cleary makes Cleary look bad – but that he sought out for the safety of the staff, which he thought paramount, *and which he was hired as an administrator to do!* But to Cleary, it was all about Cleary. He didn't want the nurses to have PPE; he wanted them "to get in there."

234.    Brian asked Emmanuel Badillo at the hotel to help him collect four foot scanners – something Burr had procured through donations. These scanners cost $10,000 apiece and eliminate the bacteria and viruses the workers would have on their shoes. Each scanner had a place the donors wanted them to go if not Krucial. Brian was afraid that Krucial would resell them to a different location. These were in his charge; he was responsible for taking them and maintaining them with proper bulbs – Krucial wouldn't know how to do that.

235.    Krucial stole the scanners.  Burr didn't know that at first, but he called the NYPD, which arrived on the scene. The officers and the manager checked the security cameras, and they found the footage of Krucial staff members pushing the equipment into an unused banquet kitchen. They then went to that kitchen and retrieved the scanners.

236.    Brian Cleary instructed the New Yorker to terminate his room. The owner told him that if Burr didn't leave the hotel by 5 PM, he would be charged the regular rate for the night and pay out-of-pocket. Burr did not want to do that, so he packed his belongings. When he returned from his room, the police were gone. Krucial misappropriated the scanners and even had the nerve to post a video about them on Facebook! It was pure theft.

237.    Burr spoke to all the donors to let them know that he would soon be working at another site and not to send more equipment to Krucial.

238.    If Burr had embarrassed Brian Cleary with his extensive efforts, he would transfer them to a new deployment. He left the information with Barry, the hotel manager. Burr had also ordered 300 pairs of donated crocs that had arrived on April 3. Burr instructed the manager at the New

Yorker to distribute them to staff. Manny asked him to have a letter signed by Brian, allowing him to do this.

239.    Crocs: Nurses use them because they are always on their feet. But here is where Brian Cleary's ego betrayed him. He was offered 300 Crocs for his staff but refused to sign the letter. Some N95 masks then arrived, and since Cleary refused to protect his nurses, Burr had them distributed between the Javits Center and Elmhurst and Woodhull Hospitals.

240.    When Cleary learned that Burr had foiled him again – he decided to blast an email to Krucial staffers to everyone on several outlets that Brian Burr was a "scammer" and to report to him to the police if seen on site. This was purely defamatory and retaliation for providing patient and nursing care. Plus, Cleary had no power to ban Burr from The New Yorker Hotel. He just wanted to assert his dictatorial power.

241.    <u>Latricia Hickenbottom</u> also deployed to New York as a nurse practitioner. Before arriving north, there were no specifications as to what type of degree or specialty Krucial wanted. She saw the company was accepting everyone, including newly graduated nurse practitioners.

242.    Again, she was asked her specialty, just as the others.

243.    She went, as requested, to Harlem Hospital. The workers there took her group of NP's on a tour, and afterward doled out assignments.

244.    There was no orientation. Latricia shadowed a physician for about three hours. He mostly sat at a desk during this time, writing. She also followed him into the ICU and ER.

245.    After that, someone at Bellevue told her to perform as a hospitalist. A "hospitalist" is doctor who works in a hospital. A Nurse Practitioner can perform the role of a hospitalist to an *extent,* but not if it is out of her scope of practice.

246.    She had explained to Krucial, specifically Donnie and her team leader Calada, that she was not a hospitalist; she had no experience in acute care. Her degree was in primary care, and to work in an acute-care setting, whether it be a hospital, or an urgent-care facility is contrary to the ethics of her profession. Again, she would have been practicing outside the scope of her competence.

247.    The team leaders offered that she work as an RN or staff nurse. But she saw that many such nurses without critical care training were working with maybe ten patients at a time, all on ventilators.  Death triage without PPE – she couldn't perform that job. She refused to be a warm body to attend to the dying.

248.    Latricia is not critical-care trained, let alone trained to work with ten patients. True, this was an emergency, but she was not competent to do what Krucial insisted and could have risked her license or committed gross negligence.

249.    When she returned to the hotel, she went to the Ballroom where the Krucial staff convened, and she alerted them of the situation.  Staff said they would discuss the situation further.

250.    The same night, a Hospital Chief Resident sent out assignments via text. Latricia was to work the next day in a COVID overflow intensive care unit.

251.    The text included language that employees could not question assignments and must be "flexible" – if that is not a contradiction in terms.

252.    Staff finally told her there were only hospital assignments, and she would have to take one or demobilize.

253.    Latricia chose to return home because Bellevue was unsafe for patients, and there was the potential of having a mark on her license (or reputation) for working outside the scope of her practice.

254.    Krucial didn't even try to find her something where she could work with competence, although one Caucasian woman secured a plum assignment at a swabbing site. The Black nurses were surely treated less favorably. For example, Jasen is a go-getter just like Burr. Yet Burr was given an opportunity even after he was banished from Elmhurst.

255.    Latricia would have done anything legal that she was competent to do. There had to be something she could have done. But she was not willing to anything illegal, contrary to the standard of care that her Nursing Board could consider gross negligence.

256.    It wasn't much to ask – or to refuse.

FIRST CAUSE OF ACTION
BREACH OF CONTRACT

329.    Plaintiffs repeat and reallege all previous paragraphs.

330.    Plaintiffs entered into an employment contract, which was expected to last for less than one year.

331.    Plaintiffs followed the terms of that contract.

332.    Defendants breached that contract.

333.    As a result of the foregoing, two plaintiffs left jobs paying (a) to make more money than; (b) help with the COVID crisis, and (c) enhance their experience.

334.    As a result of the breach, plaintiffs have each been damaged, individually, in amounts over $75,000.

SECOND CAUSE OF ACTION
QUASI CONTRACT – RELIANCE ON A PROMISE

335.    Plaintiffs repeat and reallege all previous paragraphs.

336.    In the contingency that a classic breach-of-contract claim is insufficient to cover their damages, and is otherwise not duplicative with this claim, plaintiffs relied on the promises offered by Krucial.

337.    Krucial did not live up to its promises, the proximate cause of plaintiffs accepting the assignments.

338.    As a result of the preceding, plaintiffs have been damaged.

THIRD CAUSE OF ACTION<br>NEW YORK LABOR LAW § 741

339.    Plaintiffs repeat and reallege all previous paragraphs.

340.    Krucial took retaliatory action against each plaintiff because they (a) disclosed to a supervisor a policy or practice of the employer that the Plaintiff(s), in good faith, believed the assignments constituted improper quality of patient care; or (b) objected or refused to participate in such activity.

341.    Each Plaintiff brought the improper quality of patient care to the attention of a supervisor and afforded the employer a rEatonable opportunity to correct such activity, policy, or practice.

281.    As a result of the preceding, Plaintiffs have been damaged and are entitled to rEatonable attorneys' fees.

FOURTH CAUSE OF ACTION<br>BREACH OF CONTRACT IMPLIED-IN-LAW

282.    Plaintiffs repeat and reallege all previous paragraphs.

283.    Plaintiffs were fired – or forced to resign – based on a contract implied in law under the doctrine established in *Wieder v. Skala,* 80 N.Y.2d 628 (1992).

284.    Each Plaintiff is required, as a condition of nursing licensure, must follow the rules of the State in which they work.

285.   Each Plaintiff is subject to discipline if he or she violates any code – at a minimum – of the code of conduct of the State of Alabama (and other states).

286.   For example, the Alabama Board of Nursing Administrative Code, Chapter 610-X-8 (Disciplinary Action) states that failure to exercise the applicable standard of care is grounds for discipline, at a maximum loss of licensure. All states' nursing codes – including Tennessee's, as Aimée would learn, have similar provisions.

287.   The Codes of all states also impose reciprocal discipline for those who violate similar provisions in other states. Wyatt, with the most certifications, could have been disciplined by approximately four state Nursing Boards had he taken these assignments.

288.   At least one plaintiff mentioned the disciplinary code to officials at Krucial, and the other two pointed out that Krucial asked them to violate the standard of care.

289.   Although traditional malpractice-liability rules relax during an emergency, in addition to the chance they could commit gross negligence, Krucial had no authority to allow its recruits to violate their State's licensing board's standards of care.

290.   Plaintiffs were unwilling to violate these standards of care.

291.   Plaintiffs were terminated or required to resign because they refused to violate the standards of care of their home state.

292.   As a result of the preceding, plaintiffs have been damaged.

FIFTH CAUSE OF ACTION
FRAUD

293.   Plaintiffs repeat and reallege all previous paragraphs.

294.   Defendants made representations as to material facts, including that (a) plaintiffs would work in their field of expertise; (b) that plaintiffs would get proper PPE; (c) that there were jobs available that they could perform even if not precisely within their field of expertise.

295.    Krucial misrepresented that PPE would be in short supply.

296.    It misrepresented that the PPE rules would change and misrepresented the scope of individual Model Acts (and Governor Cuomo's Executive Order).

297.    Such representations were false.

298.    Defendants intended to deceive plaintiffs. In sending out the mass text, they intended solely to bring in as many bodies as they could, without regard to these workers' area of competence, or their lives.

299.    Plaintiffs believed and justifiably relied upon the statements

300.    While not essential, but complimentary to this cause of action, Krucial knew it could not provide proper PPE. As of March 3, the World Health Organization notified the health care community of this tragedy. *See* https://www.who.int/news-room/detail/03-03-2020-shortage-of-personal-protective-equipment-endangering-health-workers-worldwide. Unless Krucial admits to complete incompetence in not knowing about this, the text blasts it sent out after March 3 that nurses would get PPE were purely false. Indeed, the shortage was caused in part by the Australian wildfires occurring in January 2020.

301.    Plaintiffs were induced by the promises to come to New York for high pay for at least several weeks.

302.    As a result of such reliance, plaintiffs sustained financial loss.

303.    There are additional damages beyond which may be compensated by the breach of contract causes of action, including but not limited to:

        (a)  the emotional toll the debacle took on each Plaintiff, to varying degrees;

        (b)  the loss that they could have the experience of helping in the prime U.S. COVID hotspot competently;

(c)  the scurrilous defamation invited upon Jalen and Brandon in a mass email to scare other employees;  the exposure to COVID without proper PPE;

(d)  the failure to test the nurses as they left the assignment;

(e)  the failure of Krucial to follow its own worker's compensation guidelines, which provided for testing, but was refused by two plaintiffs;

304.   Additionally, insofar as defendants' actions violate public policy, punitive damages should be assessed, which are not available under traditional contract law.

SIXTH CAUSE OF ACTION
CONVERSION
(Brandon Burr)

305.   Plaintiffs repeat and reallege all previous paragraphs.

306.   Brian Burr was deprived of four scanners, which were in his control, each costing $10,000.

306.   Krucial under the direction of Brian Cleary stole those scanners.

307.   The defendants refuse to tender back the scanners to Burr, and they are likely now damaged.

308.   As a result of the preceding, Brian Burr has been damaged.

SEVENTH CAUSE OF ACTION
DEFAMATION
(Brandon Burr and Jasen Eaton)

309.   Plaintiffs repeat and reallege all previous paragraphs.

310.   Brian Burr was fired from the job because he was doing things for the staffers that Cleary could not do for Krucial Staffers.

311.   Brian Cleary then sent out a blast email referring to Brian as a "scammer."

312.   This was defamation per se.

313.   The word scammer is incapable of anything other than defamatory meaning.

314.    The word and its context harmed Burr as a result.

315.    Jalen Eaton was similarly excoriated in a blast email for refusing to do his job as ordered, which was capable of defamatory meaning and defamation per se.

316.    As a result of the preceding, Brian Burr and Jasen Eaton have been damaged.

COUNT EIGHT
INTENTIONAL TORT CAUSING MENTAL AND PHYSICAL
PAIN AND SUFFERING
(Branch, Torres and Pinlac)

317.    Plaintiffs repeat and reallege all previous paragraphs as if set forth herein.

318.    Defendants acted in bad faith and lied, and Plaintiff, relying on the misrepresentation (or material omission), was harmed by the bad faith and lie.

319.    The misrepresentations included but were not limited to (a) not providing PPE; (b) knowingly putting these plaintiffs that there was PPE when Krucial knew there was not.

320.    As a result of the foregoing, these three plaintiffs caught COVID.

321.    Defendants were required in their contract with the City to have Worker's Compensation coverage, but its two policies fail:

322.    The first policy applies only to workers in three or four states where no plaintiff lives.

323.    The second policy states that the "employment must be necessary or incidental to your work in a state or territory listed in Item 3.A. of the Information Page."

324.    Defendants conveniently have omitted providing the Information Page in accordance with initial disclosures. Defendants knew this insofar as one of the defenses in the answer refer to "FEMA Worker's Compensation." No such policy was provided to plaintiffs and the City required Krucial to have its own policy.

325.    Even if the policy covers every single state in the country, New York takes away the Worker's Compensation bar where intentional acts caused physical or mental injury.

326.     While New York law usually relegates claims for injuries in the workplace to Worker's Compensation, an intentional injury by the employer – or its employee – is an exception to the NY Worker's Compensation Law bar. Where an injury is sustained to an employee due to an intentional tort perpetrated by the employer or at the employer's direction, the Workmen's Compensation Law is not a bar to a common-law action for damages.

327.     To recover for his injuries under the intentional tort exception, the employee must establish that the employer that the acts of the employer constituting an intentional tort were deliberate.

328.     Krucial's intentional acts were extreme and the facts demonstrate that evil acts in derogation of the plaintiffs who contracted COVID were spun into action by Krucial.

NINTH CAUSE OF ACTION
WAGE THEFT
NEW YORK LABOR LAW § 201 et seq.
(Burr, Torres, Pinlac and Branch)

329.     Plaintiffs repeat and reallege all previous paragraphs.

330.     The contract between Krucial and each plaintiff required two weeks of quarantine pay. Termination was irrelevant (and as a matter of public policy should be).

331.     Pinlac and Torres were refused quarantine pay.

332.     Burr and Branch were cheated of some $10,000 of quarantine pay.

333.     As a result of the foregoing, plaintiffs have been damaged.

334.     Defendant Krucial must pay liquidated damages for willful wage theft as well as attorneys' fees.

WHEREFORE, Plaintiffs demands the following relief:

a.   Compensatory Damages in excess of the jurisdictional limit of this court;

b.   Punitive Damages for such causes of action that allow for its imposition;

c.   Attorneys' fees and costs under New York Labor Law § 741 and § 2012 et seq.;

d.   Liquidated damages;

e.   Such other relief as the Court may deem appropriate.

Dated:      New York, New York
                  October 2, 2020


_Greg S. Antollino_
_____

Gregory Antollino, Esq.
275 Seventh Avenue, Seventh Floor
New York, New York 10001
(212) 334-7397
gantollino@gmail.com