UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
Alexis Allen, Latricia Hickenbottom, Jalen Eaton,
Nancy Torres, Jose Pinlac, Aimée Branch
& Brandon Burr,

      Plaintiffs,

      v.

Krucial Staffing, LLC & Brian Michael Cleary V,

      Defendants.
------------------------------------------------------------ X

SECOND AMENDED COMPLAINT

20-cv-2859 (JGK)(OTW)

**JURY TRIAL DEMANDED**

> Clinical competency has been a challenging issue in nursing[.] The feeling of low competency  . . . influences the quality of care. Nursing care in surgical departments [requires] considerable clinical competencies. Surgery is a traumatic procedure, and patients need special care. Many patients confront complex situations, and nurses should be competent in making urgent and correct clinical decisions in surgical wards. Besides, infection is an important issue in surgical departments and surgical nurses must be competent in implementing infection control strategies.

"A Study on Improving Nursing Clinical Competencies in a Surgical Department," <u>NursingOpen</u>, July 2020, pp. 1052–1059.[1]

> "The Grey Nurse"
>
> The Grey nurse entered a rose garden
>   Where roses' shadows dappled her.
> Her apron was brown with blood. She prayed,
>   And roses wondered at her prayer.

D.H. Lawrence, "The Grey Nurse," <u>Poetry: A Magazine of Verse</u>, July 1919.

1.     A nurse who travels to regional crises – a nurse without a permanent assignment who

travels to who might respond to a COVID-19 crisis, will almost do so in good faith; the high pay

---

[1] Mohammad Afshar, Hamidreza Sadeghi-Gandomani, and Negin Masoudi Alavi, Faculty of Nursing and Trauma Nursing Research Center, Kashan University of Medical Sciences, Kashan, Iran, available at https://tinyurl.com/y4jyxnk5.

– $10-13,000 a week – is also a huge incentive. However, notwithstanding high salary, these nurses have a right to good faith and fair dealing, respect, and their employer keeps its promises.

2.      Unfortunately for these plaintiffs, Krucial Staffing, a disaster-response, temporary-personnel agency formed in 2019, corralled nurses from all over the country in a fraudulent manner, promising so much yet delivering so little; for some of these plaintiffs, the withheld the last promised paycheck for two-weeks' quarantine.

3.      This diversity action recounts the story of seven nurses from states other than New York who wanted to assist in the New York hotspot – but only in a manner consistent with protecting the lives of others and themselves, and within their field of competence. It is also the story of an LLC, Krucial Staffing, profiteering from the crisis, putting nurses' lives at risk, and making promises that its CEO (and other of its principals) knew they wouldn't keep. The DocuSign contracts it entered with these nurses were blunderbuss. The contracts were not highly favorable to an employer, as most are, but it didn't matter: at some point, Krucial knew it wouldn't abide by the terms of these agreements, leaving nurses to sue to have their promises kept.

4.      Krucial – from Lawrence, Kansas – is backed by an on-site, wealthy hedge fund; its 2019 birth it arranged to have preceded by a groundswell of online goodwill – false references on Glassdoor and Yelp, for example, all with close to 5-star ratings. It also got substantial-good press that it engineered by bringing local TV stations to fill their time information about its work. It could not have known in 2019 that the pandemic was coming, but disasters always do.

5.      When the pandemic came, Krucial rushed into the bidding process. It got the bid then ran a cruel operation: Nurses were lured into COVID hotspots and pushed as if they were *any* warm body with a nursing degree into settings for which they were untrained and incapable of

performing. Nurses were given lip service "not to do anything they did not feel comfortable" in doing.

6.      But the slightest objection by any nurse about lack of Personal Protective Equipment (PPE) – or Krucial's coercion that they perform procedures <u>for which they lacked minimum qualifications</u> – resulted in bullying and termination – a word hidden by the quasi-military, Orwellian "demobilization."

7.      Krucial's loyal aides-de-camp – hench workers – enforced the Krucial strategy with resolve. Health risks were built into the process, to be sure, but a nurse's failure to obey an order that risked a patient's life – or that of the nurse himself – resulted in the form of banishment with robust notes of contempt. These scorned nurses were whisked away on a bus crowded like a rabbit warren; if they had to wait for a plane, Krucial staffers told them to confine in a cramped, second-rate hotel room.

8.      Krucial neither encouraged nor enforced physical distancing at the New Yorker Hotel, where everyone stayed, nor to and from the hospitals in the rolling rabbit warrens (Krucial at some point refused to allow the nurses to take cabs and Ubers). Though intended to save lives from COVID, the operation itself was probably a super-spreader event to begin with. For example is not proof, but look:



9.      Krucial did not even employ a "mini contact-tracing program" within the operation. Some nurses (inevitably) contracted the virus. After testing positive, their likely exposure to the virus to other nurses Krucial chose not to reveal the possible infection. Those who wanted testing followed a goose chase.

10.     Many unnotified others – such as Aimée Branch – left New York as asymptomatic carriers. Unknowingly, they infected people in buses to the airports, the airports themselves, cramped airplanes, then their families. After she returned to Tennessee, Aimée learned she was COVID positive. She developed massive (fortunately not lethal) symptoms and transmitted the virus to her ten-year-old daughter. This event caused severe pain and suffering and emotional distress, as it would any person, any mother.

11.     Krucial knew it could have prevented – or at least alleviated – Aimée's condition by informing her that she had been sharing the bus and was in frequent contact with another nurse who had to return home because she started showing symptoms.

12.     We know more about asymptomatic carriers now than in the spring, but there was no reason for Krucial not to inform others that they had likely been exposed. She could have been tested and not infected others. Who knows if she infected anyone other than her daughter, but the moral burden that she did infect others on the way home weighs heavily, and she contemplates its horror to this day.

13.     It should be no surprise that as New York recovers, the parts of the Midwest and South from where Krucial recruited the nurses are now in varying states of decimation. Nurses coming to New York to work with COVID patients, then going back to states without social distancing measures in place, had to add to the spread of the virus.

14.     Plaintiff Jalen Eaton is a nurse admitted to practice in Alabama, South Carolina, California, and Washington. He has two nursing degrees and studies for a Ph.D. when he can.

15.     Nursing jobs *can* be well paid, but not in all parts of the country. Southern and midwestern nurses make $40,000-60,000 annually; the Northeast and West salaries are at least 25% higher. That is why Jalen is a travel nurse. When he (and so many others) got a mass text from Brian Cleary in March 2020, he quit a temporary job paying $2,000 a week. One could say he lives the life of a *flâneur* in a sense: He harbors ambivalence about the conventional structures of Alabamian life, particularly in Mobile, where he lives with his grandparents. He won't leave them but wanders in and among travel assignments when he can: This allows him to see the world, serve patients, and observe contemporary mores in other parts of the country, nursing practice and life.

16.     He wanted to be closer to the front lines of the COVID crisis; at the time, that was New York. Five figures a week was certainly an incentive.

17.     The City of New York (perhaps with help from FEMA) paid Krucial over fifteen million dollars as an *initial* payment to bring in nurses like Jalen from lesser-paid areas of the nation. Krucial knew of the salary disparities and recruited precisely those areas where so much money would deter most employees from insisting on quality of care.

18.     That is how the "aides-de-camp" kept the travel nurses in line: threatening them with loss of such a well-paid job if they objected to Krucial's unethical, unsafe practices. Most succumbed to Krucial's jingoistic march as people rang bells in the street. But those who performed as part of the Seven O'clock clarion didn't know what, exactly, they were cheering for.

19.     Krucial latched onto this nightly praise (which was for all frontline health workers, not just those from Krucial) and attempted to cloak its deployment within warm feelings of goodwill. The

Krucial CEO, Bryan Cleary, often succeeded; most nurses followed his orders, including his demand to present for cameras of local news stations all over the country.

20.     Jalen, a nurse who knows whereof he speaks, joined Krucial. He wanted and expected to do a job he was qualified for. He was unwilling to follow Cleary's orders – proscribed by human decency and the law – and neither were any of the other plaintiffs.

21.     Eaton, in his late twenties, has an excellent knowledge of the medical practice. Nursing is his life, and he has responded to several short-term crises in remote locations. But just as a divorce lawyer is incompetent in perfecting a patent application, Jalen knows not all nurses perform every nursing procedure. Nursing is a subset of medicine; just like medicine, if a nurse engages in improper practice, that nurse can injure or kill.

22.     Eaton was willing to travel to New York to help – even at the cost of leaving his job in Alabama. The higher pay was attractive, but he was motivated by doing the right thing and the experience. However, he did not know that Krucial would expect him to sacrifice his health or work outside his scope of competence.

23.     Krucial paid $10,000 weekly in his case. The salary was $13,000 for nurse practitioners – including plaintiffs Alexis Allen, Latricia Hickenbottom, and Aimée Branch.

24.     Complicating matters, however, HHC did not need nurse practitioners. It seemed the City asked for them, but recruiting NP's – whether it was at Krucial's suggestion or the City's – fit within with Krucial's approach: nurses with higher educational credentials were perhaps brought in for the show. NP's can prescribe medications, but none used that ability (that we know). Having nurses with higher credentials was arguably a cover for their lack of qualifications to attend to dying patients in the ICU. NP's typically act in that capacity.

25.     These nurses – NP's and others – were not provided even "crash training" to work in the ICU – if "crash training" is possible in this context. Krucial simply demanded the nurses "get in there" – "there" being the ICU – and someone ushered them through the doors of contagion and death. Inside, they probably cost lives and served little purpose. Perhaps some learned specific abilities by doing, but none of *these* plaintiffs were willing to commit gross negligence or nursing malpractice.

26.     After he arrived in New York, Jalen Eaton refused to risk his own life (or, as with Aimée Branch, his family's). Additionally, when he pointed out the obvious flaws in Krucial's method, he was excoriated, fired, and then held up as an example to other workers as to the fate they would suffer if they didn't participate in practices contraindicated by medicine.

27.     Jalen trained in Rehabilitation Nursing – an area of expertise where the nurse supports nursing home patients, Alzheimer's patients, amputees, and people in a critical state who cannot care for themselves. Though very knowledgeable, he has never worked with patients in a Medical-Surgical Unit (known as "Med-Surg") or in an ICU.

28.     Plaintiff Alexis Allen is the mother of two and has a BS and MS in Nursing; she also has a Family Nurse Practitioner's certificate, which means she can prescribe medications and supervise other nurses again. She, too, studies for her doctorate. Allen has completed all of this training at the age of 31 and enjoys admission to Alabama practice.

29.     When Krucial contacted her, she had already enrolled in a Ph.D. course that cost her $4,000. She decided to withdraw and retake the class in the summer. She wanted to help.

30.     Plaintiff Nancy Torres is an experienced nurse who has worked in several travel nursing assignments for her income; she, like Jalen, enjoys temporary positions in different parts of the country and has provided care in psychiatric nursing and the correctional setting. One wouldn't

characterize her a is a *flâneuse,* however. She considers Illinois her home base, though she had been working in Oregon when she got the call from Krucial.

31.     Plaintiff Latricia Hickenbottom has a BS in nursing and took an MS to become a nurse practitioner. She is 32 and has two children under ten, whom she left with her husband when she traveled north. She quit her job as a Home Health Hospice Work Practitioner to help with the crisis – and not only for the big short-term money. When she returned earlier than expected, she came clean and tried to get her job back, if unsuccessfully.

32.     That nurses in these regions would quit their jobs for such high pay underscores a societal flaw in Krucial's model. The recruitment robbed rural and less-than-wealthy exurbs of nurses that these areas need. This type of recruitment allows Krucial to fill the City with untrained, scammed nurses. Krucial and its hedge fund then raked in hundreds of millions of dollars.

33.     Plaintiff Jose Pinlac is a resident of Florida, proudly born in the Philippines. He is a retired, assiduously detail-oriented RN, and he previously served in the EBOLA and first SARS crises. What he saw in those assignments was nothing like he saw in New York. Krucial fired him in a day because he demanded proper PPE – which was part of the blunderbuss DocuSign contract. But it didn't matter what contract Krucial tendered to nurses; the LLC would not have abided by any term it didn't like, whether after the fact or now, forcing nurses like these plaintiffs to sue.

34.     Plaintiff Aimée (*Ah-MAY*) Branch is a citizen of Tennessee. She is a nurse with young children and a nurse practitioner. She caught COVID due to Krucial's lax standards and was out of work for a month. While the DocuSign contract guaranteed quarantine pay, Krucial doled it out as it wished. Krucial still owes Branch approximately $10,000 in quarantine pay. Plaintiffs Torres and Pinlac got none. In keeping with these Plaintiff's experiences as to quarantine pay, and as a demonstration of Krucial's modus operandi, the company has stiffed hundreds, if not thousands of

nurses of promised quarantine pay, even where the state to which the nurses' return requires quarantine. (One nurse who worked in Louisiana took her case to the press, and her experience dovetails with the experience had by many after working for Krucial: https://tinyurl.com/y57jgdwc.

35.     Brandon Burr is a nurse practitioner who runs a small practice in Virginia. Cleary fired him in a fit of rage that came with a defamatory mass email to all other Krucial nurses. Although he procured, on his own, substantial PPE (and other things like discounts for nurses) and lent it to Krucial, Cleary didn't like it that a staff nurse was doing a better job than Cleary (who is also a nurse) making the workplace safer. The PPE, some of which was high-tech, Krucial hid in a Hotel corner, then stole it from Burr. Cleary then ordered him out of the Hotel. To kick him while he was down, Krucial gave him less than half of the quarantine pay he was entitled to.

36.     Each Plaintiff also wanted to keep her nursing license. There are probably so few plaintiffs in this case because only those who believed that their home states' Nursing Boards would not allow them to work out of their fields of competence. At least one double-checked that they were not. That they were willing to risk losing so much potential compensation speaks to their bona fides.

37.     A nurse is not a fungible entity; different nurses have different competencies. For example, a nurse in a primary care doctor's office is known as a Clinical Nurse; he is not qualified to work in the emergency room. No plaintiff is a clinical nurse, but each has different training. Only Pinlac was competent to work – if the conditions were safe– in the Intensive Care Unit or the Emergency Room. However, one might conclude that because Jose is so familiar with the minimum care required in the ER, his reaction to the horrors he saw resulted in his termination in a day.

38.    Before mass furloughs resulting from the pandemic, Krucial took almost anyone with a nursing degree. When prospective employees called, Krucial staffers operating the phone lines asked them their specialty. Therefore, each assumed she would work in that specialty – or at least in a manner consistent with *competent* care. As should be clear by now, competence was of secondary or tertiary concern – or perhaps of no trouble whatsoever.

39.    When Plaintiffs arrived in New York, some plaintiffs realized that Krucial's operation was a classic bait and switch: There was insufficient, non-existent, or inappropriate PPE; and, for example, the mobile drive-through swabbing that Krucial promised (in a mass text that preceded the contract) was constructively non-existent. Any plaintiff – perhaps any person with basic training – could have done swabbing. Krucial lured the nurses by mentioning the non-existent swabbing jobs, but the lure was a lie. New York had only two swabbing sites at the time, and they were fully staffed. Upon information and belief, it is close to certain the City offered to recruit swabbers at such a high price.

40.    Plaintiffs were willing to take other posts within their areas of competence. By forcing them otherwise, Krucial profited from the crisis on an existential level. Like any temporary agency, to survive – a or perhaps bring in eight figures – Krucial rakes in close to double what it pays its workers. When so many people were furloughed and needed to feed their families, it was easy to bring in nurses by the thousands – to New York, Louisiana, now Texas.

41.    Krucial might have profited on its work, but its ethics were not of concern. Thus it should suffer maximum monetary penalties for disrupting the lives of these honorable plaintiffs. They liked the pay but were unwilling to compromise their personal and professional mores make money for themselves or Krucial and, in the offing, to harm society.

JURISDICTION & VENUE

42.     Plaintiffs are residents of the States of Alabama, Tennessee, Illinois, and Florida. Krucial

Staffing is incorporated in Kansas, and Cleary, the CEO of Krucial, is a resident of Overland Park,

Kansas. The amount in controversy exceeds $75,000, thus allowing diversity jurisdiction.

43.     Venue is proper in that almost all of the acts and omissions occurred in this judicial district.

DEATH TRIAGE AND ITS DISCONTENTS

44.     Plaintiff Alexis Allen is a "Family Care" specialist. A nursing "specialty" is a term of art

within nursing: "Specialty" and competence are distinct, though one is necessarily competent in

her specialty or perhaps others, that doesn't mean she is qualified to do any nursing assignment.

45.     Indeed, during the Krucial debacle, a YouTube video made its circulation among nurses

who had not worked in hospital care warning them that to work out of one's area of competence –

it could be grounds for nursing discipline. The video, titled "Be sure your credentials match the

components of your practice," is presented by a former nurse practitioner, now a lawyer

representing nurses. The video, last recently, is seen at https://tinyurl.com/y5jpysqw.

46.     Allen is 31, a single mother with two young kids. She did not quit her job, but she lost the

expected income from Krucial, which would have amounted to some six figures in revenue.

47.     Aimée Branch is also a Family Care Specialist and a Nurse Practitioner. She also has young

children and is a font of knowledge about the operations – or lack thereof – at Krucial.

48.     Latricia Hickenbottom is an Adult-Gerontology Primary Care Nurse Practitioner. She has

worked in that role for nearly two years; previously she was, a nurse. Latricia has experience in

long-term care as an outpatient clinician and in-home health care.

49.     A Krucial recruiter told Latricia over the phone that nurses (NP's) would be placed based

on their specialty or in areas in which they are "comfortable" or knowledgeable. But "comfort"

was a code word, almost a pejorative to Krucial and its aides-de-camp. If one is not comfortable, one cannot "get in there" and is therefore demobilized.

50.     Like Eaton, Hickenbottom also quit her Alabama job, which paid approximately $100,000 annually, to help in the crisis. She relied on Krucial's representations to her financial detriment, though she is now re-employed.

51.     Nancy Torres is an RN whom Krucial demobilized because she insisted on working within her practice and with PPE as Krucial promised. She was bullied by a Krucial henchwoman to leave because she would not engage in life-threatening procedures. Torres has experience in psychiatric nursing and correctional settings; though she asked, no one could find her any location that she would be qualified for. Instead, she took temperatures for a day, then was fired.

52.     On or about March 18, 2020, a friend forwarded Eaton a mass-text sent to nurses asking that they deploy to New York to assist in the COVID crisis. The text, done up in caps, was from CEO Cleary himself. Hickenbottom and Allen received the same text message later the same day.

53.     The text stated: (1) all nurses (or NP's) would be provided appropriate Personal Protective Equipment (PPE); (2) nurses would earn approximately $10,000 a week or $13,000 for Nurse Practitioners; and (3) a stipend of $76 daily for meals; plus (4) housing at the New Yorker Hotel. Krucial also promised them to test when they demobilized, as well as quarantine pay if necessary. The three of the four for whom the contract required quarantine pay did not get it.

54.     The invitational text also stated that nurses would deploy at (a) a traditional hospital, (b) field hospitals (like the Javits Center), or (c) a mobile-testing site (where people drive through a tent are swabbed through their noses). Eaton wanted mobile testing, but there were no assignments in that area, as he would find out. Presumably, most were taken by permanent New York City Health and Hospital Corporation workers. Krucial knew this in advance – and upon information

and belief, the City never promised that – but hung it out there to attract more workers. Swabbing: You have to wear a hazmat suit, but the pay is so delicious that fashion is an afterthought.

55.     Eaton would have accepted working at a field or traditional hospital if deployed within his competence (and given proper PPE). Since Krucial asked him his specialty, he expected a position within his specialty. But this was the way Krucial operated: It asked for one's specialty to reinforce the idea that the prospective employees would work within their specialties.

56.     The contract was likely to be extended (and was) for another 60 days. There was talk of a $5,000 bonus for anyone working eight consecutive weeks, but it is unknown if that suggestion of a promise came to fruition.

57.     No plaintiffs would have joined this campaign, this maneuver for nurses and cash, for any money had they known they would put patients' lives at risk, potentially their families, and let's not forget their licenses.

58.     All plaintiffs arrived on the date they agreed to and checked into "The Ballroom" at the New Yorker Hotel, where Krucial organized its operation.

59.     After paperwork and some waiting around, within a few days, plaintiffs began to be deployed. Someone from Krucial informed everyone that the "swab testing" assignment had "fallen through." The possibility that any Krucial staff would do swab testing was close to fiction. Hickenbottom believed there was one white woman who was allowed it.

60.     Krucial did not assign Eaton to a hospital per se. He consulted a woman who asked him, again, his specialty. Jalen responded, "Rehab." The woman replied, "Then you're going to Coler."

61.     Coler was then the operating medical facility among the rotting former hospitals on Roosevelt Island. The building in which Coler had a single floor and the entire building was

renamed "Roosevelt Island Medical Center." (RIMC.) Coler was an actual rehabilitation center on the property, but no plaintiffs or staff nurses would work in Rehab. It was just further appeasement.

62.     RIMC would eventually become a depository for the dead; cadavers became so numerous that the City had to put them in refrigerated trucks outside the door.

63.     Jalen took the bus to RIMC. The Rehab center was on one floor, where the City was retrofitting a couple of upper floors for incoming COVID patients. But rehabilitation facility it was not – instead, it was a makeshift ICU.

64.     Again, Mr. Eaton assumed that since Krucial asked him his specialty, he would work with Rehab patients. Not so, as he learned the next day. An HHC nurse (Rosalie Boumantay) informed him that he would not be working Rehab, but in Med-Surg, which is not Logan's specialty, nor within his competence.

65.     At RIMC, the entire group of thirty-some nurses expressed surprise. (There is a video of this.) Rosalie then lied – or repeated misinformation – saying, "Your patients will not have COVID. They will be overflow patients from a hospital," by which she meant people who had been discharged with no place to go." She added that they would be "Med-Surg. patients with low acuity." (Low acuity denotes those discharged from hospital on their way home.) But this was either misinformation or Rosalie's style in getting staff to return the next day. Whichever, it was untrue.

66.     Rosalie said Jalen would work with homeless people or those qualified for a skilled nursing facility on Medicaid. Plaintiff was ready to accept such an assignment, but he sensed something was amiss. Jalen's instincts – honed by his training and the perspicacity he's gained in his nursing *flânerie* – were correct.

67.     After some orientation, another night at the Hotel, then another training at RIMC – all on such things as washing hands, not work in the ICU – Plaintiff returned for the third time to RIMC.

68.     Rosalie and another man told him that each nurse would get five to seven patients – Rehab but not COVID patients. Eason was okay with that, given the limitation Rosalie had described.

69.     Minute by minute, he learned (a) Rosalie's representations were incorrect; (2) he would have to work without proper PPE; and (c) Krucial had hired too many staff out of their level of competence. The COVID patients who needed skilled, critical care as they entered the hospital would get warm bodies with nursing degrees, but nothing approaching an assemblage of competence. There was a reason so many died.

70.     The nurses – Jalen, other non-plaintiffs, and Nancy Torres, who, coincidentally, was also there – then met with a man identifying him as the Chief Medical Officer. Although Eaton thought he would be working in Rehab, the CMO said he and the others should start assisting putting together the new floors for the incoming COVID patients.

71.     Jalen was okay with setting up shop, but it was then that he had an epiphany: Someone from Krucial – at the moment at the New Yorker Hotel – had lied to the group of out-of-staters, telling them, "You know the new hospital Donald Trump is building? That's where you are going."

72.     There is no such facility – either in the works or in actuality. The idea of Trump Hospital, whether wicked or mild, betrays Krucial's institutional thinking: purple fibs, appeasements, and outright misrepresentations.

73.     Despite the promise for proper PPE, this was the first time Jalen learned no one would issue him the standard-of-care N95 masks.

74.     The difference between surgical masks and the N95 variety is extreme. A surgical mask provides protection, but it measures in microns; a surgical mask is better than a t-shirt, but the N95,

which requires a sizing "fit test," is more akin to high-thread Egyptian Cotton. While many nurses volunteer to put themselves in harms' way – only the N95 with a proper fit will keep out bacteria – Krucial promised these volunteers appropriate PPE but reneged on the promise. The one person with connections who could bring in some N95s – Brandon Burr – was fired because he made CEO Cleary look bad. Cleary didn't want to address the N95 shortage – he just wanted to send out the highly paid less-than-competent nurses into dangerous rooms to perform what one might characterize as death triage – PPE and competent patient care be damned.

75.     The CMO at RIMC modified his statement – too late for those deployed – noting that he would issue N95s only for those "doing aerosolized procedures such as endotracheal suctioning."

76.     It is still not within the (usual) standard of care to limit PPE to such procedures. Eaton was not competent to do suctioning. Indeed, one could also say the standard of care is to perform such functions in a negative-pressure room to avoid flying viral or bacterial microbes.

77.     While the City HHC and the CDC have issued modified standards – modifications that have killed nurses  – during the pandemic, the standard of care to protect against infection is (1) the  N95; (2) a plastic gown; (3) shoe covers; (4) a face shield or goggles; and (5) a headcover. The N95s are particularly important because they prevent droplets or particulates from entering nasal and oral passages in a way that the surgical masks (or lesser cloth protections) do not.

78.     The shortage of these masks was not entirely Krucial's fault – at least except insofar as it fired Brandon in a fit of rage; Brandon was able at least to bring *some* relief.

79.     Nevertheless, Eaton was promised standard-of-care PPE. When Cleary sent out the blast texts, Cleary and Krucial knew of the scarcity of the 95's.

80.     Assuming *someone* at Krucial, even if not CEO-Nurse Cleary, was following information on the very subject of their existence – defendants had to know that the World Health Organization announced the PPE shortage on March 3.

81.     Indeed, in the contract between the City and Krucial, the City indemnifies Krucial for PPE shortages, which also would put any reasonably educated person that a PPE shortage might become a "thing," as we say. <u>Yet, after these clues, Krucial promised full PPE</u>.

82.     Eaton, still in Alabama, knew nothing of the PPE shortage. Rather, he relied on Krucial's willful misrepresentations. Though he could have dispensed with some of the PPE – the booties or hair bonnet, for example – he expected the essentials.

83.     The CMO, after he informed the nurses of new limits in dispersing N95 masks, said, "If anyone is uncomfortable without the N95, you are free to leave." This statement was cold comfort for nurses who had traveled from all over the United States on the representation that Krucial would provide proper PPE.

84.     Jalen discovered that to treat new patients coming to RIMC would require traditional minimum standards of care to protect him – and the patient, the vast majority of whom died. His preference had been to swab noses, but he was willing to work with COVID Rehab patients. Now he had been asked to work in a Med Surg capacity and not in the limited manner that Rosalie had explained.

85.     His standard of care in treating patients is assiduous, and he was stunned. Krucial provided him malpractice insurance and informed the nurses that traditional norms of malpractice liability are suspended in times of emergency. But this was a misrepresentation. Although Governor Cuomo issued an Executive Order suspending *some* rules for medical professionals, the order says just that medical professionals are "immune from civil liability for any injury or death . . . unless

it is established that such injury or death was caused by the gross negligence of such medical professional." Executive Order 202.10.

86.     But this is only qualified immunity. "Gross negligence is a conscious, voluntary disregard of the need to use reasonable care likely to cause foreseeable grave injury or harm to persons, property, or both."

87.     It is gross negligence to perform services one is unqualified to perform. The Executive Order would not absolve plaintiffs of liability if they had gone ahead with the assignments – they would have been committing gross negligence.

69.     Krucial also sent a blast email citing the "Model State Emergency Health Powers Act," and the "Uniform Emergency Volunteer Health Practitioners Act" that would supposedly protect the workers from liability. The problem is that the MSEHPA is only draft, model legislation. The Centers for Disease Control wants states to pass this law, but not all have; neither Alabama nor Illinois have; New York has only adopted privacy portions of the Act.

70.     The "Uniform Emergency Volunteer Health Practitioners Act" has not been adopted in Alabama. It has in Illinois but does not protect against gross negligence or recklessness.

71.     Krucial, in this email blast, had the nerve to construe these Acts legally to suggest that a nurse would be reckless *not* to act as a Good Samaritan and at the risk of his life. Cleary, who signed the email, craftily – if inartfully – defined "recklessness" as standing by and refusing to engage in gross negligence. This was just another of Krucial's intimidation tactics, and there were so many. But to give such faulty legal advice? It was a double-sided weapon – swing it one way to make the nurses feel protected, then swing it the other way to instill fear of malpractice.

72.     Also, none of this quasi-legislation protected workers from being subject to suit – which any patient or decedent may file – which might require discovery, repeat appearances in New York

with no compensation, and possibly trial. These are distressing things for laypersons – even she wins in the end.

73.    Krucial certainly knew these nurses were incompetent to tend to the dying in any way other than to babysit the patients as they died, at a great cost to the nurses' own lives. The City, through Krucial, wanted nursing bodies to work in a disaster zone. It looked better than nothing, but at what cost? It is unclear whose fault lies in City's failures to coordinate with Krucial, but for now, plaintiffs assume, under traditional rules of agency, that Krucial is responsible. It did nothing to smooth over the obvious tensions that would arise when permanent workers were overwhelmed by the presence of travel nurses who didn't know what they were there for either.

74.    Krucial exacerbated these tensions by punishing any worker about whom an HHC employee complained. With the exception of Brandon Burr, they were swiftly "demobilized."

75.    Indeed, according to the Krucial Staffing Terms and Conditions of Employment, Krucial requires employees to follow "OSHA and their client facility's policies and procedures when using any equipment."

76.    OSHA still requires the strongest use of PPE. The City *did* as well until the day after the travel nurses were trained in the pre-COVID HHC procedures.

76.    Additionally, OSHA protocols require that employers must include a proper "FIT test" – which OSHA characterizes as "mandatory" – to be sure the mask seals the face, and nothing escapes into any gap between the mask and the face.

77.    The OSHA regulations also include head, foot, and hand protection, all or most of which were not followed in any setting.

78.    As a nurse admitted to practice in several states, plaintiffs could be subject to discipline by state boards for working in capacities in which they were untrained. Eaton, admitted to practice in

several states, was wary of having to rely on the assumption that a state board would overlook nursing misconduct, even in a New York emergency. The sister state *might have* loosened its rules but would not be required to suspend the under any – or at least man – circumstances.

79.     An RIMC staff person asked Eaton and the other nurses go to the empty floors to convert them for the incoming COVID patients. The floors reminded Wyatt of abandoned army barracks he once saw in a post-apocalyptic horror movie.

80.     Any nurse who chose to work at RIMC (at any salary) would have vastly increased chances of contracting COVID, and not only because of the inadequate PPE.

81.     As the rooms were constructed and filled, each were fitted with four beds. On Eaton's last day, RIMC was putting confirmed COVID patients in rooms with patients that (a) had symptoms but were not verified as COVID positive; (b) needed hospitalization for other reasons and had no other place to go. There would naturally, thus, be extreme cross contamination. This comingling of patients added to the dead bodies piling up in the refrigerated trucks.

82.     Jalen could not understand why this was happening, and he considered it an invitation to death. Again, he was willing to work to assist in the crisis, but as promised: not at the cost of his life or the potentiality that he would infect his elderly grandparents.

83.     Naturally, he wanted to keep each of his licenses.

84.     Essential to Jalen was that there would need to be different safety protocols, depending on whether the patient had COVID. But there was only one protocol. Nevertheless, by mixing the COVID-infected with the untested or uninfected, it required protections of proper PPE at all times, in every room.

85.     Again, Krucial reneged on its promises to provide proper PPE, as stated not only in the first text blast (and contract adopting OSHA rules) and on Krucial's Instagram site, where a short

video insisted that nursing professionals would have appropriate PPE.  (It was taken down after this lawsuit was filed.)

86.    Sadly, three nurses from Alabama had to upend their lives to travel north to expose this horror, with great upheaval to their lives. Krucial, sanctimonious, punished nurses who spoke of the malpractice (as did other hospitals, including, shamefully, NYU).

87.    One cannot sympathize with Krucial that manufacturers were behind in producing these masks as quickly as they could. That is not the fault of unsuspecting, well-educated nurses from the South and Midwest.

88.    By deploying Plaintiff and other nurses into New York City, Krucial was putting them in harm's way. The same is true of the patients, though, if not all, many of the RIMC patients died, and many nurses, given lack of proper PPE, contracted the virus. Some of those nurses will die.

89.    Jalen complained to Krucial employee Olivia about these detrimental conditions. All nurses had already been given an invitation to the door by the CMO. Olivia explained, "We're just asking you to be flexible." Indeed the word "flexible" here did not mean "accommodating" but "docile."

81.    Eaton responded, "My coming here from Alabama to work on the front lines is my being flexible."

82.    Plaintiff then asked to go up the chain of command to a person named Alex(andra) Lender. He repeated his grievance to Lender, who repeated the line about "flexibility." It was a code word that staffers had to learn by inference, but it was not part of the contract of employment.

83.    Indeed, flexibility with their lives as they tended to the dying in abysmal conditions amounted not only to gross negligence but malpractice.

84.    Jalen went up the chain again and called CEO Cleary. Wyatt explained whom he had spoken to before and said he didn't feel comfortable working out of his field of competence. He asked if there were any rehab positions available, or something else for which he was qualified.

84.    Brian Cleary shouted at Jalen in response: "You mean to tell me you're a freaking rehab nurse, and you are not going to work with med surg! That is ridiculous! I have clinical nurses who have never set foot in a hospital, and now they are working in ICU!"

85.    The last sentence of the above-quoted statement was a damning admission, evidence of gross negligence at a minimum: ICU patients are the most critical of all. ICU nurses can only learn protocols on the job, with supervision, whereas clinical nurses work in doctors' offices and take temperatures and give shots. A clinical nurse would not, for example, know how to treat a gunshot wound. A clinical nurse will not know how to operate a ventilator for an advanced COVID patient. It takes about eight months to learn how to work in ICU.

86.    Eaton decided that the non-ventilated were more prone to expose the virus to others. All of these rooms required the N95 masks. This need does not consider other traditional PPE to protect nurses from globules of sputum or dry, airborne virus particles – which come from the sputum laden coughs of the non-ventilated patients. Everything depended on the situation, but Jalen was only following guidelines – some of which came directly from Krucial's handbook and HHC's training, both of which were following OSHA rules.

87.    After he complained to Cleary, he was immediately retaliated against and "demobilized." He had to pay for his flight to Alabama, despite the promise – or practice – that nurses were to be flown home. How dare this uppity Black man speak to Cleary like this! The anger rose in Cleary's throat. It was retaliation – a kick in the pants as the henchmen pushed Jalen out the door.

88.     When he arrived home, he found a mass-email about *him,* where Cleary threatened other Krucial employees to "be flexible" or be fired. Yes, Plaintiff had agreed to be "flexible," but not at the cost of his life, his family's, or any license he possessed. And to use Jalen's *name* when he simply insisted on what he was promised, consistent with his health, patient care and nursing practice! It was not only retaliatory to Jalen, but a despotic threat to wield power among the remaining nurses.

89.     Plaintiff Alexis Allen relied on her parents to take care of her kids as she traveled north; during the day they needed daycare, which cost her approximately $1,000. Fortunately, because Alexis works remotely and usually at home, she did not have to quit her job as some of the others.

90.     She, too, was asked for her specialty – the continual gauzy misrepresentation.

91.     After arriving and completing paperwork, Krucial sent her to Bellevue Hospital with other nurse practitioners and physicians' assistants.

92.     They all met with a Bellevue nursing administrator, who greeted everyone as she invited them to take a seat. There were approximately 25 in her cohort, and they did as she instructed, even if to wait four hours as HHC and Krucial tried to coordinate the joint deployment.

93.     Alexis had the distinct feeling that Bellevue did not expect deployment of any nurse practitioners, and the hospital administration did not know what to do with any of them, even if they were probably needed elsewhere in HHC.

94.     Then they were trained on Bellevue procedures for identification cards. After two hours, all took lunch, then went to a Board Room. They watched a video about the computer chart system.

95.     After another two hours, certain Bellevue personnel were in and out of the Board Room, and it seemed as if they (the Bellevue personnel) were trying to figure out where they would send the Krucial employees. They really didn't know what to do with them.

96.     The Bellevue personnel ultimately stated that the only need that they had was for nurses. Few agreed to this unexpected direction. Indeed, the Physician's Assistants legally could not work as nurses. (Bellevue eventually assigned the PA's to the Emergency Room.)

97.     Alexis and most of the Nurse Practitioners would not agree to work out of title <u>because they were repeatedly told not to do so by Krucial</u>. Krucial was getting paid more for NP's and it wanted that cash, But it was odd that Nurse Practitioners were asked for at all – and paid at a higher salary – when there were hundreds of nurses arriving and more on the way.

98.     Krucial had purposely over-hired and did the same thing in Louisiana and Texas. Alexis saw people daily waiting around the New Yorker Hotel. They signed in and went back to their rooms; some never saw the inside of a hospital or other medical facility by the time she left.

99.     Alexis called Donnie, her supervisor from Krucial, about the deployment of NPs as RN's, which was contrary to Krucial's rules. Donnie said that he would discuss the issue when everyone returned to the Hotel.

100.    When Alexis said she could not be a nurse, Bellevue tried again to ascertain what the NP's could do. As it happened, Alexis was willing to work as an RN at the guaranteed rate of pay *if she were competent to perform the job* and could function safely with proper PPE. Fortunately, she brought her own N95 because, though Bellevue did have them, a worker simply stuck one in her face – and without the smell test that ensures a proper seal. This is not a proper "Fit Test" – an essential part of being safe from infection, as everyone's face is different.

101.    After the failure of the "Fit Test" – the person operating the machine did not know how to work it and was just handing out "guestimates" based on face size – she and the others returned to the Hotel.

102.    The next day, her group of personnel arrived at Bellevue. The PA's and NP's separated into different groups. Three nurses greeted the NPs with whom they would train.

103.    Alexis asked, "Are we being trained as NP's or as nurses?" No one from Krucial had yet given her permission to deploy as a nurse.

104.    Meanwhile, one of the trainers said, "We don't employ Nurse Practitioners at Bellevue." This statement left Allen in a state of liminality and confusion.

105.    The Krucial team leader and the Bellevue trainers were in and out of the room in a flurry of confusion and whispers. Finally, the Krucial employee allowed this option: To work as a med-surg nurse or in the ICU. But if Alexis were to work in the ICU, she would have to write lab orders (plus help turn the patients' bodies as needed, which was no problem).

106.    Allen could have turned patient bodies – and anyone could – but she noted: "I don't think Family NP's can write orders because it is beyond our scope of practice." She mentioned that she didn't want to violate any rules of the Alabama Nursing Board.

107.    Writing lab orders is like prescribing drugs. One has to have the competence to interpret lab results to know what medications to prescribe, or what further testing might be needed, or if there is a procedure that is required. Alexis could not do this with competence.

108.    Instead of further speaking among the group, she texted the team leader, Aimée Branch, also a plaintiff herein. After some back and forth, they both agreed that the situation was a disaster.

109.    Allen got on well with Aimée, but there no resolution that day. Nurses in Med Surg floors were each assigned over ten patients. Alexis would not accept an assignment she couldn't perform with competence.

112.   Aimée later said that Krucial had determined that her only options were Med Surg or ICU. Alexis was willing and could have done so many things, including work at the Javits Center, which had some swabbing and outpatient care. But Krucial refused.

113.   She returned to the Hotel. Someone in the Ballroom told to go to her room, and someone from Krucial would be in touch. She would have to book her flight (she, unlike others, was reimbursed). Krucial tended to respect the contract with the employees based on their "niceness." Alexis, a poised, quiet woman would get a flight. The righteously angry nurses who noted any flaw within this disorganized, unmitigated super-spreader deployment where nurses were expected to follow The Leader, got – as Tony Soprano might have put it – the stugatz.

114.   Several at the Hotel who were NP's never received an assignment. They didn't need NP's, but they were still recruiting them as of at least March 31, as Allen saw from the Krucial Facebook page.

115.   Later, Allen heard from Aimée that she had been fired, as explained below. She agreed Krucial was pressuring NPs to work outside of their scope of practice.

116.   Aimee's situation was much like that of Alexis; she, too, complained about quality of care and was fired.

117.   In addition, matters in her situation are of particular note. First, in addition to complaining about the lack of proper patient care (and care for the nurses), she verified with her Tennessee Board of Nursing that working outside of her scope of practice would be considered gross negligence.

118.   This report contradicted Krucial's suggestions to the contrary. Aimée was therefore labeled a scallywag for contradicting Krucial's false representations and insisting on working where she could competently perform.

26

119.   The next day, Aimée returned to Bellevue, and a nurse called someone at HHC (or Krucial). The conversation was within earshot of all. The nurse shouted over the phone: "What are we supposed to do with all of these fucking Nurse Practitioners?" The anger arose from the complaint of patient safety and working within the role of incompetence that Krucial expected.

120.   Someone whom Aimée knew as a CMO heard this call and told the nurse to apologize. She did, but then immediately called operations at Krucial, and complained about Aimée. The call succeeded in getting Aimée fired for refusing to work outside of her realm of competence.

121.   When Aimée returned to the Ballroom, she was summarily fired on the pretext of whatever the nurse from Bellevue had said. Krucial did not even ask Aimée for her side of the story. Indeed, Krucial had already labeled her trouble for demanding a proper deployment.

122.   Plaintiff Nancy Torres is an RN, whose recent experience is in psychiatric nursing, and corrections environments. She has worked in Med-Surg, Intermediate Monitored Care, and Rehab, though not recently. She told Krucial about her psychiatric and corrections experience.

123.   She applied for the deployment, and Krucial accepted her at the nurse's rate. Like the others, she was promised PPE in the email confirming her hiring, which indicated, in part, that "any staff that are directly working with the general public in close proximity will be provided PPE." PPE was not defined, and there was no indication that the minimum standard of care had been reduced, or that nurses should not expect the N95.

124.   Again, the Krucial handbook incorporates OSHA regulations, which require the PPE. Upon information and belief, Krucial sent her this handbook.

125.   Nancy arrived on March 22 and went through the paperwork routine. Even though she had not been assigned to a hospital, she went to her room after henchperson Michael told her as if she had been a bad girl: "Go to your room!"

126.    Krucial employee Alex(andra) Tender said, "Since you refused to go to work, we're not going to pay you." What? Was Alex insane, or misinformed or was this just part of the gaslighting Krucial regularly engaged in. Nancy hadn't been asked to do anything. As it happens, Krucial paid her, but Nancy had not refused to work. Alex's comments suggested to Nancy that something was amiss; she was correct in this inference. Bully the nurses, even if they've just arrived, and publicly shame or denounce them, instill fear. It was management based on a dictatorial mindset: Intimidate everyone; exile those who don't fall in line.

127.    On March 24, Krucial bussed Nancy and others to RIMC. She was given a crash course for ten minutes on how to suction a patient needing tracheostomy care. Nancy had performed that procedure a few times, though not for a while. The procedure requires that the patient's throat is sliced open; a tube inserted into the throat sucks mucous out of the lungs. It requires the room to be very clean. The nurse needs proper protection. Otherwise, a nurse could introduce virus into the patient, and vice versa.

128.    The standard of care in performing endotracheal suctioning is to do it in a "negative pressure room" where airborne virus does not travel.

129.    Although Nancy brought her N95 mask, she could not perform intubations and protect herself. She had had only five-minutes of training for a procedure she hadn't done in years.

130.    The staff at RIMC chose her as part of a group of nurses to set up the new hospital with supply carts, supplies, computers, linens, and stock – whatever needed. The nurses also put linens on the new beds in the new rooms. Nancy did these tasks without complaint.

131.    Later the same day, there were modules of computer training on the standard of care and isolation precautions. Nancy took several screenshots indicating the N95 was the standard of care at RIMC; HHC guidelines stated explicitly that "use [of the] N95 respirator mask if there is

possible exposure to aerosol-generating procedures [to] ensure meticulous environmental disinfection." A screenshot she snapped from her "training":



132.    But the staff at RIMC said no one would be getting an N95, except for those who did intubations. This contradicted HHC's own rules requiring the N95 if there is "possible exposure," not just for those doing the dangerous intubations.

133.    Krucial's rules required employees to follow the rules of the host's deployment.

134.    After the nurses saw this (and other screenshots), what did Krucial expect them to do? Break the written rules, or just get the vibes from the Leader and "get in there?"

135.    After she finished such training (such as it was), there was talk of what would happen the next day. Rosalie, as she had told Jalen, said there would be *no* COVID patients arriving, only those in post-ambulatory status. Rosalie told Nancy and the others that these were patients who were ready for discharge but had nowhere to go. She referred to them as "walkie talkie" patients.

136.    Rosalie promised to look into getting N95s for everyone, but, bless her heart, this was a fib to get the nurses to return; she couldn't get a single one. Few would get N95s – let alone those that properly fit. Those who brought their own masks would have to reuse them – an act OSHA guidelines say is a contraindicated practice.

137.    All Krucial temp. nurses raised concerns about incoming patients not having been tested for COVID could be infected, causing everyone worries without PPE.

138.    The next day Nancy and the RIMC cohort met the same CMO as Jalen had.

139.    The CMO said the CDC is recommending surgical masks, not the N95. This was a misrepresentation. The CDC was not recommending surgical masks per se, only because N95s were in shortage.

140.    After meeting with the CMO, some Krucial Nurse Practitioners walked throughout the facility with N95s before the patient arrivals. Nancy asked Alex, an HHC employee, "If N95s are not necessary, why" is there a disparity in the use of N95s between nurses and nurse practitioners?

141.    Alex said, laughingly, "Because they are going to be assessing patients!" This response was non-sensical, all nurses would assess patients.

142.    Nancy returned that evening to the ballroom with three other employees and all voiced concerns.

143.    The Ballroom staff modified what the CMO said – that they would be doing intubations, but not getting N95s, just surgical masks. This was an invitation to infection.

143.    The nurses collectively expressed that they came to New York to do a job, and Krucial promised proper PPE, not just surgical masks.

144.    A Krucial supervisor Brian, perhaps not realizing the hidden truth, said: "Do not take patients without proper PPE."

145.    Another Krucial staffer then said the nurses were covered by insurance for working without PPE. What did this mean exactly? That they had malpractice insurance? That they had worker's compensation insurance should they become infected?

146.     As it happened, Krucial has two Worker's Compensation policies, one of which only covers nurses in certain states – and none of the plaintiffs live in these states. The second covers "disease" but the disease must be contracted while on the job – something a worker's compensation carrier would fight to the death because discovery of infection doesn't always happen immediately – as in the case of Aimée Branch. And there was another problem with this second contract in that it only covered certain states – though which precise states one cannot glean from the words.

147.     In addition, intentional acts are not barred by Worker's Compensation in New York.

148.     Nancy returned to RIMC the next day and was told to take temperatures. It was known by now that she was "uncomfortable" working out of competence or without PPE. She wasn't "flexible," in other words. A henchwoman was on her way to RIMC to send Nancy home.

149.     Nancy started the day taking temperatures, then saw Rosalie who said, "I don't need psych nurses." Her voice reflected frustration. She added, "I can't understand why they are sending psych nurses."

150.     Then came Stephanie: a loud, aggressive woman working for Krucial – and aide-de-camp, a henchwoman. She said, "I'm the lead!" She stormed off, saying, "You two [Nancy and another nurse] are going home. I called for transportation to the Hotel."

151.     When the car arrived, Stephanie barked at them, demanding they get on the phone with Jennifer Pino – a chief enforcement officer for Krucial, though Nancy didn't know her at the time.

152.     Throughout the day, Nancy saw many patients transferred from area hospitals, all of whom were of high acuity. She also observed some to have tracheotomies, life-vests (personal defibrillators worn by patients at risk for sudden cardiac arrest). There was talk of one patient having a feeding (or "PEG") tube. Patients were moaning and crying out while on the stretchers.

153.    Meanwhile, in addition to Nancy's employable skills, she noted that there "were people dying every day that Elmhurst was storing bodies in refrigerated trucks. These people died without family. Is there no psychiatric need in these circumstances?"

154.    Stephanie then came downstairs to demand names. She said, "I'm going to file a complaint with Krucial because you and [the other nurse] are refusing assignments." Stephanie continued to show aggression in front of police officers, EMT's, staff, and patients. She stormed off but completed her task in the end.

155.    After a while, Nancy and other nurses were returned to the Hotel. Someone from Krucial told Nancy to speak to one "Paul" for a proper assignment.

156.    "Paul does not handle that," Stephanie snarled. She wanted to get rid of Nancy. "We need people who are willing to get in there!"

157.    Nancy said, "I am trying to protect my license."

158.    Pino said she needed "to get in there and do what is required! Your license is protected by a waiver."

159.    That statement was a lie.

160.    Pino continued, "If you are assigned a ventilated patient, get in there and do what you need to do. This is a pandemic, and we're in disaster mode. Even if you've never had a ventilated patient, you need to be willing to get in there and get hands-on! They're probably going to die anyway!"

161.    The latter admission was true – in part because of the incompetent response – and it exposed Krucial's pandemic profiteering.

162.    She added, "Your license is protected, and if you're not willing to work with the patients at Coler, then you should leave."

163.    Nancy asked, "Are you telling me to go or recommending it?"

164.    Jennifer didn't want Nancy around but was too afraid to fire her. She said, "I highly recommend you leave."

165.    Nancy stated, "I will leave if you want, but you should realize that I came here to work and wanted the same opportunity as promised," within her specialty and with PPE. She added, "I have to find somewhere to go because my mom is quarantined in my home after completing chemotherapy."

166.    Nancy walked out of the Ballroom, and Jennifer yelled out for her to sign the demobilization papers. Nancy did no such thing. She's a midwestern mom who expects that people will do what they promise and not harm others. This might be true most of the time, but not with Krucial, an organization governed by greed, intimidation and lies.

167.    Nancy tried to resolve the problem through Krucial Human Resources the next morning. One woman named Taylor actually had the heart to tell her, "Don't go yet! Don't leave yet!" There was a suggestion of a promise to try to find her a new assignment.

168.    Nancy returned to the Ballroom – no assignment – and back to her room. She then called to Taylor again, who had clearly been given the Leader's marching orders. Taylor's demeanor had vastly changed; she said that Nancy had never told her that Rosalie wanted people to provide "get in there" patient care, or that psych nurses were not needed.

169.    What difference did that make? Taylor's statement was objectively true, but, in context, a non sequitur; it was pretext to deny Nancy a proper assignment. It made no difference that Nancy just wanted a job that she could perform without harming patients and protecting herself.

170.    Someone named Nicole added that she should be ready to jump in and do anything asked of her, including suctioning under unsafe conditions.

171.    Nicole then threw into the conversation the incongruous allegation that Nancy had sworn three times during her conversation with henchperson Stephanie.

172.    Nancy denied this. Three times? It seemed like an over-plotted lie. Nancy said that as a mother of several kids, swearing – let alone three swear words in a row – was not within her repertoire of verbal behavior. "I'm not a child," she said, and she wasn't there to argue with someone taking orders from Leader Cleary.

173.    Nancy added she was expressing concerns about safety "because this is what's going on at the facility. People come here to risk their lives; they come here to do a job because nursing is a calling. I thought I could help in some capacity, even if I am a psych nurse. People are dying alone."

174.    Nicole would not relent even though Nancy added that there were places that Krucial (or HHC) could use her skills. She noted, "there is a nurse at Jacobi Hospital trying to pull me to another facility." Nichole did not want to hear it.

175.    Nancy added, "There are also labor and delivery nurses I could have worked with." Nicole responded with reserve, then added she "didn't want" to find a position where Nancy was comfortable, because she had to help in any capacity.

176.    Nancy gave in: "I'll be gone tomorrow," she said, and hung up.

177.    The next day, a contact from Jacobi texted her, reporting that a nursing supervisor named Shameka still wanted her services.

178.    *Feh.* Nancy waited a bit, but she had rented a car to drive home to Illinois. In her mind, she had already given up, knowing she was unwelcome.

179.    She would not get on an airplane because she had a scratchy throat and presumed she might have COVID. She drove home, which took her 13 hours at a constant rate.

180.    Nancy hoped her scratchy throat was just from wearing her mask as she hadn't been drinking enough water; she had not wanted to remove the mask from her face to avoid infection.

181.    But along Route 80, she began to feel respiratory constriction. It was difficult to take a deep breath, and she suffered body aches. She went to a local ER on her doctor's orders.

182.    A Physician's Assistant at the ER advised that she probably had COVID, but he could not test her, even if she paid out of pocket. Tests were scarce, so it would be her former employer's responsibility, he explained. The PA gave her a note indicating she had probable COVID, though he did not test her.

183.    She called Krucial, which *refused* to find a place for her to have a test. Krucial's refusal should be no surprise because this is how Krucial works. It also was retaliation as someone knew Nancy had been discharged for complaining about patient safety and left rather than risk her life. She has recovered and is working again but wonders why she was put through this horror.

184.    Adding insult to injury, on April 9 – apropos of nothing pertinent at the time – Nancy received an email from Krucial, stating:

> Finally, as I have said before, many times. [sic] If you can't protect yourself with PPE, you
> need to speak to a clinical lead at the Hotel or speak to a hospital administrator before
> proceeding if there are concerns with PPE.

185.    Foolishly, Krucial was slow in eliminating any terminated plaintiff from its email list, but what was this email about? Perhaps this was another example of Brian Cleary's illogic, his lies or both. Or perhaps it was an invitation to termination if anyone still employed by Krucial complained about lack of PPE and made it known. (Indeed this had *never* been "said before," not once, let alone "many times," though Krucial made it part of its new DocuSign contract.

186.    Jose Pinlac is a retired ER nurse with 35 years' experience, including, as indicated, during the EBOLA and SARS crises. He is licensed in Florida and California.

187.    A friend informed him of the openings in New York. The friend needed a companion on the trip north, and he agreed to go with her. Both applied and were accepted, then travelled by car.

188.    Like the others, they were promised PPE, without any mention that the PPE would be different than in any other situation. Jose knows PPE and would never have come to New York had he known it would have been so woefully limited.

189.    Krucial asked him his specialty – again, the fraudulent suggestion to a nurse that he would work within his specialty. As it happened, Jose was the only Plaintiff that got an assignment within his specialty, specifically in Woodhill Hospital ER. But his assignment was disastrous; not only was there was no PPE not as promised, it was not anywhere, none.

190.    He and his friend arrived in New York on March 31, 2020.

191.    Upon arrival, the two did fit testing. Jose learned he would work the night shift at the beleaguered Woodhull.

192.    He slept, and the next morning in the Ballroom, he asked for his N95. He asked one "Jen," Jennifer, and Brian, all Krucial staffers, *none of whom would answer him.* He began to think something was amiss. Why perform a fit test if the respirator that he fit for – the N95 – would not be discussed, let alone provided? It was an ugly charade. Jose, a man with superior training and experience had been a successful nurse because he knew the most important element of proper nursing was safety. He began to become afraid. Yes, he had survived service in two major pandemics, but as Renata Adler reminded us "Fear is forward. No one is afraid of yesterday."

193.    Krucial staff told him he would get the mask at the facility. This was a lie; it didn't appease Jose. Warily, he got on a bus to Woodhull Hospital, which is in Brooklyn.

194.    After arriving, there was a computer training on COVID, which specified that the nurses would need the full armor of PPE, including the N95. He began to feel more comfortable, but it set him up for a strong emotional reaction.

195.    Woodhull staff asked him to start working, but he inquired, again and again and again, about his mask. Some nurses had them, some not.

196.    One of the Woodhull nurses expressed anxiety that he should start.

197.    Jose said, "I need a proper mask." The nurse ignored him. He repeated: "No, no, no, we need masks."

198.    Wanting *some* protection, he asked for a surgical mask at least. He saw some on a desk of a nursing supervisor. As he reached for one, she snatched the whole bunch out of reach and told him he would get his later. Another lie.

199.    He would not go into the ER and the staff was getting upset with him. But what did anyone expect? These nurses were promised PPE and Jose knew nothing of a shortage. He was just trained that he needed PPE – a simple fact that he already knew. What universe were these workers living in? There was no discussion of a shortage. It was like being in an episode of the "Twilight Zone," perhaps the one titled "The Eye of the Beholder," where pig-like faced doctors transform a woman's face into their image, and act as if she is the crazy one.

200.    A man took Jose's temperature; neither had a mask. He waited with no face cover, near a pile of soiled linens.

201.    He strolled to the lobby to get a surgical mask, then to a staff room. There he received at least a face shield – not as protective as a surgical mask, let alone an N95; it only protects the worker from fluids – not airborne virus.

202.    Someone gave him ordinary medical gloves – not rubber, just thin, paper gloves for single use of modest danger. He also got a plastic apron. When he trained for EBOLA and SARS, there was more extensive protection. After begging repeatedly, Jose got his mask.

203.    He entered the ER, where people were immobile, dying, moaning, groaning, urinating and defecating on the floor. Monitors were beeping, beeping: evidence of crisis or death.

204.    Jose intubated one patient, then a few others. He used the same paper gloves on everyone – a sure case of transferring bacteria and probably gross negligence.

205.    A doctor on site selected patients who would get ventilators and who needed intubation. All Jose could do was administer palliative care drips of morphine or intubate.

206.    He finished his shift, but he had used the same PPE for four hours. He washed his hands; he had no shoe covers and believed his shoes were undoubtedly covered in virus and bacteria.

207.    The day shift arrived as he embarked on the bus to the Hotel. Jose knew that people arriving to Woodhull would infect the bus when they returned and transmit the virus to other temporary workers when they switched.

208.    Indeed, one nurse tested positive; another Krucial nurse, not from Krucial, was reported to have died in the restroom.

209.    When he returned to The New Yorker, he put his clothes into the basement laundry.

210.    He had brought Lysol from Florida and disinfected his room. His friend came, and he told her, "Please be careful, nurses are coming in and out of these hospitals and will be infecting everyone." He would not open the door for her.

211.    She continued to knock. Jose knew at least his clothes and body had been heavily infected and told her, "Don't come into my room!"

212.    Then a Krucial staffer came in, and Jose told him he refused to work without PPE. His friend went downstairs, returned, and informed him Krucial was going to fly him out and do testing. Alex Render, one of the recruiters, promised that everyone would receive a COVID test when they left. It didn't happen.

213.    He called his family, complained about the lack of PPE, and made this complaint to Krucial Staff, several times. He even called the corporate office.

214.     Instead of assisting this experience nurse who had experienced such a Traumatic reaction, someone accused him of having brain damage, called Krucial HR to complain about Jose, and said he was "unfit." Unfit? Krucial is unfit. Jose only wanted proper PPE, as promised, and he knew nothing of any PPE shortage.

215.    Krucial Staffing had lied to him – by omission at least – and he did not want to infect his family. As it happens, he has a vacation home in the Philippines and asked to be flown there. Tickets at the time were in the low hundreds.

216.    He probably needed care as he demobilized, but Krucial provided him an Uber to the airport. Jose had no symptoms, but he had been exposed. He did not want to infect his family and when he returned to Florida, he booked a hotel to quarantine. Krucial was supposed to get him tested before sending him home, but they did this for very few.

217.    He called and asked again that Krucial pay for his quarantine and testing. Krucial refused.

218.    Now in a hotel in Boca Raton, he was tested, waited three days, then learned the result was inconclusive. He had to wait another week to be retested and remain in quarantine on his dime. Finally, he tested negative.

219.    Brandon Burr received a text message from Krucial on March 25, 2020, inquiring if he would be a medical provider for the NYC COVID-19 frontline. Brian has a pleasant military demeanor, is a Board-Certified Psychiatric Mental Health Nurse Practitioner and is an NP.

220.    He has a family practice, a graduate degree from Old Dominion University, and is a doctoral candidate in Behavioral Therapy. Brian has worked as a nurse for four years and specializes in mostly mental health needs. He left this practice for this time, wanting to help on the front line. He also has extensive experience procuring medical supplies.

221.    He drove his car from Virginia to New York City the day after the invitation.

222.    He learned some basics on March 27, and Krucial staff told the newly arrived nurses that it would assign them to different locations. His assignment was Elmhurst Hospital as the emergency room team lead; by then many nurses had quit because of the lack of PPE or had been fired. He noticed was a condescending attitude that Elmhurst Hospital staff had towards the Krucial workers. Initially, Brandon helped source IV bags and food & drinks for patients. On his first weekend, a reporter contacted him about the situation at Elmhurst. Brian did a video interview with WABC. As a result, the hospital staff at Elmhurst told him he was no longer welcome there.

223.    Burr returned to the Hotel and told his story. CEO Cleary (at the time) liked Burr's military, get-things-done demeanor. He knew he could use Burr and asked him to join the administrative team in sourcing PPE, as there was none available for staff.

224.    Burr spent the next five to ten days, every day, on the phone with different vendors and with family and friends connecting with people that could send PPE, food, uniforms, shoes, and foot scanners to the Hotel.

225.    So the staff would have clean clothes, Burr organized a laundry service to come pick up dirty nursing outfits. Burr prearranged for a delivery service to send food.  Several administrators

(on-site) asked if Burr would use his car to grocery shop at Costco to pick up vitamins for Krucial staff. He did that and submitted receipts, but Krucial only reimbursed him for a fraction of the amount he spent. It was too modest a stiff to complain about, but an omen for what was to come.

226.    Someone asked if Brandon would drive nurses to other locations in hospitals that had slept in or missed their busses. Brian complied. He continued to find sources for necessary things such as algorithms for ventilators, appropriate ways for staff members to have forms available so that they could treat patients and have the protective equipment all needed and that he supplied.

227.    Brian Cleary said Brandon was a vital part of the team. Cleary even sent him a bonus of $1,500 for his ingenuity. He was able to get pathogen foot scanners, PPE, uniforms, scrubs, meals, eye protection for staff. Burr handed out everything like a Santa Claus. He had procured the material and the donating vendors expected him to dole out the equipment as he deemed fit.

228.    Brian's friend, Rebecca, offered to send 65 N95 masks. Then Brian Cleary changed his attitude. Although there were Krucial staffers at Elmhurst, Clear refused to allow him to donate these masks to Elmhurst.

229.    Because the mail came in through the mailroom at the New Yorker, some PPE went missing. Cleary then told him that he would book him a room in the Hotel that Burr could "lock supplies," as he put it, so they wouldn't go missing. That is where Burr stashed most of the donations – uniforms for those who lost their luggage, coolers (there were no refrigerators in the rooms), coffee machines and microwaves so staff could eat between shifts. He was working 20 hours a day.

230.    Burr continued to do scutwork like delivering pizzas to the staff at RIMC as there are few eateries on Roosevelt Island. He purchased the pizzas with his credit card, without reimbursement. Rebecca Love, a person Burr knew who had procured the medical supplies, called and said she

had an additional 1,500 N95 masks that she would like to send to him from Johnson & Johnson. But she needed an answer by 4 PM; a plane was leaving, and she needed to know where they were going.

231.    Rebecca had them rerouted from Sloan-Kettering to Krucial because of Krucial's needs.

232.    This was the last straw for Cleary. Burr was protecting Krucial staff, but this didn't look good because Krucial couldn't supply PPE and part of Leader Cleary's mode was to have nurses expect no protection. Safety was not part of Krucial's business model.

233.    Burr was able to procure N95s when Brian Cleary could not. Burr was drawing too much attention to the effort of saving lives rather than death triage *sans* a modicum of protection. Cleary said that Burr was making him look bad and fired him. Burr apologized to Cleary for making him look bad – even though Cleary makes Cleary look bad. But he sought out safety for the staff, which he thought paramount, *and which is what he was hired as administrator to do!* But to Cleary, it was all about Cleary. He didn't want the nurses to have PPE; he wanted them "to get in there."

234.    Brandon asked Emmanuel Badillo at the Hotel to help him collect four foot scanners – something Burr had procured through donations. These scanners cost $10,000 apiece and eliminate the bacteria and viruses the workers would have on their shoes. Each scanner had a place the donors wanted them to go if not to Krucial. Brian was afraid that Krucial would resell them to a different location. These were in his charge; he was responsible for taking them and maintaining them with proper bulbs – Krucial wouldn't know how to do that.

235.    Krucial stole the scanners.  Burr didn't know that at first, but he called the NYPD, which arrived on the scene. The officers and the manager checked the security cameras, and they found the footage of Krucial staff members pushing the equipment into an unused banquet kitchen. Then they went to that kitchen and retrieved the scanners.

236.    Brian Cleary – foiled again – immediately instructed the New Yorker to terminate Brandon's room. The owner told him that if Burr didn't leave the Hotel by 5 PM, he would be charged the regular rate for the night and had to pay out-of-pocket. Burr had elsewhere to stay, so he went to his room and packed his belongings.

237.    When he returned from his room, the police were gone. Krucial misappropriated the scanners and even had the nerve to post a video about them on Facebook! It was pure theft.

238.    Burr spoke to all the donors to let them know that he would soon be working at another site and not to send more equipment to Krucial.

239.    If Burr had embarrassed Brian Cleary with his extensive efforts, he would transfer them to a new deployment. He left the information with Barry, the hotel manager.

240.    However, Burr had ordered 300 pairs of donated Crocs that had arrived on April 3. Burr instructed the manager at the New Yorker to distribute them to staff. Manager Manny asked him to have a letter signed by Brian allowing him to do this.

241.    Crocs: Nurses use these soft, rubber sandals because they are always on their feet. But here is where Brian Cleary's ego betrayed him. He was offered 300 Crocs for his staff but refused to sign the letter to accept them. Some N95 masks then arrived, and since Cleary refused to protect his nurses, Burr had them distributed between the Javits Center, Elmhurst and Woodhull Hospitals.

242.    When Cleary learned that Burr had foiled him yet again, he decided to blast an email to Krucial staffers to everyone on several outlets that Brian Burr was a "scammer" and to report to him to the police if seen on site. This was purely defamatory and retaliation for providing patient and nursing care. Plus, Cleary had no power to ban Burr from The New Yorker Hotel. He just wanted to assert his dictatorial power.

243.     Latricia Hickenbottom also deployed to New York as a nurse practitioner. Before arriving

north, there were no specifications as to what type of degree or specialty Krucial wanted. She saw

the company was accepting everyone, including newly graduated nurse practitioners.

244.     As the others, as part of the routine, she was asked her specialty.

245.     She came to New York and went, as requested, to Harlem Hospital. The workers there took

her and a group of NP's on a tour, and afterward doled out assignments.

246.     There was no orientation. Latricia shadowed a physician for about three hours. He mostly

sat at a desk during this time, writing. She also followed the doctor into the ICU and ER.

247.     After that, someone at Bellevue told her to perform as a hospitalist. A "hospitalist" is doctor

who works in a hospital. A Nurse Practitioner can perform the role of a hospitalist to an extent,

but not if it is out of her scope of practice or training.

248.     She had explained to Krucial (specifically Donnie and her team leader Calada) that she was

not a hospitalist; she had no experience in acute care. Her degree was in primary care, and to work

in an acute-care setting, whether it be a hospital, or an urgent-care facility is contrary to the ethics

of her profession. And again, she would have been practicing outside the scope of her competence.

249.     The team leaders offered that she work as an RN or staff nurse. But she saw that many such

nurses without critical care training were working with ten patients at a time, all on ventilators.

Death triage without PPE – she couldn't perform that job. She refused to be a warm body to attend

to the dying, but in her frontal lobe, she was thinking about her license and training.

250.     Latricia is not critical-care trained, let alone to work with ten patients. True, this was an

emergency, but she was not competent to do what Krucial insisted and could have risked her

license or committed gross negligence.

251.    When she returned to the Hotel, she went to the Ballroom where the Krucial staff convened; she alerted them of the situation at Harlem Hospital. Staff said they would discuss the situation further.

252.    The same night, a Hospital Chief Resident sent out assignments via text. Latricia was to work the next day in a COVID overflow intensive care unit.

253.    The text included language that employees could not question assignments and also must be "flexible" – if those are not contradictions in terms.

254.    Staff finally told her there were only hospital assignments, and she would have to take one or demobilize.

255.    Latricia chose to return home because Harlem was unsafe for patients, and there was the potential of having a mark on her license (or reputation) for working outside the scope of her practice.

256.    Krucial didn't even try to find her something where she could work with competence, although she heard that one Caucasian woman secured the rare, plum assignment at a swabbing site. The Black nurses were surely treated less favorably. For example, Jasen is a go-getter just like Burr. Yet Burr was given an opportunity even after he was banished from Elmhurst.

257.    Latricia would have done anything legal that she was competent to do. There had to be something. But she stood firm: she was not willing to anything illegal, or contrary to the standard of care that her Nursing Board could consider gross negligence.

258.    It wasn't much to ask – or to refuse.

FIRST CAUSE OF ACTION
BREACH OF CONTRACT

259.    Plaintiffs repeat and reallege all previous paragraphs.

260.    Plaintiffs entered into an employment contract, which was expected to last for less than one year.

261.    Plaintiffs followed the terms of that contract.

262.    Defendants breached that contract.

263.    As a result of the foregoing, two plaintiffs left jobs paying (a) to make more money than; (b) help with the COVID crisis, and (c) enhance their experience.

264.    As a result of the breach, plaintiffs have each been damaged, individually, in amounts over $75,000.

## SECOND CAUSE OF ACTION
## QUASI CONTRACT – RELIANCE ON A PROMISE

265.    Plaintiffs repeat and reallege all previous paragraphs.

266.    In the contingency that a classic breach-of-contract claim is insufficient to cover their damages, and is otherwise not duplicative with this claim, plaintiffs relied on the promises offered by Krucial.

267.    Krucial did not live up to its promises, the proximate cause of plaintiffs accepting the assignments.

268.    As a result of the preceding, plaintiffs have been damaged.

## THIRD CAUSE OF ACTION
## NEW YORK LABOR LAW § 741

269.    Plaintiffs repeat and reallege all previous paragraphs.

270.    Krucial took retaliatory action against each Plaintiff because they (a) disclosed to a supervisor a policy or practice of the employer that the Plaintiff (s), in good faith, believed the assignments constituted improper quality of patient care; or (b) objected or refused to participate in such activity.

46

271.    Each Plaintiff brought the improper quality of patient care to the attention of a supervisor and afforded the employer a reasonable opportunity to correct such activity, policy, or practice.

281. As a result of the preceding, Plaintiffs have been damaged and are entitled to reasonable attorneys' fees.

FOURTH CAUSE OF ACTION
BREACH OF CONTRACT IMPLIED-IN-LAW

282.    Plaintiffs repeat and reallege all previous paragraphs.

283.    Plaintiffs were fired – or forced to resign – based on a contract implied in law under the doctrine established in *Wieder v. Skala,* 80 N.Y.2d 628 (1992).

284.    Each Plaintiff is required, as a condition of nursing licensure, must follow the rules of the State in which they work.

285.    Each Plaintiff is subject to discipline if he or she violates any code – at a minimum – of the code of conduct of the State of Alabama (or others).

286.    For example, the Alabama Board of Nursing Administrative Code, Chapter 610-X-8 (Disciplinary Action) states that failure to exercise the applicable standard of care is grounds for discipline, at a maximum loss of licensure. All states' nursing codes – including Tennessee's, as Aimée would learn, have similar provisions.

287.    The Codes of all states also impose reciprocal discipline for those who violate similar provisions in other states. Eaton, with the most certifications, could have been disciplined by approximately four state Nursing Boards had he taken these assignments.

288.    At least one Plaintiff mentioned the disciplinary code to officials at Krucial, and the other two pointed out that Krucial asked them to violate the standard of care.

289.    Although traditional malpractice-liability rules were relaxed during the emergency, in addition to the chance they could commit gross negligence, Krucial had no authority to allow its recruits to violate their State's licensing board's standards of care.

290.    Plaintiffs were unwilling to violate these standards of care.

291.    Plaintiffs were terminated or required to resign because they refused to violate the standards of care of their home state.

292.    As a result of the preceding, plaintiffs have been damaged.

FIFTH CAUSE OF ACTION
FRAUD

293.    Plaintiffs repeat and reallege all previous paragraphs.

294.    Defendants made representations as to material facts, including that (a) plaintiffs would work in their field of expertise; (b) that plaintiffs would get proper PPE; (c) that there were jobs available that they could perform even if not precisely within their field of expertise.

295.    Krucial intentionally omitted that PPE was in short supply.

296.    It misrepresented that the PPE rules would change and misrepresented the scope of individual Model Acts (and Governor Cuomo's Executive Order).

297.    Its representations were false and materially omitted essential information.

298.    Defendants intended to deceive plaintiffs. In sending out the mass text, they intended solely to bring in as many bodies as they could, without regard to these workers' area of competence, or their lives.

299.    Plaintiffs believed and justifiably relied upon the statements

300.    While not essential, but complimentary to this cause of action, Krucial knew it could not provide proper PPE. As of March 3, the World Health Organization notified the health care community of this inopportune confluence of events. *See* https://www.who.int/news-

room/detail/03-03-2020-shortage-of-personal-protective-equipment-endangering-health-workers-worldwide.

301.    Unless Krucial admits to complete incompetence in not knowing this, the text blasts it sent out *after* March 3 that nurses would get PPE were purely false. Indeed, the shortage was caused in part by the Australian wildfires occurring in January 2020.

302.    Plaintiffs were induced by the promises to come to New York for high pay for at least several weeks.

303.    As a result of such reliance, plaintiffs sustained financial loss.

304.    There are additional damages beyond which may be compensated by the breach of contract causes of action, including but not limited to:

    (a)  the emotional toll the debacle took on each Plaintiff, to varying degrees;

    (b)  the loss that they could have the experience of helping in the prime U.S. COVID hotspot competently;

    (c)  the scurrilous defamation invited upon Jalen and Brandon in a mass email to scare other employees;  the exposure to COVID without proper PPE;

    (d)  the failure to test the nurses as they left the assignment;

    (e)  the failure of Krucial to follow its own worker's compensation guidelines, which provided for testing, but was refused by two plaintiffs;

305.    Additionally, insofar as defendants' actions violate public policy, punitive damages should be assessed, which are not available under traditional contract law.

SIXTH CAUSE OF ACTION
CONVERSION
(Brandon Burr)

306.    Plaintiffs repeat and reallege all previous paragraphs.

307.    Brian Burr was deprived of four scanners, which were in his control, each costing $10,000.

306.    Krucial under the direction of Brian Cleary stole those scanners.

307.    The defendants refuse to tender back the scanners to Burr, and they are likely now damaged.

308.    As a result of the preceding, Brian Burr has been damaged.

SEVENTH CAUSE OF ACTION
DEFAMATION
(Brandon Burr and Jasen Eaton)

309.    Plaintiffs repeat and reallege all previous paragraphs.

310.    Brian Burr was fired from the job because he was doing things for the staffers that Cleary could not do for Krucial Staffers.

311.    Brian Cleary then sent out a blast email referring to Brian as a "scammer."

312.    This was defamation per se.

313.    The word scammer is incapable of anything other than defamatory meaning.

314.    The word and its context harmed Burr as a result.

315.    Jalen Eaton was similarly excoriated in a blast email for refusing to do his job as ordered, which was capable of defamatory meaning and defamation per se. Cleary omitted the fact that he objected to working outside of his training.

316.    As a result of the preceding, Brian Burr and Jasen Eaton have been damaged.

COUNT EIGHT
INTENTIONAL TORT CAUSING MENTAL AND PHYSICAL
PAIN AND SUFFERING
(Branch, Torres and Pinlac)

317.    Plaintiffs repeat and reallege all previous paragraphs as if set forth herein.

318.    Defendants acted in bad faith and lied, and Plaintiff, relying on the misrepresentation (or material omission), was harmed by the bad faith and lie.

319.    The misrepresentations included but were not limited to (a) not providing PPE; (b) knowingly putting these plaintiffs that there was PPE when Krucial knew there was not.

320.    As a result of the foregoing, two of these three plaintiffs – upon information and belief – caught COVID; Branch did with certainty and suffered the emotional distress of having infected her daughter.

321.    Defendants were required in their contract with the City to have Worker's Compensation coverage, but its two policies fail.

322.    The first policy applies only to workers in about four states where no plaintiff lives.

323.    The second policy states that the "employment must be necessary or incidental to your work in a state or territory listed in Item 3.A. of the Information Page."

324.    Defendants have omitted providing the Information Page in accordance with Initial Disclosures. Defendants knew this insofar as one of the defenses in the original answer refer to "FEMA Worker's Compensation." No such policy was provided to plaintiffs and the City required Krucial to have its own policy.

325.    Even if the policy covered every single state in the country, New York takes away the Worker's Compensation bar where intentional acts cause workers physical or mental injury.

326.    An intentional injury by the employer – or its employee – is an exception to the NY Worker's Compensation Law bar. Where an injury is sustained to an employee due to an intentional tort perpetrated by the employer or at the employer's direction, the Workmen's Compensation Law is not a bar to a common-law action for damages.

327.    To recover for his injuries under the intentional tort exception, the employee must establish that the employer that the acts of the employer constituting an intentional tort were deliberate.

51

328.   Krucial's intentional acts were extreme and the facts demonstrate that evil acts in derogation of the plaintiffs who contracted COVID were spun into action by Krucial.

NINTH CAUSE OF ACTION
WAGE THEFT
NEW YORK LABOR LAW § 201 et seq.
(Burr, Torres, Pinlac and Branch)

329.   Plaintiffs repeat and reallege all previous paragraphs.

330.   The contract between Krucial and each Plaintiff required two weeks of quarantine pay. Termination was irrelevant (and as a matter of public policy should be).

331.   Pinlac and Torres were refused quarantine pay.

332.   Burr and Branch were cheated of some $10,000 of quarantine pay.

333.   As a result of the foregoing, plaintiffs have been damaged.

334.   Defendant Krucial must pay liquidated damages for willful wage theft as well as attorneys' fees.

WHEREFORE, Plaintiffs demands the following relief:

a.   Compensatory Damages in excess of the jurisdictional limit of this court;

b.   Punitive Damages for such causes of action that allow for its imposition;

c.   Attorneys' fees and costs under New York Labor Law § 741 and § 2012 et seq.;

d.   Liquidated damages;

   e.   Such other relief as the Court may deem appropriate.

Dated:      New York, New York
             October 9, 2020


*Greg S. Antollino*
_____
Gregory Antollino, Esq.
275 Seventh Avenue, Seventh Floor
New York, New York 10001
(212) 334-7397
gantollino@gmail.com